**No. 23-1179**

# In the
# United States Court of Appeals
# for the Sixth Circuit

◆

OAKLAND TACTICAL SUPPLY, LLC, et al.*,*

*Plaintiffs–Appellants*,

v.

HOWELL TOWNSHIP, MI,

*Defendant–Appellee*.

◆

Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 18-cv-13443

◆

### APPELLANTS' OPENING BRIEF

◆

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665

MARTHA A. DEAN
LAW OFFICES OF MARTHA
A. DEAN, LLC
144 Reverknolls
Avon, CT 06001
(860) 676-0033

PETER A. PATTERSON
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ppatterson@cooperkirk.com
*Counsel of Record*

ROGER L. MYERS
MYERS & MYERS, PLLC
915 N. Michigan Ave., Ste. 200
Howell, MI 48843
(517) 540-1700

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1179 _____        Case Name: Oakland Tactical Supply, LLC, et al v. Howell Township, MI

Name of counsel:  Peter A. Patterson _____

Pursuant to 6th Cir. R. 26.1, Oakland Tactical Supply, LLC _____
                              *Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ April 24, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Peter A. Patterson _____

_____

_____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS.............................................................................. ii

TABLE OF CITED AUTHORITIES ........................................................... iv

STATEMENT REQUESTING ORAL ARGUMENT ......................................... 1

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 3

ISSUE PRESENTED................................................................................. 4

STATEMENT OF THE CASE ..................................................................... 5

    I.   Howell Township severely restricts shooting ranges, including effectively banning outdoor and rifle-distance shooting ranges.................. 5

    II.  Because Howell Township effectively bans outdoor ranges, Training Plaintiffs cannot train at such ranges in the Township. ............................... 7

    III.  Procedural History.......................................................................... 9

        A.    The district court's first opinion.......................................................10

        B.    This Court vacates the district court's first opinion.............................11

        C.    The district court's second opinion. ................................................11

SUMMARY OF THE ARGUMENT ...............................................................12

STANDARD OF REVIEW ........................................................................14

ARGUMENT .........................................................................................15

    I.   Training with common firearms is covered by the Second Amendment's plain text...............................................................................15

        A.    Under *Bruen*, the initial consideration is whether the plain text covers training with common arms. ...................................................15

        B.    The plain text of the Second Amendment protects training with arms that are protected by the Second Amendment............................19

    II.  The Township failed to provide historical evidence and thus cannot satisfy its burden of proving a tradition of firearm regulation. ...................29

    III.  History reveals a celebrated tradition of training........................................31

        A.    England long depended on training for domestic order and national defense. ........................................................................................31

        B.    Training was essential to survival in colonial America. ......................35

C.    Americans learned how valuable lifelong firearms practice was during the Revolutionary War and kept this lesson in mind when forming their new government...........................................................37

D.    Post-ratification interpretations of the Second Amendment confirm that firearms training was viewed as integral to the right to keep and bear arms. .................................................................45

IV.  Traditionally, training was encouraged rather than restricted....................50

A.    Most colonial- and founding-era training regulations promoted, rather than restricted, training. ..........................................................50

B.    Location-based restrictions primarily applied to crowded public locations and do not justify the Township's ban on safe training on private property. .................................................................51

V.   The Township's training ban is unconstitutional under *Bruen*. .................54

CONCLUSION ....................................................................55

CERTIFICATE OF COMPLIANCE ...................................................57

CERTIFICATE OF SERVICE.......................................................58

# TABLE OF CITED AUTHORITIES

## Cases

*Andrews v. State*,
    50 Tenn. 165 (1871) ....................................................... 20

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ........................................................ 21

*Briggs v. Ohio Elections Comm'n*,
    61 F.3d 487 (6th Cir. 1995) ............................................... 14

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................... *passim*

*Doe v. Miami Univ.*,
    882 F.3d 579 (6th Cir. 2018) ............................................. 14

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ..................................... 20, 22, 54

*Espinoza v. Montana Department of Revenue*,
    140 S. Ct. 2246 (2020) ..................................................... 46

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ........................................ 20, 22

*Gamble v. United States*,
    139 S. Ct. 1960 (2019) ..................................................... 46

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ....................... 46

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ................................... 22

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ............................................. 22

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ................. 14

*Luis v. United States*,
578 U.S. 5 (2016)..................................................................1, 19, 21

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................................................................14

*McConnell v. Federal Election Comm'n*,
540 U.S. 93 (2003)......................................................................21

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)................................................................15, 45

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022)...........................................................*passim*

*Oakland Tactical Supply, LLC v. Howell Twp., Michigan*,
No. 21-1244, 2022 WL 3137711 (6th Cir. 2022)....................4, 11, 17

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980)....................................................................21

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....................................................................21

*Stanley v. Georgia*,
394 U.S. 557 (1969)....................................................................21

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017)........................................................22

*United States* v. *Sineneng-Smith*,
140 S. Ct. 1575 (2020)................................................................31

*Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*,
623 F.3d 281 (6th Cir. 2010)........................................................14

*White v. United States*,
601 F.3d 545 (6th Cir. 2010)........................................................14

**Constitutional Provisions**

U.S. Const. amend. I..................................................................21, 22

U.S. CONST. amend. II ...............................................................*passim*

U.S. CONST. amend. XIV ..................................................................15

**Statutes and Regulations**

12 Ric. II ch. 6 (1388)...............................................................21, 32

17 Edw. IV ch. 3 (1477)..................................................................32

28 U.S.C. § 1291............................................................................ 4

28 U.S.C. § 1331............................................................................ 3

28 U.S.C. § 1343............................................................................ 3

28 U.S.C. § 2201............................................................................ 3

28 U.S.C. § 2202............................................................................ 3

3 Hen. VIII ch. 3 (1511)..................................................................32

33 Hen. VIII ch. 6 (1541)................................................................33

33 Hen. VIII ch. 9 (1541)................................................................32

42 U.S.C. § 1983............................................................................ 3

42 U.S.C. § 1988............................................................................ 3

6 Hen. VIII ch. 2 (1514)..................................................................32

E.D. Mich. LR 59.1......................................................................... 4

E.D. Mich. LR 7.1(h)(3) ................................................................. 4

Fed. R. Civ. P. 59(e) ...................................................................... 4

**Other Authorities**

A SERMON PREACHED TO THE ANCIENT AND HONORABLE ARTILLERY-
    COMPANY, IN BOSTON, NEW ENGLAND, JUNE 7TH, 1773 (1773).........................38

vi

Abbott, Benjamin Vaughan, JUDGE AND JURY : A POPULAR EXPLANATION OF LEADING TOPICS IN THE LAW OF THE LAND (1880) ..................................20, 49

ADAMS FAMILY CORRESPONDENCE: DECEMBER 1761-MAY 1776, vol. 1 (Lyman H. Butterfield ed., 1963) ........................................................42

Adams, John, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA, vol. 3 (1788) .........................................25

AMERICAN ARCHIVES, vol. 3 (4th Ser., Peter Force ed., 1846) .......................39, 40

Beverley, Robert, THE HISTORY AND PRESENT STATE OF VIRGINIA (J.W. Randolph ed., 1855) ...........................................................35

BOSTON GAZETTE, Dec. 5, 1774 ...........................................................38

Brown, M.L., FIREARMS IN COLONIAL AMERICA (1980) ...................................33, 37

Coke, Edward, THE SECOND PART OF THE INSTITUTES OF THE LAWES OF ENGLAND (1642) ...................................................................32

Cooley, Thomas M., A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION (1868) ............................................................20, 48

Cooley, Thomas M., THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880) ...........................................48

Cunningham, Timothy, A NEW AND COMPLETE LAW DICTIONARY (1771) ...........21

DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS, vol. 3 (Lyman H. Butterfield ed., 1961) ..........................................................................36

Diary of John Harrower, 1773-1776, *in* THE AMERICAN HISTORICAL REVIEW, vol. 6 (1900)..........................................................................40

DIARY OF THE AMERICAN REVOLUTION: FROM NEWSPAPERS AND ORIGINAL DOCUMENTS, vol. 1 (Frank Moore ed., 1863) ......................................40

Dillin, John G.W., THE KENTUCKY RIFLE (Palladium Press 1998) (1924)........40, 43

DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS: DEBATES IN THE HOUSE OF REPRESENTATIVES: THIRD SESSION, DECEMBER 1790 - MARCH 1791, vol. 14 (1996)..........................................................................47

Doddridge, Joseph, NOTES ON THE SETTLEMENT AND INDIAN WARS OF THE
        WESTERN PARTS OF VIRGINIA AND PENNSYLVANIA FROM 1763 TO 1783
        (John S. Ritenour & Wm. T. Lindsey eds., 1912)................................35

Draper, Lyman Copeland, THE LIFE OF DANIEL BOONE (Ted Franklin Belue
        ed., 1998) ...........................................................................................43

FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER
        ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR
        HERETOFORE FORMING THE UNITED STATES OF AMERICA, vol. 5 (Francis
        Newton Thorpe ed., 1909)..................................................................25

FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER
        ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR
        HERETOFORE FORMING THE UNITED STATES OF AMERICA, vol. 6 (Francis
        Newton Thorpe ed., 1909)..................................................................25

FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER
        ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR
        HERETOFORE FORMING THE UNITED STATES OF AMERICA, vol. 7 (Francis
        Newton Thorpe ed., 1909)..................................................................24

Fortescue, John, DE LAUDIBUS LEGUM ANGLIÆ (John Selden ed., 2d ed. 1741)....34

Frothingham, Richard, HISTORY OF THE SIEGE OF BOSTON, AND OF THE BATTLES
        OF LEXINGTON, CONCORD, AND BUNKER HILL (4th ed. 1873) ...........................41

Greenlee, Joseph G.S., *The Right to Train: A Pillar of the Second
        Amendment*, 31 WM. & MARY BILL RTS. J. 93 (2022) ....................31, 32, 37, 41

Gunn, Steven, *Archery Practice in Early Tudor England*, 209 PAST &
        PRESENT 53 (2010)...........................................................................33

Hanger, George, COLONEL GEORGE HANGER'S ADVICE TO ALL SPORTSMEN,
        FARMERS AND GAMEKEEPERS (1814)...............................................................44

Highmore, Anthony, THE HISTORY OF THE HONORABLE ARTILLERY
        COMPANY OF THE CITY OF LONDON (1804)....................................................33, 35

HISTORY OF BUCKS COUNTY, PENNSYLVANIA (J.H. Battle ed., 1887) ...................43

Holinshed, Raphael, CHRONICLES OF ENGLAND, SCOTLAND, AND IRELAND,
        vol. 2 (1588).....................................................................................33

Jefferson, Thomas, WRITINGS (Merrill D. Peterson ed., 1984) .......................36, 42

JEFFERSON'S MEMORANDUM BOOKS, ACCOUNTS, WITH LEGAL RECORDS AND
   MISCELLANY, 1767-1826, vol. 1 (2d series, James A. Bear, Jr. & Lucia C.
   Stanton eds., 1997).............................................................................................36

Johnson, Nicholas et al., FIREARMS LAW AND THE SECOND AMENDMENT:
   REGULATION, RIGHTS AND POLICY (3d ed. 2021).................................................36

JOURNAL OF THE SECOND SESSION OF THE SENATE, vol. 1 (1820) .........................47

JOURNALS OF THE AMERICAN CONGRESS FROM 1774-1788, vol. 1 (1823)..............41

Keith, William, A SHORT DISCOURSE, ON THE PRESENT STATE OF THE COLONIES
   IN AMERICA, WITH RESPECT TO GREAT BRITAIN (1728)......................................27

Ketchum, Richard M., SARATOGA: TURNING POINT OF AMERICA'S
   REVOLUTIONARY WAR (1997) ...........................................................................44

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of
   Young Adults*, 43 S. ILL. U. L.J. 495 (2019) ......................................................51

Lambard, William, EIRENARCHA OR OF THE OFFICE OF THE JUSTICES OF PEACE,
   IN TWO BOOKES (1581) .....................................................................................32

Letter from Benjamin Franklin to Jonathan Shipley, July 7, 1775, *in* LETTERS
   OF DELEGATES TO CONGRESS, 1774-1789, vol. 1 (Paul H. Smith ed., 1976) ......39

Letter from James Madison to William Bradford, June 19, 1775, *in* THE PAPERS
   OF JAMES MADISON, vol. 1 (William T. Hutchinson et al. eds., 1962)................40

Letter from John Hancock to Joseph Warren, June 18, 1775, *in* LETTERS OF
   MEMBERS OF THE CONTINENTAL CONGRESS, vol. 1 (Edmund C. Burnett ed.,
   1921)..................................................................................................................42

Letter from Richard Henry Lee to General Washington August 1, 1775, *in*
   AMERICAN ARCHIVES, vol. 3 (4th Ser., Peter Force ed., 1846)...........................40

Letter from Samuel Nasson to George Thatcher, July 9, 1789, *in* THE
   COMPLETE BILL OF RIGHTS (Neil H. Cogan ed., 2d. ed. 2015)...........................28

ix

Letter from Thomas Jefferson to John Payne Todd, Aug. 15, 1816, *in* THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES, vol. 10 (J. Jefferson Looney ed., 2013) ..............................................................................37

LETTERS OF DELEGATES TO CONGRESS, 1774-1789, vol. 1 (Paul H. Smith ed., 1976)..............................................................................................40

Malcolm, Joyce Lee, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994)..............................................................32

Nedham, Marchamont, THE RIGHT CONSTITUTION OF A COMMONWEALTH (1656) ..............................................................................................25

NEW-HAMPSHIRE GAZETTE, Jan. 27, 1775..........................................................38

Pomeroy, John Norton, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES (1868)..............................................................49

Porter, Rufus L., *Porter's Fort*, COLO. SPRINGS GAZETTE TEL., Jan. 2, 1973 ........43

Quincy, Jr., Josiah, *Observations on the Act of Parliament Commonly Called the Boston Port-Bill: with Thoughts on Civil Society and Standing Armies* (1774), *in* MEMOIR OF THE LIFE OF JOSIAH QUINCY, JUNIOR, OF MASSACHUSETTS: 1774-1775 (2d ed. 1874)......................................................38

Ramsay, David, THE HISTORY OF THE AMERICAN REVOLUTION, vol. 1 (1789).......42

Rawle, William, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (1825)..............................................................................48

RECORDS OF MASSACHUSETTS, 1628-1641, vol. 1 (Nathaniel B. Shurtleff ed., 1853)..............................................................................................50

Rose, Alexander, AMERICAN RIFLE: A BIOGRAPHY (2008)....................................35

Rowland, Kate Mason, THE LIFE OF GEORGE MASON (1892) ...............................27

Sawyer, Charles Winthrop, FIREARMS IN AMERICAN HISTORY, vol. 1 (1910) ..............................................................................................41, 43

Schwoerer, Lois G., GUN CULTURE IN EARLY MODERN ENGLAND (2016) .............34

Sharp, Granville, TRACTS, CONCERNING THE ANCIENT AND ONLY TRUE MEANS OF NATIONAL DEFENCE, BY A FREE MILITIA (3d ed. 1782)...............32, 34

Smith, Mark W., *"Not all History is Created Equal": In the Post-*Bruen
*World, the Critical Period for Historical Analogues is when the Second
Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022) ........................45

*Tales from the 1769 Vansant/Craven Burying Ground*, THE CRAVEN HALL
NEWSLETTER (Craven Hall Historical Society, Warminster, Pa.), Mar. 2021 ....43

*Text of a Federalist Speech Not Delivered in the Maryland Convention*, MD.
JOURNAL, July 25, 29 & August 1, 5, 8, 1788.....................................................26

THE AMERICAN MUSEUM: OR REPOSITORY OF ANCIENT AND MODERN FUGITIVE
PIECES, &C. PROSE AND POETICAL, vol. 6 (Mathew Carey ed., 1789) ...............27

THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF
MASSACHUSETTS BAY (1814) .............................................................................50

THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW
PLYMOUTH (1836) .............................................................................................50

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION,
vol. 10 (John P. Kaminski et al. eds., 1993) .....................................................27

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION,
vol. 12 (John P. Kaminski et al. eds., 2015) .....................................................26

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION,
vol. 37 (John P. Kaminski et al. eds., 2020) .....................................................28

THE FEDERALIST NO. 29 (Alexander Hamilton)....................................................26

THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, vol. 5
(James T. Mitchell & Henry Flanders eds., 1898) ............................................51

THE WRITINGS OF GEORGE WASHINGTON, FROM THE ORIGINAL MANUSCRIPTS
1745-1799, vol. 7 (John C. Fitzpatrick ed., 1932).............................................42

*To the People of America*, Feb. 3, 1775, *in* MEMOIRS OF THE LIFE OF THE LATE
CHARLES LEE, ESQ., (1792) ...............................................................................39

Tyler, Moses Coit, THE LITERARY HISTORY OF THE AMERICAN REVOLUTION,
1763-1776 (1898)...............................................................................................39

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)........49

Wilbur, James Benjamin, IRA ALLEN: FOUNDER OF VERMONT, 1751-1814
     (1928) ...........................................................................................................37

Williamson, Harold F., WINCHESTER: THE GUN THAT WON THE WEST (1952) ......38

Ziskind, Martha A., *John Selden: Criticism and Affirmation of the Common
     Law Tradition*, 19 AM. J. LEGAL HIST. 22 (1975) ...............................................34

## STATEMENT REQUESTING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), Plaintiffs-Appellants respectfully request oral argument. This case presents significant issues involving the fundamental constitutional right to keep and bear arms, and it involves an issue of first impression in this Circuit regarding the application of *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) to the right to train with firearms. Given the nature of the issues presented, oral argument will facilitate the decision-making process.

## INTRODUCTION

The Second Amendment protects a fundamental, individual right to possess and carry common firearms for lawful purposes. The right to train with common firearms is included within the scope of this right by necessary implication. That is because "constitutional rights necessarily protect the prerequisites for their exercise." *Luis v. United States*, 578 U.S. 5, 25 (2016) (Thomas, J., concurring in judgment). One of the prerequisites for effective exercise of Second Amendment rights is training with firearms. Therefore, the "right to keep and bear arms … implies a corresponding right … to acquire and maintain proficiency in their use." *Id*. at 26 (quotation omitted). Because the Second Amendment protects training with common firearms, it follows that for any restrictions on training to be constitutional they must be shown by the government to be "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

Defendant Howell Township's restrictions on training fail this constitutional test. Plaintiff Oakland Tactical desires to operate on its property in the Township rifle, shotgun, and handgun ranges for the general public and a long-distance rifle range of up to 1,000 yards for qualified shooters. The Township, however, prohibits Oakland from doing so because the Township bars the operation of shooting ranges on Oakland's land and effectively bars the operation of outdoor ranges in the Township generally. There is no historical basis for the Township's restrictions. Indeed, the few restrictions that existed around the ratification of the Second Amendment sought to promote safety by restricting shooting in crowded urban environments. Those restrictions cannot possibly justify Howell Township's prohibition of Oakland's firing ranges. Oakland's land is in a rural area, and the type of shooting Oakland would like to facilitate is *freely allowed* on Oakland's land— just not when offered in the context of a commercial range. Howell Township thus perversely *prohibits* training in a safe, organized range environment while freely allowing *unorganized* shooting by individuals on their own land or while invitees on the land of others.

The district court improperly dismissed Plaintiffs' complaint. It did so after narrowly construing the relevant conduct to be the "construction and use of an outdoor, open-air, 1000-yard shooting range." Op. & Order Addressing Supp. Briefing & Grant'g Def.'s Mot. to Dismiss, R.E.No. 117, PageID#2629–30 (cleaned

up). It then concluded that this conduct is not covered by the Second Amendment's plain text because "the plain text of the Second Amendment says nothing about long-range firing or even, for that matter, training more broadly." *Id.* PageID#2633. The district court erred both factually and legally. Factually, Oakland has alleged a desire to offer training that includes but is not limited to a 1,000-yard shooting range. Legally, as a matter of plain text and necessary implication, training with common firearms—including training with those firearms in the manner Oakland seeks to offer, including at a 1,000-yard range—is covered by the Second Amendment. Because the district court was wrong to conclude otherwise, and because there is no valid historical justification for prohibiting the operation of Oakland's ranges, this Court should reverse the decision below and conclude that Howell Township is in violation of the Second Amendment.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States. Second Am. Compl. ¶ 17, R.E.No. 44, PageID#1091 ("SAC"). Relief is sought under 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983. *Id.*

The district court previously issued an opinion and order granting Howell Township's motion to dismiss on September 10, 2020. Op. & Order Grant'g Def.'s Mot. to Dismiss, R.E.No. 84, PageID#2091 ("Order Grant'g MTD"). On September

24, 2020, Plaintiffs timely moved to reconsider, alter, or amend the judgment under Fed. R. Civ. P. 59(e) and E.D. Mich. LR 59.1 and 7.1(h)(3). The court denied Plaintiffs' motion on February 9, 2021, R.E.No. 91, PageID#2190. Plaintiffs timely appealed on March 10, 2021. Not. of Appeal, R.E.No. 92.

On August 5, 2022, this Court vacated and remanded for the district court to consider the case under *Bruen*. *Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, No. 21-1244, 2022 WL 3137711 (6th Cir. 2022).

On February 17, 2023, the district court granted Howell Township's motion to dismiss. Op. & Order Addressing Supplemental Briefing and Grant'g Def.'s Mot. to Dismiss, R.E.No. 117, PageID#2625. Plaintiffs timely noticed the appeal on February 24, 2023. Not. of Appeal, R.E.No. 119. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because Plaintiffs are appealing a final judgment of the district court.

## ISSUE PRESENTED

1.     Whether Plaintiffs have pleaded a valid claim that Howell Township's restrictions on shooting ranges violate the Second Amendment, as incorporated against the Township by the Fourteenth Amendment.

4

## STATEMENT OF THE CASE

**I.  Howell Township severely restricts shooting ranges, including effectively banning outdoor and rifle-distance shooting ranges.**

Howell Township regulates approximately 20,000 acres of unincorporated land in Livingston County, Michigan, under the Howell Township Zoning Ordinance ("Ordinance"). SAC ¶ 37, R.E.No. 44, PageID#1095–96. This Ordinance specifies permitted uses in each enumerated zoning district and "prohibit[s] any use not specifically listed." *Id.* ¶ 34, R.E.No. 44, PageID#1095; *see* Ordinance art. III, §§ 3.06, 3.07, 3.10, R.E.No. 61-2, PageID#1361–62. Plaintiff-Appellant Oakland wants to use land in a former rock quarry, located in an Agricultural Residential District, to build an outdoor rifle range with distances up to 1,000 yards and to operate shotgun and handgun ranges. SAC ¶ 6, R.E.No. 44, PageID#1085–86. Howell Township does not allow the operation of a firing range on Oakland's land and at the time the operative complaint was filed did not permit outdoor ranges in any district, *see* Ordinance art. IV-XIII, R.E.No. 61-2, PageID#1367–1411, while it at all relevant times has allowed *unrestricted* shooting on private property as an accessory use throughout the Township, Def. Supp. Br., R.E.No. 97, PageID#2221. While the Township has amended its Ordinance since the outset of this litigation, all concede that Oakland still cannot operate on its land, and Plaintiffs believe the Ordinance continues effectively to operate as a de facto ban on outdoor ranges throughout the Township and in violation of the Second Amendment. We focus here

5

on the unamended Ordinance because the amendments at a minimum cannot extinguish Plaintiffs' damages claims. *See generally* Plaintiffs-Appellants' Supplemental Brief, *Oakland Tactical Supply, LLC v. Howell Township, MI*, No. 21-1244 (6th Cir. Nov. 22, 2001), ECF No. 37.

The Ordinance might appear to permit outdoor ranges—but each apparent opening vanishes under scrutiny. First, the Ordinance classifies "rifle ranges" as "open air business uses," SAC ¶ 35, R.E.No. 44, PageID#1095; Ordinance art. II, § 2.02, R.E.No. 61-2, PageID#1349—but it does "not allow Open Air Business Uses, either by right or as a special use, in any zone in Howell Township," SAC ¶ 36, R.E.No. 44, PageID#1095. Second, the Ordinance permits certain recreational facilities in Regional Service Commercial Districts and Heavy Commercial Districts—but no outdoor recreational facilities of any kind. *See* Ordinance art. X, § 10.02(B), R.E.No. 61-2, PageID#1395; id. art. XII, § 12.05, R.E.No. 61-2, PageID#1406. Third, the Ordinance permits "recreation and sports areas … completely enclosed with fences, walls, or berms," *id.* art. XI, § 11.03(b), R.E.No. 61-2, PageID#1399—but only "in the Highway Service Commercial District ("HSC District") consisting of 7 parcels with a total area of less than 30 acres," SAC ¶ 38, R.E.No. 44, PageID#1096, and only if, in the Township's judgment, such a use does not "interfere with or interrupt the pattern of development of" enumerated, highway-service-focused uses, Ordinance art. XI, § 11.03, R.E.No. 61-2, PageID#1399

6

(conditioning use for recreation and sports areas on such noninterference and on requirements of Article XVI, "Special Uses"); *id.* art. XVI, § 16.02, R.E.No. 61-2, PageID#1447 (requiring Township approval of "special uses").

"The HSC District is highly developed serving the principal uses [for such a district], with only a few acres of undeveloped land available and significantly less area than that required for a safe, long-distance rifle range." SAC ¶ 41, R.E.No. 44, PageID#1097. The HSC District does not include a rifle range, or even a stand-alone recreational facility, among its principal permitted uses, *see id.* ¶ 40, R.E.No. 44, PageID#1096; Ordinance art. XI, § 11.02, R.E.No. 61-2, PageID#1399, nor is it purposed for activities such as rifle ranges that might interfere with "servicing the needs of high traffic at the interchange areas of public roads and highway facilities," *see* SAC ¶ 39, R.E.No. 44, PageID#1096; Ordinance art. XI, § 11.01, R.E.No. 61-2, PageID#1399.

In short, the Ordinance could conceivably permit outdoor shooting ranges only in the HSC District, but the space and traffic-related restrictions that the Ordinance lays on uses in that district effectively ban outdoor shooting ranges of any kind.

## II. Because Howell Township effectively bans outdoor ranges, Training Plaintiffs cannot train at such ranges in the Township.

Howell Township's prohibition on outdoor shooting ranges burdens, among others, Jason Raines, Matthew Remenar, Scott Fresh, Ronald Penrod, and Edward

George Dimitroff ("Training Plaintiffs"). Each desires to engage in firearms training in Howell Township for lawful purposes, including self-defense, long-range target shooting, shooting competitions, and hunting. SAC ¶¶ 7–15, 60–64, R.E.No. 44, PageID#1086–90, 1101–02. They cannot do so, however, because there is no public shooting range in Howell Township. *Id.* ¶¶ 7–15, R.E.No. 44, PageID#1086–90.

Oakland leased, with an option to purchase, 352 acres of former rock quarry land in Howell Township to accommodate Training Plaintiffs and others, including the 327,000 rifle target shooters and 638,000 hunters within a 100-mile radius. *Id.* ¶¶ 5, 6, 28 R.E.No. 44, PageID#1085, 1094. Oakland made "plans to build an extensive outdoor shooting range facility for both private and public use," and therefore to "provide a safe location for residents in the area to practice target shooting for self-defense and other lawful purposes, including but not limited to a long distance (e.g., 1,000 yard) range for qualified shooters and public access rifle, shotgun and handgun ranges." *Id.* ¶¶ 5, 6, R.E.No. 44, PageID#1085–86. These plans were halted by the Township's ban, however, when the zoning staff advised Oakland that it "could not apply for a permit for a rifle range located on Oakland's property because the Agricultural Residential District [in which the quarry property is located] does not allow open air business uses, shooting ranges, or rifle ranges." *Id.* ¶ 46, R.E.No. 44, PageID#1098. As explained above, there is in fact nowhere in

Howell Township where Oakland could operate its range consistent with Township law.

The zoning staff also stated that Oakland should apply for a text amendment to the Zoning Ordinance to allow shooting ranges in the AR Zoning District. *Id.* ¶ 47. But after receiving Oakland's application—and its $1,000 application fee—the Township rejected the proposed amendment, maintaining the effective ban on outdoor shooting ranges. *Id.* ¶¶ 48–54, R.E.No. 44, PageID#1098–1100. As of July 11, 2019, Oakland had incurred costs of approximately $130,000, and had lost revenue of approximately $1,820,000, due to the Township's ban. Meanwhile, Training Plaintiffs continued to be blocked from training with firearms, including for lawful purposes that require outdoor ranges. *See id.* ¶¶ 59–64, R.E.No. 44, PageID#1101–02.

## III. Procedural History

Oakland, Raines, Remenar, and Fresh filed suit on November 2, 2018, challenging Howell Township's de facto ban on certain ranges as a violation of the Second Amendment, which is applicable to the Township under the Fourteenth Amendment. Compl., R.E.No. 1, PageID#1, 15. Subsequently amending their complaint on July 11, 2019, they added Penrod and Dimitroff as plaintiffs. *See* SAC, R.E.No. 44, PageID#1084.

9

On June 19, 2020, Howell Township moved to dismiss Plaintiffs' Second Amended Complaint pursuant to Fed. R. Civ. P. 12(c). Def.'s Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(c), R.E.No. 60, PageID#1179. That same day, Plaintiffs moved for summary judgment. Pls.' Mot. for S.J., R.E.No. 61, PageID#1277.

### A.   The district court's first opinion.

The district court decided both motions in the same order. The court, first, found no precedent for two propositions: (1) "that a municipality must permit a property owner (or a property lessee) to construct, and for interested gun owners to use, an outdoor, open-air, 1,000-foot shooting range," and (2) that "Howell Township must change its zoning ordinance to permit the construction and use of such a facility as a matter of right anywhere within the AR district." Order Grant'g MTD, R.E.No. 84, PageID#2089. Next, the court deemed implausible that "Howell Township bans all shooting ranges," *id.*, PageID#2090, because (1) Oakland "d[id] not allege that it ever sought permission to construct a shooting range on the specific piece of property it leases," and (2) "the ordinance appears on its face to allow shooting ranges in districts other than those designated AR." *Id.* PageID#2089–90. On these grounds, the court granted the Township's motion to dismiss, denied Plaintiffs' motion for summary judgment as moot, *id.*, PageID#2091, and entered judgment, Judgment, R.E.No. 85, PageID#2092.

10

Plaintiffs subsequently filed a motion to reconsider or to grant leave to amend, Mot. to Reconsider, R.E.No. 86, PageID#2098, but the court denied the motion, Order Denying Reconsideration., R.E.No. 91, PageID#2190.

Plaintiffs timely appealed. Not. of Appeal, R.E.No. 92.

**B.    This Court vacates the district court's first opinion.**

While this case was pending before this Court, the Supreme Court decided *Bruen*. Consequently, on August 5, 2022, this Court vacated the district court's grant of judgment on the pleadings and its order denying reconsideration and remanded "to allow the district court to consider the plausibility of Oakland Tactical's Second Amendment claim in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)." *Oakland Tactical Supply, LLC*, 2022 WL at *1.

**C.    The district court's second opinion.**

The district court, after ordering additional briefing, reaffirmed its decision to grant the Township's motion to dismiss. Op. & Order Addressing Supplemental Briefing and Grant'g Def.'s Mot. to Dismiss, R.E.No. 117, PageID#2625. The court determined that "the proposed conduct is best summarized as construction and use of an outdoor, open-air, 1,000-yard shooting range," *id.*, PageID#2629–30 (brackets and quotation marks omitted), and held that "*that* conduct is clearly not covered by the plain text of the Second Amendment," *id.*, PageID#2632. After all, the court

explained, "the plain text of the Amendment says nothing about long-range firing or even, for that matter, training more broadly." *Id.* PageID#2633. Because the court concluded that the plain text did not cover Plaintiffs' proposed conduct, it declined to consider the nation's historical tradition of firearm regulation and granted the Township's motion to dismiss. Plaintiffs timely appealed. Not. of Appeal, R.E.No. 119.

## SUMMARY OF THE ARGUMENT

The initial consideration under *Bruen* is whether the Second Amendment's plain text covers training with common arms. Because constitutional rights implicitly protect rights necessary to their effective exercise, and training with arms is necessary to effectively keep and bear arms, the right must protect training.

The Supreme Court's plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570 (2008) confirms this. In analyzing "bear arms," *Heller* provided an example involving training. 554 U.S. at 587–88. In analyzing "security of a free State," *Heller* recognized that "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id.* at 597–98. Analyzing *"*well regulated," *Heller* determined that it implies "proper discipline and training." *Id.* at 597.

*Heller*'s methodology provides further confirmation. To confirm its plain text analysis, *Heller* consulted state constitutions. The constitutions of Virginia,

Pennsylvania, and Vermont all ensured that the people be trained. *Heller* also consulted the debates over the U.S. Constitution. Federalists and Antifederalists agreed that a trained populace was essential for preventing tyranny. This agreement was reflected in several proposed declarations of rights as well as the Second Amendment.

Because the Second Amendment's plain text covers training, the Township has the burden of proving that its restrictions on training are consistent with America's tradition of firearm regulation. But the Township declined to provide historical evidence, despite several opportunities to do so. The only historical evidence was submitted by the Township's *amici*, but this evidence fails to establish a tradition.

While English, colonial, and founding-era history proves that training was widely understood as essential to the right to keep and bear arms, training restrictions were scarce. Most historical training regulations mandated training. As for restrictions, most prevented shooting in crowded public locations.

There is no tradition of banning organized training in safe places on private property. And it cannot be alleged that Oakland's site is unsafe, because the Township concedes that the same training could occur there if it did not occur as part of Oakland's business. The Township's ban therefore violates the Second Amendment.

13

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of a motion for judgment on the pleadings de novo using the same standard as for a motion to dismiss under Rule 12(b)(6)." *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010). Therefore, this Court "'construe[s] the complaint in the light most favorable to the plaintiff and accept[s] all allegations as true' to determine whether the 'complaint … contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018)).

"'[O]n a motion to dismiss,'" this Court "'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *White v. United States*, 601 F.3d 545, 551 (6th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). And where the plaintiffs offer multiple factual scenarios for a particular claim, only one need be sufficient. *Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 494 (6th Cir. 1995).

# ARGUMENT

## I. Training with common firearms is covered by the Second Amendment's plain text.

### A. Under *Bruen*, the initial consideration is whether the plain text covers training with common arms.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *Heller*, the Supreme Court held that the Second Amendment protects an individual right to use common firearms for lawful purposes such as self-defense, 554 U.S. at 592, and in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court concluded that this right is fully applicable to the States through the Fourteenth Amendment, *id.* at 791. After much contestation about how properly to apply *Heller* in the lower courts, the Court in *Bruen* clearly prescribed the mode of analysis for Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30.

Under the *Bruen* test, at the outset this Court must determine whether Plaintiffs' proposed course of conduct is covered by the Second Amendment's plain text. To make that determination, the Court must of course determine what the proposed course of conduct is. Here, that proposed course of conduct is training with

firearms that are in common use. This can readily be seen from the operative complaint. Oakland desires to operate a state-of-the art outdoor shooting range, including offering a rifle range with distances up to 1,000 yards for qualified shooters and rifle, shotgun, and handgun ranges open to the general public. SAC ¶ 6. Training Plaintiffs desire to use the full extent of training options planned by Oakland. SAC ¶¶ 7–15; 61–64.

The district court construed the "proposed course of conduct" more narrowly, stating that it "is best summarized as construction and use of an outdoor, open-air, 1,000-yard shooting range." Op. & Order Addressing Supplemental Briefing and Grant'g Def.'s Mot. to Dismiss, R.E.No. 117, PageID#2629–30 (brackets and quotation marks omitted). But this conclusion was erroneous both factually and legally.

Factually, the district court ignored most of the conduct Plaintiffs wish to engage in. Training Plaintiffs wish to train with commonly possessed handguns, shotguns, and rifles at the distances for which they are designed to be effective, including 50 yards, 100 yards, and 1,000 yards. SAC ¶¶ 7–15, 60–64, R.E.No. 44, PageID#1086–90, 1101–02. Oakland's range plans provide a safe place for all such training. As this Court previously recognized, "Oakland Tactical has alleged that the Second Amendment protects the right to train on 'outdoor ranges appropriate for … common firearms,' 'shotgun and handgun ranges,' and, more generally, 'a shooting

range,'" as well as training at "'outdoor, long-distance shooting ranges.'" *Oakland Tactical Supply, LLC*, 2022 WL at *2 n.3 (quoting R. 86 PID 2113; R. 44 PID 1085–86; Appellants Br. at 10). To be sure, Oakland does wish to construct a 1,000-yard outdoor shooting range and Training Plaintiffs do wish to use it, but it is improper to disregard the full spectrum of training at issue in this case.

Legally, the district court put more pressure on the plain text analysis than it can bear. The adjective "plain" is key. Assuming that the Second Amendment protects training of some sort, nothing in the plain text provides a basis to make a distinction between particular types of training with firearms that are protected by the Second Amendment. Rather, it is only through historical analysis that these finer-grained distinctions can be made.

*Heller* and *Bruen* demonstrate the capacious nature of the Second Amendment's plain text. For example, both cases indicate that, as a matter of plain text, the "people" protected by the Second Amendment are "all Americans." *See Heller*, 554 U.S. at 581; *Bruen*, 142 S. Ct. at 2156. Therefore, any limitations on the arms rights of certain types of Americans must be supported with "historical justifications." *Heller*, 554 U.S. at 635. For another example, to "bear" means simply to "carry." *Id.* at 584. As a matter of plain text, therefore, there is no basis for making "a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134—or any locational distinction at all, for that matter. *Bruen* thus

17

discussed potential limits on carrying firearms in so-called "sensitive places" as part of its historical analysis, not as part of the plain text analysis. *Id.* at 2133–34. Thus, in any future case challenging a sensitive place restriction, the broad plain-text right to carry firearms would cover carrying in the place in question, and the government would be required to prove from history that restricting carry in that location is permitted.

The application of the foregoing principles to this case is straightforward. Plaintiffs wish to engage in certain types of training with arms that are protected by the Second Amendment. Assuming training generally is protected by the plain text, nothing in the plain text would give the Court any basis to exclude from protection the conduct Plaintiffs wish to pursue. This is true even if the relevant conduct considered is erroneously limited to "construction and use of an outdoor, open-air, 1,000-yard shooting range." Op. & Order Addressing Supplemental Briefing and Grant'g Def.'s Mot. to Dismiss, R.E.No. 117, PageID#2629–30 (brackets and quotation marks omitted). Again, assuming training, generally, is protected (a conclusion we establish below), there is no support in the plain text for concluding that a particular type of training may be prohibited.

### B. The plain text of the Second Amendment protects training with arms that are protected by the Second Amendment.

### 1. The Second Amendment, like other constitutional rights, covers related conduct necessary for the right's effective exercise.

Whether analyzed as the right to train generally or more narrowly as the right to train at an outdoor range or at distances up to and including 1,000 yards, the plain text of the Second Amendment covers the conduct at issue in this lawsuit. That conclusion is established by the conjunction of two principles: (1) that the training in question is to be done with arms that are protected by the Second Amendment, and (2) that constitutional rights extend to conduct that makes the effective exercise of those rights possible.

It is undisputed that the firearms with which Plaintiffs intend to train—rifles, shotguns, and handguns—are in common use for lawful purposes and therefore are protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2134.

Because the firearms Plaintiffs intend to train with are protected, training with those firearms necessarily is protected as well. "Constitutional rights … implicitly protect those closely related acts necessary to their exercise," *Luis*, 578 U.S. at 26 (Thomas, J., concurring in judgment), and this includes in the Second Amendment context the right "to acquire and maintain proficiency" in the use of firearms, *id.* Indeed, this must be the case because the right to armed self-defense "wouldn't mean much without the training and practice that make it effective." *Ezell v. City of*

*Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Therefore, the right to keep and bear firearms in common use "implies a corresponding right to acquire and maintain proficiency with common weapons." *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) (quotation omitted). Put another way, it has long been recognized that the right to keep and bear arms necessarily "involves the right to practice their use." *Andrews v. State*, 50 Tenn. 165, 178 (1871). *See also* Thomas M. Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 271 (1868) ("[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use."); Benjamin Vaughan Abbott, JUDGE AND JURY: A POPULAR EXPLANATION OF LEADING TOPICS IN THE LAW OF THE LAND 333 (1880) ("[A] citizen who … practices in safe places the use of [a gun or pistol] … exercises his individual right [to keep and bear arms].").

*Heller*'s reasoning regarding the meaning of "bear arms" further supports this conclusion. When analyzing "bear arms," *Heller* provided an example involving training. Demonstrating that "bear arms" covers "nonmilitary" uses, *Heller* quoted the following example from "Timothy Cunningham's important 1771 legal dictionary": "Servants and labourers shall use bows and arrows on Sundays, &c. and not bear other arms." 554 U.S. at 581 (quoting 1 Timothy Cunningham, A NEW AND

COMPLETE LAW DICTIONARY (1771) (unpaginated)). Cunningham and *Heller* were quoting an English law requiring "Servants and Labourers" to "have Bows and Arrows" and to train with them on "Sundays and Holydays" rather than play "importune Games" like tennis and football. 12 Ric. II ch. 6 (1388). The right to bear arms, therefore, includes training.

As Justice Thomas's *Luis* concurrence indicates, the principle that necessary incidents to constitutional rights are protected is not novel. Indeed, "the First Amendment 'right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are incidents of its exercise.'" *Luis*, 578 U.S. at 27 (Thomas, J., concurring in judgment) (quoting *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part)). Other examples abound. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("We have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) ("[T]he right to attend criminal trials is implicit in the guarantees of the First Amendment."); *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now

21

well established that the Constitution protected the right to receive information and ideas.").

*Heller* itself engaged in this type of reasoning. At issue in *Heller* was not only the District of Columbia's ban on possessing handguns but also its requirement that all firearms be kept in an inoperable state. While the Second Amendment does not expressly state that it protects a right to keep and bear *operable* firearms, the Supreme Court easily dispatched with the District's restriction: "This makes it impossible for citizens to use [firearms] for the core lawful purposes of self-defense and is hence unconstitutional." 554 U.S. at 630.

Courts following *Heller* unsurprisingly have engaged in this type of reasoning to find that the Second Amendment covers training, *see, e.g., Ezell*, 651 F.3d at 704; *Drummond*, 9 F.4th at 227, as well as ammunition and acquiring firearms, *see, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire firearms.") (quotation omitted); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (quotation omitted); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("This right must also include the right to *acquire* a firearm"). This Court should follow suit and find that the

22

Second Amendment, as a matter of plain text and necessary implication, protects a general right to train with the common firearms whose possession and use the Second Amendment protects.

The district court was wrong to attach any significance to the absence from the Second Amendment's text of words such as "long-range firing" or "training." *See* Op. & Order Addressing Supplemental Briefing and Grant'g Def.'s Mot. to Dismiss, R.E.No. 117, PageID#2633. As in other constitutional contexts, the plain text of the Second Amendment covers necessary incidents not expressly stated by the text. And one of those necessary incidents—as *Heller* itself and the sources it cites demonstrate—is training with common firearms. What is more, nothing in the plain text supports excluding training at distances within which common firearms were designed to be effective, which in the case of rifles includes 1,000 yards.

## 2. The prefatory clause confirms that training is protected.

The Second Amendment's prefatory clause—which may be used to "resolve an ambiguity in the operative clause," *Heller*, 554 U.S. at 577—further clarifies that training is protected. In its analysis of "security of a free State," *Heller* explained that "the militia was thought to be 'necessary to the security of a free State'" because "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id.* at 597–98 (emphasis added). Additionally, "the adjective 'well-regulated' implies nothing more than the imposition of proper

discipline and training." *Id.* at 597 (quoting the Virginia Declaration of Rights § 13 (1776), *in* 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3812, 3814 (Francis Newton Thorpe ed., 1909) (referring to "a well-regulated militia, composed of the body of the people, trained to arms"). There is no ambiguity here to resolve, but in any event, the prefatory clause leaves no doubt that training is a protected activity.

*Heller*'s analysis therefore demonstrates that training is covered by the Second Amendment's plain text.

### 3.    State constitutions confirm that training is covered.

To the extent any further examination is necessary, it confirms *Heller*'s plain text analysis. *Heller* looked to state constitutions to confirm its interpretation of the plain text. 554 U.S. at 600–03. State constitutions confirm that the Founders understood that the people must be trained to effectively defend themselves.

Virginia's 1776 declaration of rights provided that "a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State." 7 THE FEDERAL AND STATE CONSTITUTIONS, at 3814.

Pennsylvania's 1776 constitution provided that "[t]he freemen of this commonwealth and their sons shall be trained and armed for its defence under such

regulations, restrictions, and exceptions as the general assembly shall by law direct." 5 *id.* at 3084.

Vermont's 1777 constitution copied Pennsylvania's language. 6 *id.* at 3742. And its 1786 constitution included similar language. *Id.* at 3758. In its 1793 constitution, adopted after the Second Amendment's ratification, Vermont ensured that "[t]he inhabitants of this State shall be trained and armed for its defence, under such regulations, restrictions, and exceptions, as Congress, agreeably to the Constitution of the United States, and the Legislature of this State, shall direct." *Id.* at 3768.

John Adams explained why a trained populace was needed to secure America's freedom just before the Second Amendment's ratification. "That the people be continually trained up in the exercise of arms," Adams explained, ensures that "nothing could at any time be imposed upon the people but by their consent." 3 John Adams, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 471–72 (1788) (quoting Marchamont Nedham, THE RIGHT CONSTITUTION OF A COMMONWEALTH 89 (1656)). For that reason, he added, "Rome, and the territories about it, were trained up perpetually in arms." *Id.* at 472.

### 4. The debates over the Constitution's ratification focused on the need for a populace trained in arms.

*Heller* also considered "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress," 554 U.S. at

603, but cautioned that it would be improper to place too much weight "on such history to interpret a text that was widely understood to codify a pre-existing right," *id.* Thus, while such evidence cannot be used to *contradict* the plain meaning of the text, it can be a confirmatory analytic.

The drafting history reveals that both Federalists and Antifederalists agreed that an armed and trained populace was the best defense against a tyrannical government.

Alexander Hamilton argued that a populace armed and trained was "the best possible security against" an oppressive standing army. THE FEDERALIST NO. 29 (Alexander Hamilton). Many Federalists made similar arguments. *See, e.g.*, *Text of a Federalist Speech Not Delivered in the Maryland Convention*, MD. JOURNAL, July 25, 29 & August 1, 5, 8, 1788, *in* 12 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 885 (John P. Kaminski et al. eds., 2015) ("the citizens of thirteen different states, all of whom know the use of fire-arms would soon prove the folly and madness of" a tyrannical government); *id.* at 837–38 (Charles Carroll claiming that Americans are safer from tyranny than Europeans because "our citizens have arms in their hands, & know the use of them.").

Antifederalist George Mason was influential in securing the adoption of the Bill of Rights. At Virginia's convention, Mason warned that one method of effectively disarming the people that had historically been used was to allow the

militia to fall into disuse. *Id.* at 1270–71. He noted that Pennsylvania's royal governor, Sir William Keith, proposed such a plan to the British Parliament "when the resolution for enslaving America was formed in Great-Britain." *Id.* at 1271. According to Keith, it was not "good [p]olicy, to accustom all the able men in the Colonies to be well exercised in Arms"; it was "more advisable to keep up a small, regular standing force in each province." William Keith, A SHORT DISCOURSE, ON THE PRESENT STATE OF THE COLONIES IN AMERICA, WITH RESPECT TO GREAT BRITAIN (1728), *in* 6 THE AMERICAN MUSEUM 169 (Mathew Carey ed., 1789). Thus, Mason explained, the British had decided that "to disarm the people … was the best and most effectual way to enslave them," and that it was best "not do it openly; but to weaken [the Americans] and let them sink gradually, by totally disusing and neglecting the militia" until they lost their familiarity with arms. 10 DOCUMENTARY HISTORY, at 1271. This echoed Mason's statement as the Revolutionary War approached that the people must be "introduce[d] to the use of arms and discipline" to best "act in defence of their invaded liberty." 1 Kate Rowland, THE LIFE OF GEORGE MASON 430 (1892).

The necessity for a trained populace was reflected in proposed declarations of rights and the Second Amendment. Virginia's proposed arms right for the United States Constitution provided "[t]hat the people have a right to keep and bear arms: that a well regulated militia composed of the body of the people trained to arms, is

the proper, natural and safe defence of a free State." 37 DOCUMENTARY HISTORY, at 253. North Carolina proposed the same language as Virginia. *Id.* at 266. New York's proposal used similar language, but it substituted "the body of the people trained to arms" with "the body of the People capable of bearing Arms." *Id.* at 257. Rhode Island copied New York's language. *Id.* at 273.

Future vice-president Elbridge Gerry preferred the "trained to arms" language from some proposals because it would "furnish a greater certainty" that a competent militia would be maintained. *Id.* at 403. Yet an objective of each proposal was to ensure that the populace would be familiar with arms, and as *Heller* demonstrated, this objective was reflected in the Second Amendment's text. Antifederalist Samuel Nasson acknowledged this when urging his Federalist congressman George Thatcher to ratify the Second Amendment: "you know to learn the Use of arms is all that can Save us from a forighn foe that may attempt to subdue us, for if we keep up the Use of arms and become well acquainted with them we Shall allway be able to look them in the face that arise up against us." Letter from Samuel Nasson to George Thatcher, July 9, 1789, *in* THE COMPLETE BILL OF RIGHTS 296 (Neil Cogan ed., 2d. ed. 2015).

Because the Second Amendment's plain text covers training with common firearms, "the Constitution presumptively protects that conduct" and the government's restrictions must be "consistent with the Nation's historical tradition

of firearm regulation." *Bruen*, 142 S. Ct. at 2130. "*Only then* may a court conclude that the [challenged] conduct falls outside the Second Amendment's unqualified command." *Id.* (emphasis added) (quotation marks omitted).

## II. The Township failed to provide historical evidence and thus cannot satisfy its burden of proving a tradition of firearm regulation.

The foregoing suffices to reverse the district court's decision. Having erroneously found that the Second Amendment is not even implicated, the district court did not conduct a historical analysis. Nevertheless, this Court has the information necessary to conclude that the Township cannot meet its historical burden. That is because the challenged restriction is wholly without support in this Nation's history of firearm regulation. Indeed, the Township failed to produce any historical evidence *at all*.

The Township declined to produce historical evidence despite this Court vacating and remanding the district court's first opinion so it could reconsider the case under the *Bruen* test, and despite the district court's subsequent order directing the Township to provide historical evidence. This Court explicitly instructed the district court, in the event that the plain text covers the proposed conduct, to "determine whether historical evidence—to be produced by the Township in the first instance—demonstrates that the Ordinance's shooting-range regulations are consistent with the nation's historical tradition of firearm regulation." 6th Cir. Op. 5. The district court accordingly ordered the Township to brief both "whether

29

Oakland Tactical's proposed course of conduct is covered by the plain text of the Second Amendment" *and* "whether historical evidence—to be produced by the Township in the first instance—demonstrates that the Howell Township Ordinance's shooting regulations are consistent with the nation's historical tradition of firearm regulation." Order, R.E.No. 96, PageID.2206 (quotation marks and brackets omitted).

The Township decided instead to rely exclusively on the plain text analysis, assuring the district court that if it were ordered *again* to provide historical evidence, it "would file supplemental briefing." R.E.No. 97, PageID#2231. But *Bruen* did not give New York repeated opportunities to supplement the record. The Township should not be awarded opportunity after opportunity either, especially when it is violating fundamental Second Amendment rights in the meantime.

Apparently recognizing the Township's failure to shoulder its burden, the Michigan Municipal League Legal Defense Fund and the Michigan Townships Association filed an *amicus* brief with the district court. *Amici* attached as an appendix to its own *amicus* brief an *amicus* brief filed by an unrelated party in an unrelated case, which indiscriminately listed historical limitations on shooting in particular locations—typically crowed public locations. These restrictions, as explained below, do not establish a tradition that justifies the Township's ban. And they cannot make up for the Township's failure to defend its law. "[I]n our

adversarial system of adjudication, we follow the principle of party presentation." *Bruen*, 142 S. Ct. at 2130 n.6 (quoting *United States* v. *Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)). "Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Id.* Because the plain text covers training, the Township's refusal to produce historical evidence despite being ordered to do so is enough to decide this case in Plaintiffs' favor.

## III.  History reveals a celebrated tradition of training.

Wholly apart from the Township's failure of proof, the celebrated tradition of training and the lack of historical restrictions on the right confirm that Plaintiffs' claims succeed.

### A.  England long depended on training for domestic order and national defense.

*Bruen* deemed it acceptable to consider "English practices that prevailed up to the period immediately before and after the framing of the Constitution." *Id.* at 2136 (quotations omitted).

Unsurprisingly for a nation that traditionally depended on a trained populace for domestic order and national defense, the English encouraged training starting in their earliest recorded times. *See* Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill Rts. J. 93, 96–97 (2022). England did not have a standing army until the late 17th century or a professional police force until the 19th century. *See* Joyce Lee Malcolm, To Keep and Bear Arms: The

ORIGINS OF AN ANGLO-AMERICAN RIGHT 2 (1994). Instead, it relied on members of the community to partake in the posse comitatus, hue and cry, and militia. Greenlee, *The Right to Train*, at 97–102; *see also* Granville Sharp, TRACTS, CONCERNING THE ANCIENT AND ONLY TRUE MEANS OF NATIONAL DEFENCE, BY A FREE MILITIA 23 (3d ed. 1782) ("[I]t was certainly necessary that 'every man' so bound by the common law to assist" in the posse comitatus "should be trained in arms.") (quoting Edward Coke, THE SECOND PART OF THE INSTITUTES OF THE LAWES OF ENGLAND 193 (1642)).

Training, therefore, was not only encouraged but often mandatory. *See, e.g.*, 12 Ric. II ch. 6 (1388) ("Servants and Labourers shall have Bows and Arrows, and use the same the Sundays and Holydays"); 17 Edw. IV ch. 3 (1477) ("every Person strong and able of Body should use his Bow"); 3 Hen. VIII ch. 3 (1511) (everyone under 60 shall "use and exercise shotyng in longbowes"); 6 Hen. VIII ch. 2 (1514) (everyone must practice regularly with bows and arrows); 33 Hen. VIII ch. 9 (1541) ("every man" under 60 must "exercise shooting in long-bows"); *id.* ("fathers, governors and rulers of such as be of tender age" must "teach and bring them up in the knowledge of . . . shooting"); William Lambard, EIRENARCHA OR OF THE OFFICE OF THE JUSTICES OF PEACE, IN TWO BOOKES 479 (1581) (as of 1581, the populace was summoned for arms training in times of peace anywhere from one to sixteen times per year). Other laws ensured that there were safe places to train. The 1541

training mandate provided that "all gentlemen, yeomen, and servingmen," as well as "all the inhabitants of the cities, boroughs and market-towns" could "shoot with any hand-gun, demi-hake, or hagbut, at any butt or bank of earth only in place convenient for the same." 33 Hen. VIII ch. 6 (1541).

The demand for marksmanship inevitably led to the popularity of shooting competitions. By the thirteenth century, shooting matches "were an integral part of the social scene in Europe and elsewhere." M.L. Brown, FIREARMS IN COLONIAL AMERICA 28 (1980). By the end of the fifteenth century, archery practice had become so common that "all the gardens" in London were converted into "a plaine field for archers to shoot in." 2 Raphael Holinshed, CHRONICLES OF ENGLAND, SCOTLAND, AND IRELAND 785 (1588). The typical shooting practice was a social activity, with practices often involving over a dozen participants and sometimes even more spectators. Steven Gunn, *Archery Practice in Early Tudor England*, 209 PAST & PRESENT 53, 61 (2010).

Writing about 1638, Anthony Highmore, an English legal commentator, noted that becoming "great proficients in the use and exercise of arms" was "esteemed the most laudable exercise of diversion in use amongst the citizens of London." Anthony Highmore, THE HISTORY OF THE HONORABLE ARTILLERY COMPANY OF THE CITY OF LONDON 64 (1804). Shooting was pursued with similar zeal in the eighteenth century, when "visit[ing] shooting galleries in London as well as other places for

target practice" was all the "rage." Lois G. Schwoerer, GUN CULTURE IN EARLY MODERN ENGLAND 113 (2016).

Legal treatises recognized the importance of training. Sir John Fortescue, the Chief Justice of the King's Bench, advocated for a trained populace in *De Laudibus Legum Angliæ*. "[I]t will be of no small Advantage to the Kingdom, that the Inhabitants be expert in Arms," Fortescue asserted. John Fortescue, DE LAUDIBUS LEGUM ANGLIÆ 100–01 (John Selden ed., 2d ed. 1741). John Selden—"England's first legal historian," Martha A. Ziskind, *John Selden: Criticism and Affirmation of the Common Law Tradition*, 19 AM. J. LEGAL HIST. 22, 22 (1975)—added notes to the edition of Fortescue's treatise that he edited. Demonstrating that arms training remained common practice during the period leading up to the American Revolution, Selden stated that "[t]he Custom of the Nation has been to train up the Freeholders to Discipline." Fortescue, DE LAUDIBUS LEGUM ANGLIÆ, at 101.

In interpreting the U.S. Constitution, the analytical baseline for English history is how America's Founders understood it. *See Bruen*, at 2136 ("English common-law practices and understandings" matter only if they reflect the understanding "at the time of the separation of the American Colonies.") (quotation omitted). As Granville Sharp declared in 1782, "the laws of England always required the people to be armed, and not only to be armed, but to be expert in arms." Sharp, TRACTS, at 18. Highmore expressed the general opinion of the time, stating that "the

laws of nature [and] of sound policy require every active citizen to be exercised, and expert in arms of defence and peace for mutual protection." Highmore, THE HISTORY OF THE HONORABLE ARTILLERY COMPANY, at 4.

**B.    Training was essential to survival in colonial America.**

"Nowhere else was the cult of accuracy so rigorously worshipped as in colonial America." Alexander Rose, AMERICAN RIFLE: A BIOGRAPHY 18–19 (2008). Arms proficiency was required for survival as food, self-defense, and community defense depended on accurate shooting.

As Robert Beverley wrote of Virginians in 1705, "most people are skilful in the use of fire-arms, being all their lives accustomed to shoot in the woods." Robert Beverley, THE HISTORY AND PRESENT STATE OF VIRGINIA 217 (J.W. Randolph ed., 1855). Writing of Virginia and Pennsylvania during the 1760s, 70s, and 80s, Joseph Doddridge noted that shooting contests were popular in America: "Shooting at marks was a common diversion among the men, when their stock of ammunition would allow it." Joseph Doddridge, NOTES ON THE SETTLEMENT AND INDIAN WARS OF THE WESTERN PARTS OF VIRGINIA AND PENNSYLVANIA FROM 1763 TO 1783, at 124 (John S. Ritenour & Wm. T. Lindsey eds., 1912). He added that they preferred to shoot "at a great distance." *Id.* As in England, shooting matches were social events. "Long-distance shooting contests were major events in rural communities"

especially. Nicholas Johnson et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 239 (3d ed. 2021).

Many of America's most influential Founders enjoyed recreational shooting. John Adams was especially fond of shooting. "I spent my time as idle Children do," Adams wrote in his autobiography, "above all in shooting, to which Diversion I was addicted to a degree of Ardor which I know not that I ever felt for any other Business, Study or Amusement." 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257 (Lyman H. Butterfield ed., 1961).

Thomas Jefferson enjoyed shooting competitions, sometimes placing wagers on his skill. For example, in 1768, he recorded that he "Won shooting 1/6" (one sixpence), and the following year that he "Lost shooting" "2/6." 1 JEFFERSON'S MEMORANDUM BOOKS, ACCOUNTS, WITH LEGAL RECORDS AND MISCELLANY, 1767-1826, at 81, 150 (2d series, James A. Bear, Jr. & Lucia C. Stanton eds., 1997). In 1785, Jefferson wrote a letter to his nephew about the best form of exercise: "I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprize, and independance to the mind…. Let your gun therefore be the constant companion of your walks." Thomas Jefferson, WRITINGS 816–17 (Merrill D. Peterson ed., 1984). Over three decades later, Jefferson gifted his favorite pistols to James Madison's adoptive son, John Payne Todd, "in the hope they will afford you [Todd] sport in your daily rides." Letter from Thomas Jefferson to John Payne Todd,

Aug. 15, 1816, *in* 10 The Papers of Thomas Jefferson: Retirement Series 321 (J. Jefferson Looney ed., 2013). Jefferson believed the pistols would "suit" Todd because he was "a sportsman." *Id.* at 320.

Ira and Ethan Allen wrote often of their affinity for shooting. In 1772, for example, Ira recorded a 2-hour shooting competition that Ethan engaged in. 1 James Benjamin Wilbur, Ira Allen: Founder of Vermont, 1751-1814, at 28 (1928).

Although shooting matches were a common "entertainment form," firearms historian M.L. Brown noted that "[t]he popular shooting match" was also "practical from the standpoint of practice." Brown, Firearms in Colonial America, at 127. As in England, the armed community depended on itself for domestic order and national security. *See* Greenlee, *The Right to Train*, at 112–14.

C. **Americans learned how valuable lifelong firearms practice was during the Revolutionary War and kept this lesson in mind when forming their new government.**

As the Revolutionary War approached, Americans recognized that their independence would depend on their ability to outshoot professional British soldiers. Reverend Simeon Howard, in his famous 1773 Boston sermon, expressed the need for a free people to be trained in arms:

> A people who would stand fast in their liberty, should furnish themselves with weapons proper for their defense, and learn the use of them…. [I]f they are unskilled in arms, their number will tend little more to their security, than that of a flock of sheep does to preserve them from the depredations of the world: accordingly it is looked upon as a point of wisdom, in every state, to be furnished with this skill[.]

A SERMON PREACHED TO THE ANCIENT AND HONORABLE ARTILLERY-COMPANY, IN BOSTON, NEW ENGLAND, JUNE 7TH, 1773, at 25–26 (1773).

Josiah Quincy echoed this sentiment, asserting that "[t]he supreme power is ever possessed by those who have arms in their hands, and are disciplined to the use of them." Josiah Quincy, Jr., *Observations on the Act of Parliament Commonly Called the Boston Port-Bill: with Thoughts on Civil Society and Standing Armies* (1774), *in* MEMOIR OF THE LIFE OF JOSIAH QUINCY, JUNIOR, OF MASSACHUSETTS: 1774-1775, at 347 (2d ed. 1874). Accordingly, the Provincial Congress of Massachusetts in 1775 instructed "all the inhabitants of this colony, to be diligently attentive to learning the use of arms." NEW-HAMPSHIRE GAZETTE, Jan. 27, 1775, at 1.

Given their lifelong focus on training, Americans needed little encouragement. The *Boston Gazette* reported that "all the planters sons and servants are taught to use the fowling piece from their youth, and generally fire balls with great exactness at fowl or beast." BOSTON GAZETTE, Dec. 5, 1774, at 4. An Englishman visiting New England in 1774 noted that "in the cities you scarcely find a Lad of 12 years that does not go a Gunning." Harold F. Williamson, WINCHESTER: THE GUN THAT WON THE WEST 3 (1952). Other colonies were similarly concentrated on training. A Virginian described American culture to his Scottish friend by explaining that "[w]e are all in arms, exercising and training old and young to the

use of the gun." 3 AMERICAN ARCHIVES 621 (4th Ser., Peter Force ed., 1846). Returning from England as the war approached, Benjamin Franklin reported that "I found at my arrival all America from one End of the 12 united Provinces to the other, busily employed in learning the Use of Arms." Letter from Benjamin Franklin to Jonathan Shipley, July 7, 1775, *in* 1 LETTERS OF DELEGATES TO CONGRESS, 1774-1789, at 604 (Paul H. Smith ed., 1976).

Americans were confident that their firearms expertise would give them an edge over their British adversaries. John Zubly, a Savannah minister, warned the British that "[i]n the strong sense of liberty, and the use of firearms almost from the cradle, the Americans have vastly the advantage over men of their rank almost every where else." 1 Moses Coit Tyler, THE LITERARY HISTORY OF THE AMERICAN REVOLUTION, 1763-1776, at 484 (1898). Major General Charles Lee—Washington's second-in-command—found "reason to doubt" that the British "should be able to conquer 200,000 active vigorous yeomanry … all armed, all expert in the use of arms, almost from their cradles." *To the People of America*, Feb. 3, 1775, *in* MEMOIRS OF THE LIFE OF THE LATE CHARLES LEE, ESQ., 142 (1792).

James Madison boasted about Virginians' marksmanship soon after the Battles of Lexington and Concord, while recognizing its importance: "The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers. You would be astonished at the perfection this art is

brought to." Letter from James Madison to William Bradford, June 19, 1775, *in* 1 THE PAPERS OF JAMES MADISON 153 (William T. Hutchinson et al. eds., 1962).

A Pennsylvanian wrote of a company of "a thousand riflemen," which rejected anyone "unless they c[ould] hit a playing-card, without a rest, at one hundred and twenty yards distance." 1 LETTERS OF DELEGATES TO CONGRESS, 1774-1789, at 609 (Paul H. Smith ed., 1976). "Almost every sensible man, in all the colonies, is trained, and ready to supply any loss," he added. *Id.*

When General Washington sought 500 riflemen, a competition was held because so many applied. They were so skilled, however, that they destroyed the 150-yard target before most had an opportunity. Diary of John Harrower, 1773-1776, *in* 6 THE AMERICAN HISTORICAL REVIEW 99–100 (1900).

Several other impressive displays were recorded. Riflemen regularly displayed their talent for audiences, hitting targets at will from long-distances, mid-run, on their backs, and sometimes shooting 5" by 7" boards that others held in their hands or even between their legs. Letter from Richard Henry Lee to General Washington August 1, 1775, *in* 3 AMERICAN ARCHIVES, at 1 (describing such a display in Maryland); *see also* 1 DIARY OF THE AMERICAN REVOLUTION: FROM NEWSPAPERS AND ORIGINAL DOCUMENTS 122 (Frank Moore ed., 1863) (similar display in Pennsylvania); John G.W. Dillin, THE KENTUCKY RIFLE 84 (Palladium Press 1998) (1924) (A *Pennsylvania Gazette* report of a shooting display at 250

yards); Greenlee, *The Right to Train*, at 120–22 (describing other such displays). General Howe, the commander-in-chief of the British land forces, witnessed one such display, and "was fully as much impressed as the spectators, and wrote home about the 'terrible guns of the rebels.'" 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 80 (1910).

The Continental Congress sent a warning to King George III, cautioning that "Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest." 1 JOURNALS OF THE AMERICAN CONGRESS FROM 1774-1788, at 110 (1823).

Bearing out this warning, Americans' success in the Revolutionary War was widely attributed to their arms proficiency, starting with the Battles of Lexington and Concord. As historian Richard Frothingham explained, "the habitual use of the fowling-piece made the[] raw militia superior to veteran troops in aiming the musket." Richard Frothingham, HISTORY OF THE SIEGE OF BOSTON, AND OF THE BATTLES OF LEXINGTON, CONCORD, AND BUNKER HILL 102–03 (4th ed. 1873). Discussing the Battle of Bunker Hill, which occurred two months later, the founding generation's preeminent Revolutionary War historian, David Ramsay, wrote,

> None of the provincials in this engagement were riflemen, but they were all good marksmen. The whole of their previous military knowledge had been derived from hunting, and the ordinary amusements of sportsmen. The dexterity which by long habit they had acquired in hitting beasts, birds, and marks [*i.e.*, targets], was fatally applied to the destruction of British officers.

41

1 David Ramsay, THE HISTORY OF THE AMERICAN REVOLUTION 204 (1789). Ramsay determined that Americans had an advantage because "the inhabitants had been, from their early years … taught the use of arms." *Id.* at 191.

George Washington reported that, "Our Scouts, and the Enemy's Foraging Parties, have frequent skirmishes; in which they always sustain the greatest loss in killed and Wounded, owing to our Superior skill in Fire arms." 7 THE WRITINGS OF GEORGE WASHINGTON, FROM THE ORIGINAL MANUSCRIPTS 1745-1799, at 198 (John C. Fitzpatrick ed., 1932). As the war progressed, Thomas Jefferson wrote that the "difference [in casualties] is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy." Thomas Jefferson, WRITINGS, at 760.

John Hancock, President of the Continental Congress, praised American riflemen as "the finest Marksmen in the world." Letter from John Hancock to Joseph Warren, June 18, 1775, *in* 1 LETTERS OF MEMBERS OF THE CONTINENTAL CONGRESS 134 (Edmund C. Burnett ed., 1921). Fellow Massachusettsian John Adams expressed similar acclaim, calling them "the most accurate Marksmen in the world." 1 ADAMS FAMILY CORRESPONDENCE: DECEMBER 1761-MAY 1776, at 135 (Lyman H. Butterfield ed., 1963).

The Americans earned their reputation. A few remarkable shots prove the point. In Boston, one rifleman, "seeing some British on a scow at a distance of fully

half a mile, found a good resting place on a hill and bombarded them until he potted the lot." 1 Sawyer, FIREARMS IN AMERICAN HISTORY, at 81. The *Pennsylvania Gazette* reported on August 21, 1775, that "some rifleman … killed three men on board a ship at Charlestown ferry, at the distance of full half a mile." Dillin, THE KENTUCKY RIFLE, at 85. When an English soldier on the New Jersey side of the Delaware River "mocked" Jacobus Scout, who was on the Pennsylvania side, the Pennsylvanian "shot [the] English soldier at 900 yards and killed him." HISTORY OF BUCKS COUNTY, PENNSYLVANIA 220 (J.H. Battle ed., 1887); *Tales from the 1769 Vansant/Craven Burying Ground*, THE CRAVEN HALL NEWSLETTER (Craven Hall Historical Society, Warminster, Pa.), Mar. 2021, at 7, https://perma.cc/A5FE-RAWY. Another example occurred during the 1778 Siege at Boonesborough, when the Shawnees fired into Daniel Boone's fort from roughly 300 yards, Lyman Copeland Draper, THE LIFE OF DANIEL BOONE 529 (Ted Franklin Belue ed., 1998), and one of Boone's men shot a Shawnee interpreter at 600 yards, Rufus L. Porter, *Porter's Fort*, COLO. SPRINGS GAZETTE TEL., Jan. 2, 1973, at 18.

Perhaps no long-distance shot was as consequential as Timothy Murphy's during the Battle of Saratoga. The Pennsylvania hunter killed General Simon Fraser from around 300 yards when the general was rallying his troops during a pivotal point in the battle, which became a turning point in the war. 1 Sawyer, FIREARMS IN AMERICAN HISTORY, at 86. "Thanks to Saratoga, France entered the war as

America's ally." Richard M. Ketchum, SARATOGA: TURNING POINT OF AMERICA'S REVOLUTIONARY WAR, at xi (1997). "Without the French navy, troops, and the financial and military aid so desperately needed … it is entirely possible that the unrelieved suffering and economic chaos brought on by three years of fighting might have led the Americans to negotiate a settlement with Great Britain." *Id.*

British Major George Hanger, "the best marksman in the British Army," Rose, AMERICAN RIFLE, at 56, explained that an American rifleman killed his companion's horse from 300 yards away, George Hanger, COLONEL GEORGE HANGER'S ADVICE TO ALL SPORTSMEN, FARMERS AND GAMEKEEPERS 122–24 (1814). Hanger was "certain, that, provided an American rifleman were to get a perfect aim at 300 yards at me, standing still, he most undoubtedly would hit me." *Id.* at 210. He concluded that "I never in my life saw … men who shot better" than the American riflemen. *Id*. at 122.

The Americans likely would have lost the war if not for their superior marksmanship. They learned firsthand how valuable lifelong firearms practice is for resisting a tyrannical government. They had this lesson in mind when forming their new government. *See supra*, Parts I.B.3, B.4.

**D. Post-ratification interpretations of the Second Amendment confirm that firearms training was viewed as integral to the right to keep and bear arms.**

The scope of the Second Amendment was established in 1791. *See Heller*, 554 U.S. at 634–35. That scope governs regardless of whether a Second Amendment claim is made directly against the federal government or indirectly against a state or local government through the Fourteenth Amendment. *See generally* Mark W. Smith, *"Not all History is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297. Indeed, the Supreme Court has "decisively held that incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *McDonald*, 561 U.S. at 765 (quotation omitted). *Bruen*, to be sure, acknowledged that some academics have taken the view that the Bill of Rights should be applied as it was understood in 1868, when the Fourteenth Amendment was adopted. *See Bruen*, 142 S. Ct. at 2138. But the Court did not upset its precedent establishing 1791 as the key date for establishing the scope of the Bill of Rights, and that precedent binds this Court.

While the Second Amendment's scope was set in 1791, "evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" can help to discern that scope. *Id.* at 2136 (quotation marks omitted). Of course, courts "must also guard against giving postenactment history more weight than it can rightly bear." *Id.* That weight generally diminishes the further in time one gets from adoption of the Second Amendment, and "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting)). Therefore, post-ratification history can provide "confirmation" for conclusions about the scope of the Second Amendment upon ratification, *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019), but it cannot be used to alter the Amendment's meaning. This principle was applied in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2259 (2020), in which the Court held in the Religion Clauses context that evidence from the second half of the 19th century can "reinforce an early practice but cannot create one" and therefore rejected the relevance of the adoption by "more than 30 states" of provisions against "state support for religious schools" in that time period.

Here, post-ratification statements made directly after the Second Amendment was drafted and throughout the following century confirm that firearms training was an important part of the right to keep and bear arms.

The Bill of Rights was submitted to the states for consideration on September 28, 1789. By the time of President Washington's first address to a joint session of Congress on January 8, 1790, three states had ratified the proposed Amendments. Washington used his address to emphasize that "a free people ought not only to be armed, but disciplined." 1 JOURNAL OF THE SECOND SESSION OF THE SENATE 103 (1820). The same point was made during debates in the first Congress. For example, on December 17, 1790—at which point nine of the required eleven states had ratified the Bill of Rights—the House of Representatives discussed the people's ability and willingness to defend themselves. Representative James Jackson declared "that every citizen was not only entitled to carry arms, but also in duty bound to perfect himself in the use of them, and thus be capable of defending his country." 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS: DEBATES IN THE HOUSE OF REPRESENTATIVES: THIRD SESSION, DECEMBER 1790 - MARCH 1791, at 95 (1996). To Jackson, one could not credibly contend "that the whole body of the people ought not to be armed, and properly trained." *Id.*

In his 1825 "influential treatise," William Rawle, "a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights,"

*Heller*, 554 U.S. at 607, explained: "In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens … instructed at least in part, in the use of arms for the purposes of war." William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 140 (1825).

The "most famous" legal scholar of the nineteenth century was "the judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations." *Heller*, 554 U.S. at 616. According to Cooley, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms." Thomas M. Cooley, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880). Echoing the Founders of the previous century, in 1868 Cooley explained that "[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms." Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS, at 350. Thus, as the *Heller* Court asserted, "Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms." 554 U.S. at 617.

That same year—which was also the year the Fourteenth Amendment was ratified—John Norton Pomeroy explained that the purpose of the Second

48

Amendment is "to secure a well-armed militia…. But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege … government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms." John Norton Pomeroy, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES 152–53 (1868).

Benjamin Abbott's post-Fourteenth Amendment treatise echoed these sentiments. First, addressing the public benefit of the right to bear arms, Abbott stressed that "[s]ome general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war." Abbott, JUDGE AND JURY, at 333. Then, focusing on the right secured by the Second Amendment, Abbott added, "No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." *Id.* Later, Abbott reiterated that, "As to guns and pistols, then, the citizen who practises with them is in the exercise of a constitutional right," *id.* at 334, because "[o]ne has a general right to practise with firearms," *id.* at 335. Abbott referred to "guns and pistols" because in the usage of the time, "guns" typically referred to long guns. *See* 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated) (defining

"Gun" and explaining that "one species of fire-arms, the pistol, is never called a gun").

## IV. Traditionally, training was encouraged rather than restricted.

### A. Most colonial- and founding-era training regulations promoted, rather than restricted, training.

Most colonial- and founding-era training laws *encouraged*, rather than restricted, training. In 1629, so the community "may bee the better able to resist both forraigne enemies & the natives," the governor of Massachusetts Bay asked that the people "bee exercised in the use of armes." 1 RECORDS OF MASSACHUSETTS, 1628-1641, at 392 (Nathaniel B. Shurtleff ed., 1853). In 1645, determining that "the training up of youth to the art and practice of arms will be of great use in the country in divers respects," Massachusetts Bay ordered "that all youth within this jurisdiction, from ten years old to the age of sixteen years, shall be instructed … in the exercise of arms." THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY 734 (1814). Starting in 1656, Plymouth Colony required its militiamen to bear arms to church "with powder and bullett to improve if occation shall require"—*i.e.*, to practice shooting after church when necessary. THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (1836).

The most common laws ensuring arms proficiency were militia laws. The American colonies and early states enacted hundreds of militia laws that required

virtually all able-bodied males to keep arms and train with them. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019) (covering militia laws of the 13 original states and colonies Vermont, and Plymouth Colony). These hundreds of laws reflect the universal understanding throughout the colonial- and founding-eras that training *enhanced* public safety.

### B. Location-based restrictions primarily applied to crowded public locations and do not justify the Township's ban on safe training on private property.

The only traditional regulations produced in this case were provided in an *amicus* brief filed by the Commonwealth of Pennsylvania in an unrelated Pennsylvania Supreme Court case, attached as an appendix to the *amicus* brief filed by the *amici* here. R.E.No. 99-1, PageID#2432. Neither the Township nor its *amici* made any attempt to explain how any of the regulations justify the Township's ban. Indeed, they cannot justify the Township's ban.

The appendix included four colonial laws. The first was "for preventing accidents which may happen by fire," by requiring a license to "fire any gun or other fire-arm" within a "built and settled" town. *Id.* PageID#2433 (1750 Pennsylvania). Since another section of the law forbade gambling on shooting matches, it is clear that recreational shooting, itself, was not prohibited. 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 109 (Mitchell & Flanders eds., 1898). The

other three forbade shooting in crowded public locations. R.E.No. 99-1, PageID#2432 (1713 Massachusetts: "upon Boston Neck within ten rods of the road or highway leading over the same"); *id.* (1746 Massachusetts: to prevent "indiscreet firing…. in the town of Boston…, or in any part of the harbour between the castle and said town"); *id.* (1763 New York City: "in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk").

Similarly, the only founding era law forbade shooting "in array of the streets or public ways in this town … or [in] front of any place within this town." *Id.* PageID#2433 (1785 Newburyport, Massachusetts).

Neither the "how" nor the "why" of these restrictions match Howell Township's ban on safe and organized training on private property. *See Bruen*, 142 S. Ct. at 2133. And none prohibited organized range training in areas where unorganized private shooting was freely allowed.

Nineteenth century laws, which are less informative, *see id.* at 2137, likewise focused on crowded public locations, *see, e.g.*, R.E.No. 99-1, PageID#2434–35 (1824 Philadelphia, Pennsylvania: "streets, lanes and alleys"); *id.*, PageID#2435 (1824 Schenectady, New York: "street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk"); *id.* (1836 Brooklyn, New York: near "turnpike"); *id.*, PageID#2436 (1823 Portsmouth, New Hampshire:

"within one mile of the courthouse"—*i.e.*, "the compact part of the town"); *id.* (1817 New Orleans, Louisiana: "in any street, courtyard, lot, walk or public way"); *id.*, PageID#2442 (1821 Tennessee: "within the bounds of any town, or within two-hundred yards of any public road of the first or second class"); *id.*, PageID#2437 (1823 Columbia, South Carolina: "within the limits bounded by Henderson, Blossom, Lincoln and Upper streets"); *id.*, PageID#2439 (1832 Portland, Maine: "streets, wharves, lanes, alleys, or public squares, or in any yard or garden within the city"); *id.*, PageID#2441 (1851 Newport, Rhode Island: "in the compact part of the town"); *id.*, PageID#2443 (1870 Dover, New Hampshire: "within the compact part of any town"); *id.*, PageID#2445–46 (1894 Rutland, Vermont: "within the principle inhabited parts of the city").

Other outliers, at least on their faces, appear to have flatly banned discharge altogether. *See, e.g.*, *id.*, PageID#2438 (1845 New Haven, Connecticut); *id.*, PageID#2439 (1855 Chicago, Illinois); *id.* (1855 Jeffersonville, Indiana); *id.*, PageID#2440 (1856 Winchester, Virginia); *id.* (1856 Burlington, Iowa); *id.*, PageID#2441 (1858 St. Paul, Minnesota). Laws eliminating the right to keep and bear arms cannot justify modern regulations. And, as explained, Howell Township *does not* restrict discharge, but only organized range training.

Because laws preventing shooting into crowded public areas and laws eliminating the right to keep and bear arms do not support the Township's broad

restrictions on safe and organized training on private property, no historical tradition

has been established. Moreover, as the Third Circuit held in *Drummond*, there is no

evidence that "the Second and Fourteenth Amendments' ratifiers approved

regulations barring training with common weapons in areas where firearms practice

was otherwise permitted." 9 F.4th at 227.

In sum, history confirms that the Second Amendment protects a right to train

with arms "in safe places." *Heller*, 554 U.S. at 619. And there is no claim that

allowing Oakland's range would be unsafe, since as the Township concedes,

unrestricted private shooting on the same type of land would be a lawful activity.

## V.    The Township's training ban is unconstitutional under *Bruen*.

All of the foregoing demonstrates that Plaintiffs should prevail in this case.

Under *Bruen*, this case can be resolved by a "fairly straightforward" application of

its test:

> [W]hen a challenged regulation addresses a general societal problem
> that has persisted since the 18th century, the lack of a distinctly similar
> historical regulation addressing that problem is relevant evidence that
> the challenged regulation is inconsistent with the Second Amendment.
> Likewise, if earlier generations addressed the societal problem, but did
> so through materially different means, that also could be evidence that
> a modern regulation is unconstitutional.

142 S. Ct. at 2131.

Training—including rifle training at the distances for which such firearms are

designed to be effective (commonly referred to today as precision or long-distance

54

training) and outdoor training, generally—was a common and celebrated activity throughout American history. The general societal problems that accompany training—*i.e.*, noise concerns and the potential for harm to innocent bystanders— have existed since the 18th century, yet there is no tradition consistent with the Township's ban on organized training in safe places on private property.

Nor can it be alleged that Oakland's proposed site is an unsafe location. The Township concedes that the exact same training could occur on the property if it did not occur as part of Oakland's business. Therefore, the Township forbids Plaintiffs' desired training for the sake of forbidding training. This violates the Second Amendment.

## CONCLUSION

For the foregoing reasons, the district court's judgment granting the Township's motion to dismiss should be reversed.

Respectfully submitted,

/s/ *Peter A. Patterson*
PETER A. PATTERSON
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ppatterson@cooperkirk.com
*Counsel of Record*

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Rd., Ste. 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org

MARTHA A. DEAN
LAW OFFICES OF MARTHA
A. DEAN, LLC
144 Reverknolls
Avon, CT 06001
(860) 676-0033
mdean@mdeanlaw.com

ROGER L. MYERS
MYERS & MYERS, PLLC
915 N. Michigan Ave., Ste. 200
Howell, MI 48843
(517) 540-1700
rmyers@myers2law.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Plaintiffs-Appellants' Opening Brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). The brief is prepared in 14-point Times New Roman font, a proportionally spaced typeface; it is double-spaced; and it contains 12,804 words (exclusive of items listed in Rule 32(f)), as measured by Microsoft Word.

/s/ *Peter A. Patterson*
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I certify that on April 24, 2023, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Peter A. Patterson*
*Counsel for Appellants*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

U.S. Const. amend. II ................................................................ Add 1

Howell Township Zoning Ordinance

art. II,

§ 2.02............................................................................. Add 1

art. III,

§ 3.06............................................................................. Add 1
§ 3.07............................................................................. Add 2
§ 3.10............................................................................. Add 3

art. X,

§ 10.01........................................................................... Add 3
§ 10.02........................................................................... Add 3
§ 10.03........................................................................... Add 4
§ 10.04........................................................................... Add 5

art. XI,

§ 11.01........................................................................... Add 5
§ 11.02........................................................................... Add 5
§ 11.03........................................................................... Add 6
§ 11.04........................................................................... Add 6
§ 11.05........................................................................... Add 6
§ 11.06........................................................................... Add 7

art. XII,

§ 12.01........................................................................... Add 7
§ 12.02........................................................................... Add 8
§ 12.03........................................................................... Add 9
§ 12.04........................................................................... Add 9
§ 12.05........................................................................... Add 10
§ 12.06........................................................................... Add 10

**U.S. CONST. amend. II.**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**Howell Township Zoning Ordinance art. II, § 2.02, Definitions.**

. . .

*Open Air Business Uses.* Open air business uses operated for profit substantially in the open air shall include such uses as the following:

(a) bicycle, utility truck or trailer, motor vehicle, boats or home equipment sale, repair, or rental services.

(b) outdoor display and sales of garages, motor homes, mobile homes, snowmobiles, farm implements, swimming pools, and similar products.

(b) retail sale of trees, fruit, vegetables, shrubbery, plants, seeds, topsoil, humus, fertilizer.

(d) tennis courts, archery courts, shuffleboard, horseshoe courts, rifle ranges, miniature golf, golf driving range, children's amusement park or similar recreation uses (transient or permanent).

. . .

**Howell Township Zoning Ordinance art. III, § 3.06 Application of Regulations.**

The regulations established by this Ordinance within each zoning district shall be the minimum regulations for promoting and protecting the public health, safety, and general welfare and shall be uniform for each permitted or approved use of land or building, dwelling and structure throughout each district. Where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter
of this Ordinance, the Zoning Board of Appeals shall have power in passing upon appeals to vary or modify any rules, regulations or provisions of this Ordinance so that the intent and purposes of this Ordinance shall be observed,

public safety secured and substantial justice done, all in accordance with the provisions of Article XXII of this Ordinance and Public Act 110 of 2006.

**Howell Township Zoning Ordinance art. III, § 3.07, Scope of Provisions.**

A. Except as may otherwise be provided in Article XXII herein, every building and structure erected, every use of any lot, building, or structure established, every structural alteration or relocation of any existing building or structure occurring, and every enlargement of, or addition to an existing use, building and structure occurring after the effective date of this Ordinance shall be subject to all regulations of this Ordinance which are applicable in the zoning district in which such use, building, or structure shall be located.

B. Uses are permitted by right only if specifically listed as principal permitted uses in the various zoning districts or is similar to such listed uses. Accessory uses are permitted as listed in the various zoning districts or if similar to such listed uses, and if such uses are clearly incidental to the permitted principal uses. Special uses are permitted as listed or if similar to the listed special uses and if the required conditions are met.

C. All uses, buildings, and structures shall conform to the area, placement, and height regulations of the district in which located, unless, otherwise provided in this Ordinance.

D. No part of a yard, or other open space, or off-street parking or loading space required about or in connection with any use, building or structure, for the purpose of complying with this Ordinance, shall be included as part of a yard, open space, or off-street parking lot or loading space similarly required for any other use, building, or structure. Refer to Section 14.06.

E. No yard or lot existing at the time of adoption of this Ordinance shall be reduced in dimensions or area below the minimum requirements set forth herein. Yards or lots created after the effective date of this Ordinance shall meet at least the minimum requirements established herein except as otherwise provided in this Ordinance.

F. No lot, out lot or other parcel of land in a recorded plat shall be further partitioned or divided unless in conformity with the Zoning and Subdivision Control Ordinances of the Township and the Subdivision Control Act of 1967 and the Land Division Act of 1996, as amended.

G. There shall be no more than one (1) principal use located on a lot, parcel or building site, except as otherwise permitted in this Ordinance. See Section 14.06.

**Howell Township Zoning Ordinance art. III, § 3.10, Permitted Zoning District Uses and Other Provisions in This Ordinance.**

While each Zoning District and the uses it permits are designed to represent separate categories of compatible land uses and the regulations controlling, other Articles in this Zoning Ordinance may also appropriately apply including those provisions included in Article XIV "Supplemental Regulations", Article XV "Environmental Provisions", Article XVI "Special Uses", Article XVII "Nonconforming Land, Building and Structural Uses", Article XVIII "Off-Street Parking, Loading and Unloading Requirements", Article XIX "Sign Regulations", Article XX "Site Plan Review", Article XXVI "Roads, Driveways and Related Land Use Developments and Construction in Private Developments", Article XXVII "PUD-Planned Unit Development Projects" and Article XXVIII "Landscaping Requirements". Applicants for zoning permits should relate their requests to both the appropriate zoning district as to use and the above Articles for applicability.

**Howell Township Zoning Ordinance art. X, RSC Residential Service Commercial District.**

**Section 10.01 PURPOSE**

This District is to recognize the unique regional location existing in Howell Township around the combination of I-96, M-59 and Grand River Road and therefore plan the surrounding adjacent area in part for regionally accessible commercial developments.

**Section 10.02 PERMITTED PRINCIPAL USES.**

The following uses are permitted as long as the use is conducted completely within an enclosed principal building and enclosed accessory structures and areas having controlled entrances and exits with the exits having operating cashier stations where the payment of goods or services purchased can be paid by customers:

A. Retail establishments, including supermarkets, department stores, home appliance stores, hardware stores, home improvement stores and other similar types of retail outlets that sell food items, hardware goods, drugs and sundries, home improvement items, gifts, dry goods, clothing and dressmaking equipment and supplies, notions, home appliances, wearing apparel, shoes and boots, automotive equipment, parts and supplies, photographic equipment and supplies, electrical equipment and supplies, office equipment and supplies, home interior decorating equipment and supplies, art equipment and supplies, furniture, antiques, showrooms with interior and/or exterior exposure, home garden equipment and supplies, candy and confections, alcoholic and non-alcoholic beverages, toys and games, electronic equipment and supplies, musical instruments and supplies, outdoor and indoor recreation equipment and supplies, pets and pet equipment and supplies, building and construction equipment and supplies, medical and dental equipment and supplies, graphic arts equipment and supplies, computer and data processing equipment and supplies, leasing, rental, and sale of new and used motorized vehicles including but not limited to cars, trucks, recreational vehicles, and motorcycles, and other uses of a similar character that are normally an integral part of a regional shopping center.

B. Service establishments, either as completely separate units or as an integral part of any of the principal uses permitted in A. above, and additionally including service outlets for insurance, real estate, medical and dental clinics, veterinary clinics and hospitals, nursing and convalescent homes, theatres, assembly and concert halls, indoor commercial recreation, clubs, fraternal organizations and lodge halls, restaurants, private and business schools, churches, public and private office buildings, motels and hotels, and uses of a similar character that are normally an integral part of a regional shopping center.

C. Mini Warehouses.

## Section 10.03 PERMITTED PRINCIPAL SPECIAL USES WITH CONDITIONS.

A. Automotive gasoline and service stations in accordance with the provisions of Article XVI, "Special Uses" for this use. See Section 16.11.

B. Drive-in retail and service establishments in accordance with the provisions of Article XVI, "Special Uses" for this use.

Add 4

C. Regional shopping centers in accordance with the provisions of Article XVI, "Special Uses" for a collective grouping of two (2) or more of the uses permitted in this district.

D. Commercial Kennels subject to Section 14.42.

### Section 10.04 PERMITTED ACCESSORY USES.

A. Normal accessory uses to all "Permitted Principal Uses."

B. Normal accessory uses to all "Permitted Principal Special Uses." See Section 14.34.

. . .

## Howell Township Zoning Ordinance art. XI, HSC Highway Service Commercial District.

### Section 11.01 PURPOSE

The highway service commercial district is designed to provide for servicing the needs of highway traffic at the interchange areas of public roads and highway facilities. The avoidance of undue congestion on public roads, the promotion of smooth traffic flow at the interchange area and on the highway, and the protection of adjacent properties in other districts from the adverse influences of traffic are prime considerations in the location of this district.

### Section 11.02 PERMITTED PRINCIPAL USES.

The following uses are permitted as long as they are conducted completely within a building except as otherwise provided for specific uses:
A. Vehicle service and repair stations for automobiles, trucks, busses and trailers. See Section 14.34.

B. Emergency facilities related to highway travelers.

C. Parking garages and parking areas.

D. Parking areas, if enclosed by a six (6) foot high fence, wall or berm.

Add 5

All berms shall be completely planted with grass, ground covers, shrubs, vines and trees.

E. Bus passenger stations.

F. Retail and service establishments providing foods and services which are directly needed by highway travelers.

G. Transient lodging facilities, including motels and hotels.

## Section 11.03 PERMITTED PRINCIPAL SPECIAL USES WITH CONDITIONS.

The following uses are permitted as long as they are conducted completely within a building except as otherwise provided for specific uses, and located in the District so as not to interfere with or interrupt the pattern of development of the "Permitted Principal Uses" in Section 11.02 and shall further meet the requirements of Article XVI, "Special Uses":

A.    Recreation and sports buildings.

B.    Recreation and sports areas, if areas are completely enclosed with fences, walls or berms with controlled entrances and exits.

C.    Commercial Kennels subject to Section 14.42.

## Section 11.04 PERMITTED ACCESSORY USES.

A. Normal accessory uses to all "Permitted Principal Uses."

B. Normal accessory uses to all "Permitted Principal Special Uses."

C. See Section 14.34.

## Section 11.05 PERMITTED ACCESSORY USES WITH CONDITIONS.

Swimming pools for use as a part of a Highway Service Commercial District. Use in conformance with the provisions of Section 14.18.

Add 6

## Section 11.06 REQUIRED CONDITIONS OF ALL DISTRICT USES.

All principal and accessory uses in this District shall be required to meet the following conditions, except as otherwise specified for specific uses:

A. Barriers. Replaced by Article XXVIII.

B. Access ways. Each separate use, grouping of buildings or groupings of uses as a part of a single planned development shall not have more than two (2) access ways from a public road. Such access way shall not be located closer than 300 feet to the point of intersection of an interstate highway entrance or exit ramp baseline and the public road centerline. In cases where the ramp baseline and the public road centerline do not intersect, no access way shall be located closer than 300 feet from the point of tangency of the interstate highway ramp baseline and the public road centerline. In those instances where properties fronting on a public road are of such width or are in multiple ownership and access ways to property cannot be provided in accord with the minimum 300 feet distance from the intersection of the public road an entrance or exit ramps of an interstate highway a frontage access road shall be provided to service such properties. The access way to a frontage access road shall not be located closer than 300 feet from the point of intersection or of tangency of the interstate highway ramp baseline and the public road pavement.

. . .

## Howell Township Zoning Ordinance art. XII, HC Heavy Commercial District.

### Section 12.01 PURPOSE

The intent of the Heavy Commercial District is to provide an area appropriate by location and design for a meaningful and realistic commercial utilization of Grand River road frontage that caters to both the business community and the public at large for those heavy commercial uses that can coexist and be compatible with the neighboring uses within the District.

Add 7

## Section 12.02 PERMITTED PRINCIPAL USES

The following uses are permitted as long as they are conducted completely within a building, structure or an area enclosed and screened from external visibility beyond the lot lines of the parcel upon which the use is located, except as otherwise provided in this Ordinance.

A. Facilities necessary to the operation of all existing methods of transportation, including those for highway, rail and air, including truck terminals, railroad sidings and airplane parking ramps, servicing, repair and storage.

B. Warehousing and related bulk handling facilities, equipment and support services.

C. Bulk handling of commercial and industrial services and related facilities, equipment and support services.

D. Contractor buildings, structures and equipment and materials storage yards for building and other types of construction.

E. Building material supply establishments.

F. Construction and farm equipment sales and service establishments.

G. Leasing, rental, and sale of new and used motorized vehicles including but not limited to cars, trucks, recreational vehicles, and motorcycles.

H. Gasoline Service Stations, provided they additionally meet the requirements of Section 16.11.

I. Gasoline Service Stations combined with restaurants, convenience stores and other traveler or commuter related uses provided they are located in the same building or a combination of buildings having common walls and the same front building façades.

J. Mini Warehouses.

**Section 12.03 PERMITTED PRINCIPAL SPECIAL USES WITH CONDITIONS.**

The following uses are permitted as special uses in accordance with Article XVI, "Special Uses":

A. (Deleted in its entirety).

B. Junk yards which receive, temporarily store, disassemble and reclaim used or damaged goods for the purpose of a resale as used or rebuilt goods or scrap materials.

C. The following uses are permitted as long as they are conducted completely within a building, structure or an area enclosed and screened from the external visibility beyond the lot lines of the parcel upon which the use is located and subject to Article XVI, "Special Uses":

    1) Electrical machinery, equipment and supplies, electronic components and accessories.

    2) Professional, scientific and controlling instruments, photography and optical goods.

    3) Fabricating metal products, except heavy machinery and transportation equipment.

    4) Contract plastic material processing, molding and extrusion.

D.   Any of the uses listed in Section 12.05 A-K provided they are developed and operated primarily to serve the principal uses permitted by right as listed in Section 12.02 and/or permitted as principal special uses as listed in this Section 12.03.

E. Commercial Kennels subject to Section 14.42.

**Section 12.04 PERMITTED ACCESSORY USES.**

A. Normal accessory uses to all "Permitted Principal Uses."

Add 9

B. Normal accessory uses to all "Permitted Principal Special Uses."

**Section 12.05 PERMITTED ACCESSORY USES WITH CONDITIONS.**

The following accessory uses are permitted when they are an integral part of the principal use and located within a building or structure housing the principal use or are included as a part of the site development upon which the principal use is located:

A. Restaurants

B. Medical and health care facilities

C. Office facilities

D. Warehouse and storage facilities

E. Recreation and physical fitness facilities

F. Work clothing sales and service facilities

G. Banking facilities

H. Education, library and training facilities

I. Research and experimentation facilities

J. Truck, other vehicular and equipment service maintenance, repair and storage facilities

K. Sales display facilities and areas.

L. See Section 14.34

**Section 12.06 REQUIRED CONDITIONS FOR ALL DISTRICT USES.**

A. Access roads. All uses shall only have vehicular access via Burkhart Road, Grand River Road M-59 State Highway (Highland Ave.) and Tooley Road.

Add 10

B. Barriers. Replaced by Article XXVIII - Landscaping Requirements.

C. Toxic waste disposal. All toxic wastes shall be disposed of in accordance with all state laws, rules and regulations governing their disposal.

. . .

# DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

R.E.No. 1, Complaint..................................................................PageID#1

R.E.No. 44, Second Amended Complaint ("SAC")............................. PageID#1084

R.E.No. 60, Def.'s Mot. to Dismiss..................................................... PageID#1178

R.E.No. 61, Pls'. Mot. for Summ. J..................................................... PageID#1276

R.E.No. 61-2, Ex. 1 to Pls'. Mot. for Summ. J,
    Howell Township Zoning Ordinance ("Ordinance") ................. PageID#1323

R.E.No. 117, Op. & Order Addressing Suppl. Briefing & Grant'g
    Def.'s Mot. to Dismiss .............................................................. PageID#2625

R.E.No. 118, Judgment ...................................................................... PageID#2635

R.E.No. 119, Notice of Appeal ........................................................... PageID#2636