**No. 23-1179**

**In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

OAKLAND TACTICAL SUPPLY, LLC; JASON RAINES; MATTHEW REMENAR; SCOTT FRESH; RONALD PENROD; and EDWARD GEORGE DIMITROFF,

      Plaintiffs-Appellants

v.

HOWELL TOWNSHIP, MI,

      Defendant-Appellee

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Bernard A. Friedman

**BRIEF OF APPELLEE HOWELL TOWNSHIP, MI**

Christopher S. Patterson (P74350)
Jacob N. Witte (P82558)
David J. Szymanski (P86525)
*Fahey Schultz Burzych Rhodes PLC*
Attorneys for Defendant-Appellee
4151 Okemos Road
Okemos, Michigan 48864
(517) 381-0100

Dated: June 7, 2023

1

# TABLE OF CONTENTS

Table of Contents ................................................................2

Table of Authorities ...........................................................4

Statement in Support of Oral Argument ................................8

Statement of Jurisdiction....................................................8

counter-Statement of Issues ...............................................8

Introduction .....................................................................9

Statement of the Case........................................................10

I.      The Township allows the use of firearms and commercial shooting ranges under its Zoning Ordinance. .......................................................10

II.     The District Court properly held that the Township's regulation of commercial shooting ranges does not violate the Second Amendment. ...........................13

    A.      Consistent with *Heller* and *McDonald*, the District Court dismissed Oakland's claimed right to construct and operate a 1,000-yard outdoor shooting range in the Township's AG-Residential District as falling outside the Second Amendment. ..............13

    B.      On remand from this Court and after *Bruen*, the District Court confirmed that constructing and operating a 1,000-yard outdoor shooting range anywhere in the Township was not protected by the Second Amendment.................................................14

Summary of the Argument....................................................15

Standard of Review ............................................................18

Argument.........................................................................19

I.      The plain text of the Second Amendment does not protect Oakland's proposed outdoor, open-air, 1,000-yard shooting range. ..............................................19

    A.      Oakland's proposed course of conduct is the construction and use of an outdoor, open-air, 1,000-yard shooting range..................................19

B.    The plain text of the Second Amendment does not protect Oakland's proposed course of conduct. ....................................................24

    1.    Under *Heller* and *Bruen*, the plain text of the Second Amendment does not cover the right to an outdoor, open-air, 1,000-yard shooting range, nor does it cover a general right to train.............................................................................................25

    2.    Oakland concedes that the scope of the right it seeks this Court to recognize is not within the plain text of the Second Amendment. ......................................................31

C.    Even if this Court were to recognize an ancillary right to train with firearms, the zoning ordinance neither bans nor unduly burdens that right. ...........42

D.    Oakland lacks standing if this Court broadly construes the proposed course of conduct as a general right to train. .......................................................47

II.    If this Court were to recognize a Second Amendment right, remand to the District Court is the only appropriate action because the District Court never reached or addressed the second prong of *Bruen*. .........................................50

A.    This Court should not address the second prong of *Bruen* because cases under *Bruen* are routinely decided on the first prong alone and the burden to provide historical analogues only arises when the plaint text of the Second Amendment covers the proposed course of conduct...................51

B.    The District Court did not reach or address the second prong of *Bruen* and it would be inappropriate for this Court to decide the issue in the first instance. ......................................................53

C.    This Court should disregard the "other authorities" cited by Oakland that attempt to distract from the issue in front of this Court. ...........................55

Conclusion .........................................................................................................56

Certificate of Compliance .................................................................................57

Certificate of Service ........................................................................................58

Designation of Relevant District Court Documents .................................................59

Index of Unpublished Opinions ..........................................................................61

# TABLE OF AUTHORITIES

## Cases

*Borrow Prop. Mgmt., LLC v. Oro Karric North, LLC*,
  979 F.3d 491 (6th Cir. 2020) ...............................................................21

*Brandywine, Inc. v. City of Richmond*,
  359 F.3d 830 (6th Cir. 2004) ...............................................................50

*Branzburg v. Hayes*,
  408 U.S. 665 (1972) ...............................................................36

*Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch. Dist.*,
  600 F.App'x 448 (6th Cir. 2015) ...............................................................53

*Def. Distributed v. Bonta*,
  No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839, at *7 (C.D. Cal. Oct. 21, 2022) ...............................................................52

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ...............................................................passim

*Dobbs v. Jackson Women's Health Org.*,
  142 S.Ct. 2228 (2022) ...............................................................42

*Drummond v. Robinson Twp*,
  9 F4th 217  (3rd Cir. 2021) ...............................................................43, 44

*Elonis v. United States*,
  575 U.S. 723 (2015) ...............................................................53

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...............................................................43, 44, 45

*Ezell v. City of Chicago*,
  846 F.3d 888 (7th Cir. 2017) ...............................................................43, 44

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000) ...............................................................48

*Jackson v. City & County of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ...............................................................43, 44

*JP Morgan Chase Bank, N.A. v. Winget*,
  510 F.3d 577 (6th Cir. 2007) ...............................................................19

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ....................................................................passim

*Muscarelo v. United States*,
   524 U.S. 125 (1998) ..................................................................... 27

*New York State Rifle & Pistol Ass'n, Inc v. Bruen*,
   142 S. Ct. 2111 (2022) ................................................................passim

*Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
   508 U.S. 656 (1993) ..................................................................... 48

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ..................................................................... 36

*Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*,
   477 F.3d 383 (6th Cir. 2007) ......................................................... 18

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ..................................................................... 36

*Teixeira v. Cty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ......................................................... 43

*Tollis, Inc. v. Cnty of San Diego*,
   505 F.3d 935 n.1 (9th Cir. 2007) .................................................... 11

*Tucker v. Middleburg-Legacy Place*,
   539 F.3d 545 (6th Cir. 2008) ......................................................... 19

*United States v. Alexander*,
   467 Fed. Appx. 355 (6th Cir. 2012) ................................................ 11

*United States v. Houston*,
   792 F.3d 663 (6th Cir. 2015) ......................................................... 53

*United States v. Miller*,
   307 U.S. 174 (1939) ................................................................. 19, 20

*United States v. Neal*,
   577 Fed. App'x. 434 (6th Cir. 2014) .......................................48, 53, 54

*United States v. Price*,
   No. 21 CR 164, 2023 U.S. Dist. LEXIS 23794, at *1 (N.D. Ill. Feb. 13, 2023) ..52

*United States v. Sitladeen*,
   64 F.4th 978 (8th Cir. 2023) ......................................................... 52

*United States v. Valentine*,
No. 2:20-CR-117 JD, 2023 U.S. Dist. LEXIS 46246, at *22 (N.D. Ind. Mar. 20, 2023) ................................................................................................ 52

*Wyser-Pratte Mgmt. Co., Inc. v. Texlon Corp.*,
413 F.3d 553 (6th Cir. 2005) ................................................................ 11


**Statutes**

Fed R. Civ. P. 12(c) ....................................................................... 13, 16

**Other Authorities**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 78 (2012) .................................................................... 25

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 WM. & MARY BILL RTS. J. 93 (2022) ................................................ 23

KEITH, WILLIAM, A SHORT DISCOURSE, ON THE PRESENT STATE OF THE COLONIES IN AMERICA, WITH RESPECT TO GREAT BRITAIN (1728) .... 39

Letter from Samuel Nasson to George Thatcher, July 9, 1789, in THE COMPLETE BILL OF RIGHTS (Neil H. Cogan ed., 2d. ed. 2015) ........................... 39

MICH. COMP. LAWS § 125.3201 (2006) ................................................ 11

Mich. Comp. Laws § 691.1542 (1994) .................................................. 12

Mich. Comp. Laws § 691.1543(3) ....................................................... 38

Mich. Comp. Laws §§ 28.421-28.435 (1927) ......................................... 12

*Originalism-By-Analogy and Second Amendment Adjudication*, 133 YALE L.J. (forthcoming 2023) ......................................................................... 51

ROWLAND, KATE MASON, THE LIFE OF GEORGE MASON (1892) ................. 39

Text of a Federalist Speech Not Delivered in the Maryland Convention, MD. JOURNAL, July 25, 29 & August 1, 5, 8, 1788 .................................... 39

THE AMERICAN MUSEUM: OR REPOSITORY OF ANCIENT AND MODERN FUGITIVE PIECES, & C. PROSE AND POETICAL, vol. 6 (Mathew Carey ed., 1789) ................................................................................................ 39

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 10 (John P. Kaminski et al. eds., 1993) .................. 39

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 12 (John P. Kaminski et al. eds., 2015) .................. 39

THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE
CONSTITUTION, vol. 37 (John P. Kaminski et al. eds., 2020) ..........................39

THE FEDERALIST NO. 29 (Alexander Hamilton) .................................................39

**Constitutional Provisions**

Mich. Const. art. I, § 6 ...............................................................................................39

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellee Howell Township ("Appellee" or "the Township") respectfully requests oral argument pursuant to 6 Cir. R. 34(a). The Township believes oral argument should be permitted because it would aid this Court in adjudicating the issue of first impression in this Circuit as to whether the plain text of the Second Amendment covers the right to construct or use an outdoor, open-air, 1,000-yard shooting range. Oral argument would seem particularly appropriate given the recent United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc v. Bruen*, 142 S. Ct. 2111 (2022).

## STATEMENT OF JURISDICTION

Appellee agrees with Appellants' Jurisdictional Statement.

## COUNTER-STATEMENT OF ISSUES

Whether the District Court properly dismissed Appellants' ("Appellants" or "Oakland") claim alleging the Township's Zoning Ordinance violates the plain text of the Second Amendment by not permitting Oakland's preferred outdoor, open-air, 1000-yard shooting range on the property Oakland leases adjacent to and near residential homes in the Township's Agricultural-Residential Land Use District.

## INTRODUCTION

This case centers on a challenge to the Township's Zoning Ordinance that regulates the location and operation of uses and structures within the Township so to maintain harmonious uses within certain land use districts. Consistent with such legislative policies, the Township desires commercial uses within four land use districts within the Township away from the Township's residential land use districts. The Township has classified shooting ranges as a commercial use, which disallows them from being located in the Township's AG-Residential Land Use District.

This case arose when the manager of Appellant Oakland Tactical Supply, LLC, a firearms retailer in Hartland Township, Michigan, sought to amend the Township's Zoning Ordinance to "allow for shooting ranges" in the AG-Residential Land Use District. Oakland alleges it desires to construct and open an outdoor, open-air, 1,000-yard shooting range in such district. As the Township Planner discussed with the Township's Planning Commission and Township Board, the textual amendment would allow shooting ranges near or adjacent to residential homes in approximately 65% of the land within the Township. The Township Board denied the request.

The District Court first determined that Oakland's claim failed to state a plausible Second Amendment violation. Subsequently, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), rejecting

the Sixth Circuit's previously applied means-end scrutiny analysis for Second Amendment cases.

This Court remanded; the District Court, for a second time, determined that Oakland's claim failed to state a plausible Second Amendment violation under *Bruen*. The District Court correctly determined that the proposed course of conduct— constructing and operating an outdoor, open-air, 1,000-yard shooting range anywhere Oakland so chooses—was not within the plain text of the Second Amendment.

The District Court further aptly noted that individuals in the Township were not prohibited by the Township's Zoning Ordinance from discharging their firearms to train. Nothing in the ordinance prohibits an individual's right to do so. Oakland, and individual Appellants, instead just desire a specific range on a specific piece of leased property. This Court should reach the same determination and affirm the District Court's dismissal.

## STATEMENT OF THE CASE

**I.  The Township allows the use of firearms and commercial shooting ranges under its Zoning Ordinance.**

Pursuant to the powers granted by the Michigan Zoning Enabling Act ("MZEA"), Mich. Comp. Laws §§ 125.3101-125.2702 (2006), and its predecessor, on January 8, 1983, the Township adopted its Zoning Ordinance based on its plan to design and locate harmonious land uses that preserve the public health, safety and

welfare of the Township's residents.[1] Consistent with the MZEA, the Zoning Ordinance has the express purpose of protecting public health, safety, and general welfare of the Township and its residents, as well as providing for the planned growth and development of land uses within the Township. (Answer to Am. Compl., R. 46-5, Page ID # 1147.) *See* Mich. Comp. Laws § 125.3201 (2006).

Under the MZEA, and relevant to this suit, the Township's Zoning Ordinance allowed commercial shooting ranges (indoor and outdoor facilities) in four land use districts. The Township's AG-Residential District, where Oakland desires to locate its shooting range, does not permit commercial shooting ranges. During the pendency of this suit, the Township, in good faith, adopted two amendments that still allow commercial shooting ranges in the Township. (Ordinance Amendment No. 285, R. 97-2, Page ID # 2235) As a result, commercial shooting ranges can be constructed and used in the Township's Regional Service Commercial District, Highway Service Commercial District, Industrial Flex Zone District, and Industrial District. (*See* Def.'s Supplemental Brief, R. 97, Page ID ## 2212-2214.)

---

[1] The Township asks this Court to take judicial notice of its Zoning Ordinance in line with well-established Sixth Circuit precedent. *See United States v. Alexander*, 467 Fed. Appx. 355, 360 (6th Cir. 2012) (*Citing Tollis, Inc. v. Cnty of San Diego*, 505 F.3d 935 938 n.1 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice.")); *Wyser-Pratte Mgmt. Co., Inc. v. Texlon Corp.*, 413 F.3d 553 (6th Cir. 2005) (The Court "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.").

Accessory uses that are customarily incidental to principal uses are also permitted within the Township's residential and non-residential use districts. (*See e.g.*, Township Zoning Ordinance, Article IV, Section 4.04.) Individuals can similarly perform activities related to such uses and structures. For example, individuals can construct improvements consistent with hunting and target shooting, such as, a hunting blind or backstop, on many properties in the Township.[2] Limitations, such as not discharging one's firearm within the proximity of an inhabited structure or at such a structure are subject to state law—not the Township Zoning Ordinance.[3]

The four land use districts where Oakland may construct its desired range comprise approximately 30% of the area within the Township. Individual Appellants have the ability to discharge firearms on private property, including target shooting

---

[2] While Oakland does not allege that the Township's Zoning Ordinance is at issue with respect to small residential lots within residential developments in the Township, there may be circumstances under state law and Township ordinances that hunting and target practice would not be appropriate.

[3] Michigan state law has several different regulations related to firearms, their use, and even sport shooting ranges. *See* Mich. Comp. Laws §§ 28.421-28.435 (1927); *see also* Mich. Comp. Laws § 691.1542 (1994) ("a person who owns or operates or uses a sport shooting range that conforms to generally accepted operation practices in this state is not subject to civil liability or criminal prosecution in any matter relating to noise or noise pollution resulting from the operation or use of the range *if the range is in compliance* with any noise control laws or *ordinances* that applied to the range and its operation at the time of construction or initial operation of the range) (emphasis added); *see also* Mich. Comp. Laws § 28.425b (2020) (Michigan has a "shall issue" licensing regime for carrying a concealed pistol); *see generally* Michigan State Police, *Firearms*, Michigan State Police, https://www.michigan.gov/msp/services/ccw.

and hunting, throughout the Township.

## II. The District Court properly held that the Township's regulation of commercial shooting ranges does not violate the Second Amendment.

### A. Consistent with *Heller* and *McDonald*, the District Court dismissed Oakland's claimed right to construct and operate a 1,000-yard outdoor shooting range in the Township's AG-Residential District as falling outside the Second Amendment.

After the Township—with the review and guidance of its Township Planner—denied Oakland's request to allow shooting ranges anywhere within the Township's AG-Residential district without conditions, Oakland filed suit against the Township on November 2, 2018. (Compl., R. 1, Page ID # 17.) The Township moved to dismiss Plaintiffs' Second Amended Complaint pursuant to Fed R. Civ. P. 12(c). (Mot. to Dismiss, R. 60, Page ID # 1179.) Oakland filed a Motion for Summary Judgment. (Pls.' Mot. for Summ. J., R. 61, Page ID # 1277.) The District Court granted the Township's motion and denied Oakland's motion as moot. (Op. and Order, R. 84, Page ID # 2091; *see also* Judgement, R. 85, Page ID # 2092.) The District Court dismissed the complaint "because [the Township] violated none of plaintiffs' Second Amendment rights by denying the requested zoning amendment at issue." (Op. and Order, R. 84, Page ID # 2086.) The District Court explained that the claim "Howell Township bans all shooting ranges is not plausible" because "the ordinance appears on its face to allow shooting ranges in districts other than those designated AR." (Op. and Order, R. 84, Page ID # 2086.)

Oakland moved to reconsider. (Mot. for Recons., R. 86, Page ID # 2094.) The District Court denied that motion because "plaintiffs based their claim on the outlandish proposition that Howell Township violated their Second Amendment rights by denying the application submitted by Oakland's member, Mike Paige, to amend the township zoning ordinance so as to allow for shooting ranges *throughout the AR district*." (Op. and Order, R. 91, Page ID ## 2185-86.) (Emphasis in original.) The District Court explained the absurdity pursued by Oakland:

> Had the township approved Paige's application, the township would have been obligated to approve any application for a shooting range on any parcel within this district so long as "dimensional regulations" (e.g., setback requirements) were met. As the Court further noted, two-thirds of all Howell Township land (13,500 acres) is zoned AR. No provision of the Constitution, including the Second Amendment, requires government entities to grant an amendment to their zoning ordinances to permit any particular activity, whether it be to build cement factories, graze cattle, or construct long-distance shooting ranges.

(*Id*. at Page ID # 2186.) Oakland appealed.

**B.    On remand from this Court and after *Bruen*, the District Court confirmed that constructing and operating a 1,000-yard outdoor shooting range anywhere in the Township was not protected by the Second Amendment.**

On August 5, 2022, this Court remanded to consider the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The District Court vacated its decision. (Order, R. 96, Page ID # 2206.)  The District Court also required the parties to brief *Bruen*, which the parties did. (*Id*.; *see*

Def.'s Supplemental Br., R. 97, Page ID # 2208; Pls.' Supplemental Br., R. 104, Page ID # 2466.)

On February 17, 2023, the District Court again dismissed Oakland's complaint. (Op. and Order, R. 117, Page ID # 2634.) The District Court held that Oakland's "proposed conduct is best summarized as ***construction and use of 'an outdoor, open-air, 1,000-[yard] shooting range.'***" (*Id.* at Page ID ## 2629-2630.) (Emphasis added.) The District Court then granted the Township's motion because "the proposed course of conduct, construction and use of an outdoor, open-air 1,000-yard shooting range, is not covered by the plain text of the Second Amendment." (*Id.* at Page ID # 2634.) The District Court additionally stated that the issue in this case could not be the right to train because "the zoning ordinance does not prohibit 'training with firearms.'" (*Id.* at Page ID # 2632.) Following *Bruen* and this Court's direction on remand, the District Court deemed it need not reach the second question under *Bruen* because it answered *Bruen*'s first question in the negative. (*Id.* at Page ID # 2634.)

## SUMMARY OF THE ARGUMENT

Oakland argues that the Township's Zoning Ordinance violates the right to train with firearms. Oakland, however, specifies no specific provision of the Zoning Ordinance that denies Oakland or any individuals in the Township to train with firearms. Instead, Oakland actually alleges in their Second Amended Complaint that

they desire to construct and use an "extensive outdoor shooting range facility," which would include a 1,000-yard outdoor shooting range. (Am. Compl., R. 44, Page ID # 1085, ¶6). Oakland alleges that the Township violated their Second Amendment rights by denying a text amendment that would allow such use within the Township's AG-Residential District. (Answer to Am. Compl., R. 46-2, Page ID ## 1134-1136.)

The District Court, faced with Oakland's legal arguments that they seek to establish that the right to train is protected by the Second Amendment, despite the allegations in their complaint, properly determined that Oakland's gravamen was the construction of a 1,000-yard outdoor shooting range. In so finding, the District Court applied *Bruen*, dismissing Oakland's claims under Fed. R. Civ. P. 12(c) because the plain text of the Second Amendment does not encompass a right to use or construct an outdoor, open-air, 1,000-yard shooting range wherever one so desires for preference and convenience. The District Court also rejected Oakland's legal arguments regarding a generalized claim to train due to the absurdity reached by Oakland's position.

In *Bruen,* the Supreme Court clarified that the Second Amendment must be applied based on its plain text: (1) "***[w]hen the Second Amendment's plain text covers an individual's conduct***, the Constitution ***presumptively protects that conduct***. [(2)] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct.

at 2129-30 (emphasis added). Only if Oakland's alleged conduct is covered by the plain text, does the Township have to justify it with historical analogues. According to *Bruen*, which adopted and confirmed *Heller's* approach, this standard begins "with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Id*. at 2127 (quoting *District of Columbia v. Heller,* 554 U.S. 570, 576-77, 578 (2008)). In *Heller*, the Supreme Court held the Second Amendment's operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592; *see also Bruen*, 142 S.Ct. at 2127.

Oakland concedes in its Open Brief that they seek a right beyond the plain text—one they argue can be assumed or implied by necessity. Oakland, however, overstates the meaning of the plain text. Oakland further conflates much of *Bruen*'s analysis by relying on history throughout every step in their analysis. This results in Oakland glossing over how their claims are supported by any textual component of the Second Amendment. This Court should conclude, as the District Court did, and *Heller* and *Bruen* affirm, that this proposed course of conduct is not protected by the plain text of the Second Amendment. Not even Oakland's broadly stated right to train has textual support. This Court should end its analysis there, affirming the District Court.

To the extent this Court would continue its analysis, the Court should recognize Oakland's flawed analysis regarding establishing ancillary rights under the Second

Amendment. If this Court recognizes that certain necessary predicate acts require protection, the Court should reject Oakland's methodology that ancillary rights are within the plain text of the Second Amendment post-*Bruen*. Instead, this Court should hold that ancillary rights only arise where the Township has placed an undue burden on an act that is necessary to conduct the textual elements of the Second Amendment's operative clause. The level of an undue burden on such necessary act must then "infringe" a right covered by the plain text of the Second Amendment. Since the Township does not prohibit an individual's ability to train with firearms within the Township, no such violation of an ancillary right, even if the Court were to find the right to not prohibit training with a firearm existed, has occurred here.

If the Court finds that Oakland have properly alleged a course of conduct covered by the plain text of the Second Amendment (which the District Court soundly rejected three times), this Court should remand to the District Court with further direction, including allowing the Township to establish historical regulations that are analogous to the Township's Zoning Ordinance.

## STANDARD OF REVIEW

This Court reviews the "district court's grant of a motion for judgment on the pleadings *de novo*." *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383, 389 (6th Cir. 2007). A motion for judgment on the pleadings requires this Court accept "all well-pleaded material allegations of the pleadings . . . be taken as true,"

but this Court need not accept "legal conclusions or unwarranted factual inferences" as true. *JP Morgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal quotations and citations omitted). "A motion brought pursuant to Rule 12(c) is appropriately granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (internal quotations and citations omitted).

## ARGUMENT

### I. The plain text of the Second Amendment does not protect Oakland's proposed outdoor, open-air, 1,000-yard shooting range.

#### A. Oakland's proposed course of conduct is the construction and use of an outdoor, open-air, 1,000-yard shooting range.

Oakland continues to argue that their alleged course of conduct is the general right to train. Such general right belies their Complaint. The District Court correctly held their right was far narrower, and this Court should do the same.

The Supreme Court has consistently identified and defined the conduct at issue in Second Amendment challenges before determining whether the conduct is protected by the Second Amendment. In *United States v. Miller*, the Court characterized the course of conduct as the "possession or use of a 'shotgun having a barrel of less than eighteen inches in length[.]'" 307 U.S. 174, 178 (1939). Similarly, in *Heller* the Court characterized the conduct at issue as the possession of a handgun

in one's own home for lawful use. 554 U.S. at 628. Again, in *McDonald v. City of Chicago*, the challengers were described by the Court as "Chicago residents who would like to keep handguns in their homes for self-defense[.]" 561 U.S. 742, 750 (2010) (plurality opinion). *Bruen* reiterated this standard by immediately defining the proposed course of conduct in that case as "carrying handguns publicly for self-defense," before determining whether such conduct is covered by the plain text of the Second Amendment, although no party disputed that the conduct was indeed covered. 142 S. Ct. at 2134.

The District Court adhered to the analysis laid out in *Miller*, *Heller*, *McDonald*, and, most importantly, *Bruen* determining that Oakland's proposed course of conduct is "best summarized as construction and use of 'an outdoor, open-air, 1,000-yard shooting range.'" (Op. and Order, R. 117, Page ID ## 2629-2630.) The District Court's application was in line with *Bruen* because in *Bruen* the right of self-defense was implicated, yet the Court still narrowly defined the proposed course of conduct as "carrying handguns publicly for self-defense," not a general right to self-defense. 142 S. Ct. at 2134. The distinction in *Bruen* cuts right against what Oakland is attempting to do in this case.

Oakland attempts to shift its proposed course of conduct from a specific course of conduct (i.e., the construction and use of an outdoor, open-air, 1,000-yard shooting range) to a general course of conduct (i.e., the right to train with firearms): "Here,

that proposed course of conduct is training with firearms that are in common use."
(Oakland's Opening Brief, R. 14, Page ID ## 28-29.)[4] Oakland's argument that this
Court should accept a broadly defined proposed course of conduct was implicitly
rejected by *Bruen*. The Court in *Bruen* never indicated—despite having the clear
opportunity to do so—that when a general alleged right encompassed within the
Second Amendment (i.e., the right of self-defense) is implicated, the underlying
conduct (i.e., carrying handguns publicly for self-defense) related to that concept is
presumptively covered. Instead, the Court in *Bruen* held that challengers to the
Second Amendment must establish the specific proposed course of conduct is
protected by the Second Amendment. 142 S. Ct. at 2134. The specific course of
conduct Oakland seeks to engage in is the construction and use of an outdoor, open-
air, 1,000-yard shooting range: "To be sure, Oakland [Tactical] does wish to construct
a 1,000-yard outdoor shooting range and Training Plaintiffs do wish to use it …."
(Oakland's Opening Brief, R. 14, Page ID # 30.)

---

[4] This Court has already recognized Oakland's efforts to shift its proposed course of
conduct throughout the case. (Unpublished Opinion and Judgment, R. 94, Page ID #
2200.) The attempt by Oakland to shift the entire nature of its claim even further (i.e.,
from a right to train at outdoor, long-distance shooting ranges to merely training in
general) through this appeal must be rejected because "[o]nce litigation commences,
a party typically is bound by its action[.]" *Borrow Prop. Mgmt., LLC v. Oro Karric
North, LLC*, 979 F.3d 491, 495 (6th Cir. 2020).

The District Court considered the consequences of reviewing the specific conduct in this case with generality and explained that Oakland's broad characterization of its proposed course of conduct, even if accepted, would be problematic in this case: "***The proposed conduct could not be simply 'training with firearms' because the zoning ordinance does not prohibit 'training with firearms.***" (Op. and Order, R. 117, Page ID # 2632.) (Emphasis in Original.) The District Court further explained that conduct construed so generally as the right to train would include any conduct related to firearms training:

> Moreover, ***plaintiffs' position that the 'proposed conduct' is training with firearms' would lead to an absurd result***. ***In any future case, any proposed conduct touching on any type of firearms training would be presumptively protected by the plain text of the Second Amendment***. In order to regulate, *e.g.*, the location or restriction of such training if challenged in court, a municipality would be required to reach the second step of the *Bruen* analysis and demonstrate that the regulation is consistent with the nation's historical tradition of firearms regulation. *Bruen* changed the landscape of Second Amendment jurisprudence, but it did not change it that far.

(*Id.*) (Emphasis in original.) To be sure, assuming *arguendo* the right to train is encompassed within the Second Amendment, if this Court were to accept Oakland's broad characterization of its proposed course of conduct, then future claims could be brought under the Second Amendment by many commercial businesses, such as stores that sell items for training with firearms (e.g., ammunition, practice targets, clay pigeons, safety glasses, ear protection, and shooting clothes) that are currently subject to valid local zoning regulations. It further begs the question why Oakland

could not seek to place a firearms store on Oakland's property to sell such equipment for use at their preferred range. This is because, under Oakland's view, courts could only look to whether regulations have any impact on training generally, no matter how remote. Oakland explicitly advocates for this extreme position: "Assuming that the Second Amendment protects training of some sort, nothing in the plain text provides a basis to make a distinction between particular types of training with firearms that are protected by the Second Amendment." (Oakland's Opening Brief, R. 14, Page ID # 30.) The District Court was correct in rejecting Oakland's view that would significantly expand the protections of the Second Amendment beyond the plain text.

Oakland's argument seeking to have this Court disregard their allegations of its Second Amended Complaint[5] and instead analyze a more abstract general right to train has no basis in Second Amendment jurisprudence[6] and contradicts the framework articulated in *Bruen*. Contrary to Oakland's assertion, the proposed course

---

[5] Oakland's Complaint demonstrates itself that the proposed course of conduct is to construct and use "an extensive outdoor shooting range facility," including "a long distance (e.g., 1,000 yard) range for qualified shooters and public access rifle, shotgun and handgun ranges on North Fleming Road in Howell Township." (Am. Compl., R. 44, Pg ID ## 1085-1086, ¶¶ 5-6.)

[6] In the absence of caselaw supporting Oakland's assertion of a broad general right to train, Oakland pursues this Court's validation of his own scholarship where he explores "the right to train" and explains that it is a "pillar of the Second Amendment." *See* Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill Rts. J. 93 (2022).

of conduct alleged by Oakland and argued previously should guide this Court's review on appeal. The proper inquiry under *Bruen* is whether the plain text of the Second Amendment protects the construction and use of a 1,000-yard outdoor, open air shooting range.[7]

### B.    The plain text of the Second Amendment does not protect Oakland's proposed course of conduct.

Consistent with *Heller* and *Bruen*, this Court should conclude that Oakland's right to construct an outdoor, open air, 1,000-yard shooting range anywhere it chooses within the Township is not covered by the plain text of the Second Amendment, just as the District Court did. Or, assuming *arguendo*, if this Court were to hold that Oakland's conduct is a more broadly claimed right, like the right to train at a shooting range or even more generally the right to train with firearms, this Court should still reach the same conclusion that Oakland's conduct is not covered by the plain text of the Second Amendment. *Heller* and *Bruen* did not hold such conduct, whether construed narrowly or broadly, to be covered by the plain text of the Second Amendment. If this Court were to disagree with the District Court and conclude otherwise, such conclusion would be a direct diversion from the precedent set by the

---

[7] In the event this Court construes the course of conduct slightly broader than the District Court determined (e.g., the right to train at a commercial shooting range), the Township maintains such a proposed course of conduct is not covered by the plain text of the Second Amendment, and the Township's arguments apply with equal force.

Supreme Court.

> **1.    Under *Heller* and *Bruen*, the plain text of the Second Amendment does not cover the right to an outdoor, open-air, 1,000-yard shooting range, nor does it cover a general right to train.**

The Supreme Court in *Heller* carefully analyzed the text of the Second Amendment, and then confirmed the meaning with certain history that similarly set forth textual meanings. 554 U.S. at 570. *Bruen* endorsed this approach. This Court, like the District Court, should remain consistent with *Heller* and *Bruen*'s plain text focus: "'The Constitution was written to be understood by the voters; its words and phrases were used in their ***normal and ordinary*** as distinguished from technical meaning.'" *Id*. at 575 (quoting *United States v Sprague*, 282 U.S. 716, 731 (1931)) (emphasis added).[8]

The Second Amendment's plain text provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. As explained in *Heller*:

> The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but ***rather announces a purpose***. The Amendment could be rephrased, "Because a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." *See* J. Tiffany, A Treatise on Government and

---

[8] Justice Scalia, was of the opinion that "[w]ords must be given ***the meaning they had when the text was adopted.***" Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation Of Legal Texts 78 (2012) (emphasis added).

> Constitutional Law § 585, p. 394 (1867); Brief for Professors of Linguistics and English as *Amici Curiae* 3 (hereinafter Linguists' Brief). Although this structure of the Second Amendment is unique in our Constitution, other legal documents of the founding era, particularly individual-rights provisions of state constitutions, commonly included a prefatory statement of purpose. *See generally* Volokh, The Commonplace Second Amendment, 73 N.Y.U. L.Rev. 793, 814–821 (1998).

554 U.S. at 577. *Heller* further articulated that the logical connection between the Second Amendment's prefatory and operative clause allows the "prefatory clause to resolve an ambiguity in the operative cause . . . [b]ut apart from that clarifying function, a prefatory clause does not limit or expand the scope of the operative clause." *Id*. at 577-78.

Given the role of the two clauses, *Heller* focused its textual analysis on the operative clause. In doing so, *Heller* analyzed the meaning of "keep," "bear," and "Arms." The Supreme Court described the object "Arms," as "[w]eapons of offence, or armour of defence" or "any thing that *a man wears* for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. at 581 (citing dictionaries from relevant time periods) (emphasis added). The Second Amendment extends only to "*instruments* that *constitute bearable arms*." *Id*. at 582 (emphasis added).

The Supreme Court then determined the most natural reading of "keep Arms" in the Second Amendment is to "have weapons."[9] *Heller* further confirmed that the

---

[9] *Heller* does reference that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." 554 U.S. at 583. In doing so,

right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id*. (quoting Justice Ginsburg's definition in *Muscarelo v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). The phrase includes that the ***carrying of a weapon*** is for the purpose of "offensive or defensive action." *Id.* at 584.

The Supreme Court then summarized the meaning of the textual elements, concluding the Second Amendment guarantees ***the individual right to "possess and carry weapons in case of confrontation***." *Id*. at 592 (emphasis added). The Supreme Court held the right was not unlimited: "Thus, we do not read the Second Amendment to protect the right of citizens to carry arms ***for any sort of confrontation***, just as we do not read the First Amendment to protect the right of citizens to speak ***for any purpose***." *Id*. at 595 (emphasis added).

*Heller*, as *Bruen* demonstrates, ***then*** confirmed its conclusion of this textual analysis by looking at the textual meanings from the following specific history: "English history dating from the late 1600s, along with American colonial views

---

*Heller* footnotes to sources that discuss that "everyone else" may keep arms in stances like "on the [a]ccount of [h]unting, [n]avigation, [t]ravelling and on the [s]core of [s]elling them in the way of [t]rade or [c]ommerce." 554 U.S. at 583 n.7. This footnote makes no reference to training, and even assuming *arguendo* it did, Oakland has the full ability to train within the Township, along with the other activities suggested in that footnote, subject to state law.

leading up to the founding," "state constitutions that preceded and immediately followed adoption of the Second Amendment," and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 600-01, 605, 662, n.28).

*Heller's* textual approach resulted in the Second Amendment protecting the core right for "law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 544 U.S. at 635; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (Stevens, J., dissenting) (plurality opinion) (quoting *Heller*, 554 U.S. at 635). On this understanding, the Court invalidated the District of Columbia's **complete ban** on handgun possession. *Heller*, 554 U.S. at 635, 628 ("the inherent right of self-defense has been central to the Second Amendment right," and the District's restrictions apply "to the home, where the need for defense of self, family, and property is most acute").

*Heller* further held that not all longstanding regulatory measures are presumptively unlawful, including "laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27. That list is not exhaustive and supports upholding zoning regulations. *Id*. at 627 n.26. Heller also discussed—in dicta not central to Heller's holding—that the Second Amendment includes the right

to bear arms for other lawful purposes.[10] *Id*. at 620. Even these other rights that *Heller* discussed in dicta, however, do not encompass any right to locate an outdoor shooting range or facility to train at any place a person chooses, and they do not expressly provide for the right to train generally.

Following *Heller*, the Supreme Court reviewed Chicago's handgun **ban**. *McDonald*, 561 U.S. at 785 (plurality opinion). In *McDonald*, the Supreme Court held that the Second Amendment applies to local governments through the Fourteenth Amendment. *Id.* at 790. The Supreme Court held that the scope of the right must be determined by a textual and historical inquiry. *Id*. at 770–77.

Most recently, the *Bruen* decision reaffirms the textual and historical analysis employed in *Heller* and *McDonald*. With heavy reliance upon *Heller*, the Supreme Court concluded that the plain text of the Second Amendment protects "carrying handguns publicly for self-defense." 142 S.Ct. at 2119. According to the Supreme Court, the Second Amendment's plain text meaning of "bear Arms" means public carry for purposes of self-defense. *Id*. at 2135. *Bruen* emphasized that the meaning of the term "arms" remains central to analyzing an individual's specific rights. *Id*. at

---

[10] *Heller* only referenced hunting and other lawful purposes in the context of the prefatory clause, which as discussed throughout this brief, is only used to resolve an ambiguity in the Operative Clause. Those other lawful purposes were never mentioned to include a shooting range, let alone the one sought by Oakland. Oakland concedes that no ambiguity exists in the operative clause; thus, there is no need to use the prefatory clause to determine any expanded meaning of the Operative Clause.

2132.

*Heller*, *McDonald*, and *Bruen's* analyses are instructive for this Court, as they were for the District Court, because "to keep and bear Arms" cannot be construed, based on its normal and ordinary meaning, as confirmed by history, to include a right to locate, construct, or operate an "outdoor, open-air, 1,000-yard shooting range" in any location Oakland chooses, or even more broadly, the right to train with firearms. No court has ever held that an outdoor, open-air, 1,000-yard shooting range is an actual "arm" or "instrument" that constitutes "bearable arms." By its normal and ordinary meaning, one cannot "bear," or carry an outdoor, 1,000-yard shooting range. Even looking at the conduct more generally, no court has ever held that the plain and ordinary meaning of the terms "bear arms" or "keep arms" means training with firearms. History, divorced from the plain text, should not be used to create textual meaning where none exists.

Just as the District Court did,[11] this Court should follow the plain text analyses and conclusions in *Heller*, *McDonald*, and *Bruen*, that the Second Amendment's plain text does not protect an overextended, extra-textual right to locate or construct

---

[11] The District Court concluded "[e]ven assuming that the Second Amendment offers ancillary or corollary protection for some forms of training, there is no way to read into the [Second] Amendment's 'plain text' a right to use and construct a 1,000-yard shooting range," and that the "plain text of the [Second] Amendment **says nothing** about long-range firing or even, for that matter, ***training more broadly***." (Op. and Order, R. 117, Page ID # 2633) (emphasis added).

an outdoor, open-air, 1,000-yard shooting range wherever one chooses, or even more generally, a right to operate a shooting range or train with firearms.

> ### 2. Oakland concedes that the scope of the right it seeks this Court to recognize is not within the plain text of the Second Amendment.

Oakland immediately concedes that the conduct at hand is an implied, corresponding right,[12] not a right within the normal and ordinary meaning of the Second Amendment's textual elements, as required by *Heller* and *Bruen*:

> The right to train with common firearms is included within the scope of this right ***by necessary implication***. That is because "constitutional rights necessarily protect the ***prerequisites for their exercise***." *Luis v. United States*, 578 U.S. 5, 25 (2016) (Thomas, J., concurring in judgment). One of the ***prerequisites*** for effective exercise of Second Amendment rights is training with firearms. Therefore, the "right to keep and bear arms … ***implies a corresponding right*** … to acquire and maintain proficiency in their use." *Id*. at 26 (quotation omitted).

(Oakland's Opening Brief, R. 14, Page ID # 14.) (Emphasis added.) Later in its Introduction, Oakland generally concludes that "[l]egally, as a matter of ***plain text***

---

[12] The Township notes that the terms "implied, corresponding right," "incidents or implications to constitutional rights," "ancillary right," and "corollary right" are used in this Brief and Oakland's Brief. The District Court referred to ancillary and corollary in the disjunctive. *See* Op. and Order, R. 117, Page ID # 2633. *Ezell I* and *Ezell II* reference "ancillary," "corresponding," and "important corollary." Oakland now uses "implied, corresponding right." For purposes of this case, the Township does not think this Court needs to decide if there are separate categories of rights because the Township does not unduly burden any perquisites for effective exercise of a plain text right, as occurred in Chicago, San Francisco, and the County of Alameda, or raised by Justice Thomas in *Luis*.

*and necessary implication*, training with common firearms–including training with those firearms in the manner Oakland seeks to offer, including at a 1,000-yard range–is covered by the Second Amendment." (*Id*. at Page ID # 16.)  The Supreme Court's majority has never held that a "necessary implication" should be considered and included when looking at the Second Amendment's textual elements, and Oakland provides zero analysis to support such conclusion. To the extent this Court entertains that an ancillary right to the Second Amendment is protected, which is not necessary in this case to reject Oakland's arguments, it should look to a regulation's undue burden placed on a necessary prerequisite to exercise an alleged plain text right, as discussed *infra* in Section I(C). Only upon concluding the regulation imposes such a burden, would historical analogs be applicable.

Oakland's failure to properly apply a plain text analysis continues throughout its Opening Brief. Oakland attempts to assert that "the district court put more pressure on the plain text analysis than it can bear." However, the District Court only followed and applied the plain text analysis outlined in *Heller* and *Bruen*. Oakland further makes conclusory statements, like "[a]ssuming the Second Amendment protects training of some sort," and "[a]ssuming training generally is protected by the plain text," despite *Heller* and *Bruen* never making such assumption.

Oakland does not seem to understand how *Heller* applied its textual analysis, which *Bruen* further adopts:

> *Heller* and *Bruen* demonstrate the **capacious** nature of the Second Amendment's plain text. For example, both cases indicate that, as a matter of plain text, the "people" protected by the Second Amendment are "all Americans." *See Heller*, 554 U.S. at 581; *Bruen*, 142 S. Ct. at 2156. Therefore, any limitations on the arms rights of certain types of Americans must be supported with "historical justifications." *Heller*, 554 U.S. at 635. For another example, to "bear" means simply to "carry." *Id*. at 584. As a matter of plain text, therefore, there is no basis for making "a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134—or any locational distinction at all, for that matter. *Bruen* thus discussed potential limits on carrying firearms in so-called "sensitive places" as part of its historical analysis, not as part of the plain text analysis. *Id*. at 2133–34. Thus, in any future case challenging a sensitive place restriction, the **broad** plain-text right to carry firearms would cover carrying in the place in question, and the government would be required to prove from history that restricting carry in that location is permitted.

(Oakland's Opening Brief, R. 14, Page ID # 30.) Oakland conflates different portions of *Heller* and *Bruen* in an attempt to show the right to train must somehow fall within those textual elements. However, that is not what the Supreme Court did. The Supreme Court in *Heller*, further adopted by *Bruen*, (1) defined, by reviewing the normal and ordinary meaning based on how those terms were generally known at the time of the ratification of the Second Amendment, the textual elements of the operative clause, (2) confirmed with certain history the conclusion of how the textual elements were defined, and (3) used the prefatory clause to ensure that no ambiguity existed in the operative clause.

Heller and Bruen did not, and Oakland has never shown, that the normal and ordinary meaning of the terms "arms," "keep," or "bear," include a "shooting range,"

let alone the right to construct and operate one commercially, or for that matter, the broader right to train. The only other attempt by Oakland to conduct a plain text analysis on any of the terms in the Second Amendment's operative clause is Oakland's cite to "Timothy Cunningham's important 1771 legal dictionary," which found that "bear arms" covers "nonmilitary" uses. (*Id.* at Page ID ## 33-34.) Oakland uses this cite from *Heller's* opinion to make the general conclusion that "[t]he right to bear arms, therefore, includes training." (*Id.* at Page ID ## 33-34.)

Oakland fails to consider the context in which *Heller* used this cite. *Heller* looked to Timothy Cunningham's important 1771 legal dictionary to define the term, "Arms," and to later show that the term "Bear Arms" is not limited to the military context. 554 U.S. at 582, 587-88. *Heller* did not hold or use this dictionary to show that a right to a shooting range or even a broader right to train falls within the normal or ordinary meaning of "Bear Arms," in the operative clause.

Oakland then doubles down on its claimed implied, corresponding right:

> Because the firearms Plaintiffs intend to train with are protected, training with those firearms necessarily is protected as well. "Constitutional rights … implicitly protect ***those closely related acts*** necessary to their exercise," *Luis*, 578 U.S. at 26 (Thomas, J., concurring in judgment), and this includes in the Second Amendment context the right "to acquire and maintain proficiency" in the use of firearms, *id.* Indeed, this must be the case because the right to armed self-defense "wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Therefore, the right to keep and bear firearms in common use "***implies a corresponding right*** to acquire and maintain proficiency with

common weapons." *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) (quotation omitted).

(Oakland's Opening Brief, R. 14, Page ID ## 32-33.) (Emphasis added.) Again, Oakland concedes that the right is an implied, corresponding right, and Oakland's continued reliance on Justice Thomas's concurrence in *Luis*, is flawed. *Heller*, *McDonald*, and *Bruen* (an opinion written by Justice Thomas six years later) never recognized that an implied, corresponding right is a plain text right under the Second Amendment. This Court should give no weight to a non-precedential setting concurrence in a non-Second Amendment case, written by a Justice who would later opine the majority opinion in *Bruen*, which recognized no such corresponding right.

Oakland also uses other pre-*Bruen* Second Amendment court of appeals cases, along with a plethora of other non-Second Amendment, constitutional cases, to show that their alleged conduct, whether construed broadly or more narrowly, must somehow fall within the plain text of the Second Amendment because "incidents to constitutional rights are protected." (*Id.* at Page ID # 34-35.) Again, *Heller*, *McDonald*, and *Bruen* never recognized the use of "incidents," "corollaries," or "ancillaries," in the context of a plain text analysis. And, the First Amendment cases cited by Oakland do not suggest that an "incident" to the First Amendment is within

the ***plain text*** of the First Amendment, either.[13] (*Id.* at Page ID ## 34-35.) As shown by *Heller* and *Bruen*, when conducting a textual analysis, the only considerations should be the normal and ordinary meaning of the Second Amendment's textual components, as defined or known generally at the time of its ratification. *See Heller*, 554 U.S. at 576; *see* also *Bruen*, 142 S. Ct. at 2136.

Oakland asserts that "[w]hile the Second Amendment does not expressly state that it protects a right to keep and bear *operable* firearms, the Supreme Court easily dispatched with the [District of Columbia's inoperable state] restriction" in that case. (Oakland's Opening Brief, R. 14, Page ID # 35.) Oakland fails to recognize that the Supreme Court reached this conclusion in *Heller* based on its plain text analysis of "bear arms," where it adopted Justice Ginsburg's definition, which included "being armed and ready for offensive or defensive action" and further held that the operative clause "guarantees the individual right to possess and carry weapons in case of confrontation." The District of Columbia's requirement infringed the Second Amendment because individuals could not bear arms pursuant to the Supreme Court's definition of "bear arms" in the operative clause.

Oakland also mischaracterizes the Second Amendment's prefatory clause to create a right to operate and construct a shooting range anywhere in the Township.

---

[13] Oakland cites to *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *Branzburg v. Hayes*, 408 U.S. 665 (1972); and *Stanley v. Georgia*, 394 U.S. 557 (1969).

Oakland states that *Heller*, "[i]n its analysis of 'security of a free State,' explained that 'the militia was thought to be necessary to the security of a free State,' because 'when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny.'" (Oakland's Opening Brief, R. 14, Page ID # 36 (quoting *Heller*, 554 U.S. at 597-98).) Oakland further provides that the adjective "well-regulated" implies nothing more than the imposition of training and discipline. (*Id.* at Page ID ## 36-37.) Oakland then broadly concludes, solely based on conflating the Supreme Court's textual analysis, that "the prefatory clause leaves no doubt that training is a protected activity."

Oakland is wrong. As *Heller* made clear, the prefatory clause is only an aid in understanding ambiguity of the Second Amendment; it "does not limit or expand the scope of the operative clause," and it is not where a Court should look to determine whether a right exists. *Heller*, 554 U.S. at 578. Oakland concedes that "[t]here is no ambiguity here to resolve." Thus, Oakland agrees with the Township that this Court need not resort to the prefatory clause.

Oakland also relies on the texts of state constitutions in order to reach a contradicting conclusion that "[s]tate constitutions confirm that the Founders understood that the people must be trained to effectively defend themselves," while conceding that "*Heller* looked to state constitutions to ***confirm*** its interpretation of the [Second Amendment's] plain text." (Oakland's Opening Brief, R. 14, Page ID #

37.) (Emphasis added.); *Heller*, 554 U.S. at 600-601.[14] The Supreme Court did not hold in *Heller* that state constitutions' texts create either a right to operate an outdoor 1,000 yard, shooting range, or even more generally a right to train with firearms. *See generally Heller*, 554 U.S. 570; *see also Bruen*, 142 S. Ct. at 2127-28 (holding "[w]e then canvassed the historical record and found yet further confirmation. That history included the 'analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment'").

These constitutions do not provide any analysis on how the normal and ordinary meaning of Second Amendment's textual elements should be interpreted as it relates to the inclusion of the right to train with firearms; thus, they provide little to no weight. To the extent that the state constitutions allegedly confirm that the Founders understood that people must be trained effectively to defend themselves, those opinions of the Founders should also have little to no weight, as further explained below.

Oakland makes other attempts to bring in excerpts from the debates over the

---

[14] Interestingly, the Michigan's Constitution specifically protects "[e]very person has a right to keep and bear arms *for the defense of himself* and the state." Mich. Const. art. I, § 6. Yet, Michigan also adopted the Sport Shooting Ranges Act, which specifically provides that a "local unit government" is not prohibited from "regulating the location, use, operation, safety, and construction of a sport shooting range." Mich. Comp. Laws § 691.1543(3).

Constitution's ratification,[15] arguing that "*Heller* also considered 'the drafting history of the Second Amendment–the various proposals in the state conventions and the debates in congress.'" However, *Heller* only did so to address Justice Steven's dissent and his reliance on "the drafting history of the Second Amendment." *See Heller*, 554 U.S. at 603. Oakland even identifies that *Heller* "cautioned that it would be improper to place too much weight on such history to interpret a text that was widely understood to codify a pre-existing right." (Oakland's Opening Brief, R. 14, Page ID # 39); *Heller*, 554 U.S. at 603. After making that assertion, Oakland then states that such evidence "cannot be used to contradict the plain meaning of the text, [but] it can be a confirmatory analytic." (Oakland's Opening Brief, R. 14, Page ID # 39.) This is incorrect; *Heller* only addresses this particular drafting history to attack Justice Steven's interpretation of the historical record.

---

[15] Oakland cites to nine (9) secondary sources to support its flawed argument: THE FEDERALIST NO. 29 (Alexander Hamilton); Text of a Federalist Speech Not Delivered in the Maryland Convention, MD. JOURNAL, July 25, 29 & August 1, 5, 8, 1788; THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 12 (John P. Kaminski et al. eds., 2015); Keith, William, A SHORT DISCOURSE, ON THE PRESENT STATE OF THE COLONIES IN AMERICA, WITH RESPECT TO GREAT BRITAIN (1728); THE AMERICAN MUSEUM: OR REPOSITORY OF ANCIENT AND MODERN FUGITIVE PIECES, & C. PROSE AND POETICAL, vol. 6 (Mathew Carey ed., 1789); THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 10 (John P. Kaminski et al. eds., 1993); Rowland, Kate Mason, THE LIFE OF GEORGE MASON (1892); THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, vol. 37 (John P. Kaminski et al. eds., 2020); and Letter from Samuel Nasson to George Thatcher, July 9, 1789, in THE COMPLETE BILL OF RIGHTS (Neil H. Cogan ed., 2d. ed. 2015).

As *Bruen* shows, *Heller* did not look to the debates of the Constitution's ratification to confirm its textual analysis of the components of the Second Amendment's operative clause. *Heller* looked to the following history:

> First, we reviewed "[t]hree important founding-era legal scholars [who] interpreted the Second Amendment in published writings." *Ibid.* Second, we looked to "19th-century cases that interpreted the Second Amendment" and found that they "universally support an individual right" to keep and bear arms. *Id.*, at 610, 128 S.Ct. 2783. Third, we examined the "discussion of the Second Amendment in Congress and in public discourse" after the Civil War, "as people debated whether and how to secure constitutional rights for newly freed slaves." *Id.*, at 614, 128 S.Ct. 2783. Fourth, we considered how post-Civil War commentators understood the right. *See id.*, at 616–619, 128 S.Ct. 2783.

*Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 605, 610, 614, 616-19). This Court should give no weight to any of the discussions from the Federalists and Antifederalists, provided by Oakland, as none of those discussions or history were used to confirm the Court's textual meaning in *Heller*, as identified by *Bruen*. Even, assuming *arguendo*, if this Court disagrees and does find that this history is relevant, it would be improper to place too much weight on such history, as Oakland and *Heller* point out.

Lastly, Oakland continues to oversell the history provided in Section III of its

Opening Brief. (*See* Oakland's Opening Brief, R. 14, Page ID ## 44-67.)[16] Oakland does not use such history to confirm its claimed "plain text" meaning. As discussed below, this Court should disregard such history. History is only relevant if necessary to "confirm" the meaning of the normal and ordinary of the Second Amendment's textual elements.[17] Those materials should not be provided weight in this plain text analysis.

Oakland continually argues with broad characterizations that their alleged conduct, whether construed narrowly or broadly, falls within the plain text. No matter how Oakland's conduct is construed, the conduct very clearly does not fall within the plain text of the Second Amendment if this Court follows the analysis conducted in *Heller*, *McDonald*, and *Bruen*. The District Court, after following the precedent set in those cases, found Oakland's arguments unavailing, and this Court should too.

---

[16] Oakland cites to over 61 secondary, historical sources in an attempt to show that "[h]istory reveals a celebrated tradition of training." (*See* Oakland's Opening Brief, R. 14, Page ID # 44.)

[17] Oakland does cite to post civil war commentators Thomas M. Cooley and Benjamin Vaughan Abbott. (*See* Oakland's Opening Brief, R. 14, Page ID # 33.) However, Oakland refuses to acknowledge that pursuant to *Heller* and *Bruen*, those commentator's thoughts are used only to **confirm** the normal and ordinary meaning of the Second Amendment's textual elements. *Heller* and *Bruen* did not conclude that training was included in the normal and ordinary meaning based on the use of select excerpts from those commentators.

**C.    Even if this Court were to recognize an ancillary right to train with firearms, the zoning ordinance neither bans nor unduly burdens that right.**

The Supreme Court has squarely addressed the core rights protected by the plaint text of the Second Amendment, as confirmed by history, in its prior holdings. The Supreme Court has not yet addressed whether any rights exist outside the plain text as ancillary rights.[18] The *Bruen* majority, including its author Justice Thomas, have emphasized the substantial burden on recognizing constitutional rights falling outside the plain text of the Bill of Rights.[19]  Since ancillary rights do not fall within the plain text, there is no presumption of constitutionality for those rights under *Bruen*. Oakland has the burden to establish the right and that the Township's regulation would be unconstitutional.

---

[18] Assuming *arguendo*, this Court holds that *Heller* implies some type of ancillary right, which it does not, this Court should look then at the fact that *Heller* involved a complete ban that placed such a burden on the right to "keep and bear arms" through its permitting scheme, that the burden on places to train infringed upon a core Second Amendment right. *Heller*, 554 U.S. at 632.

[19] In the same term the Supreme Court issued *Bruen*, the court issued a decision in *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022). In *Dobbs*, the Court analyzed rights outside the constitutional text, articulating a narrow test for identifying what substantive rights are incorporated against the states by the Due Process Clause of the Fourteenth Amendment. In such a context, the individual asserting the right has the burden of establishing the right. *Id*. at 2246. Where there is no historical evidence to support the claimed right, the right is not acknowledged by the court. *Glucksberg*, 521 U.S. 702, 703 (1997). Where there is conflicting historical evidence of the right being recognized, the Court does not recognize a right as existing. *See Dobbs*, 142 S.Ct. at 2247-58.

Notwithstanding the limits of the plain text, other circuits, including the Third, Seventh, and Ninth Circuits, have recognized ancillary rights under the Second Amendment only to the extent the necessary predicate falling within the ancillary right was unduly burdened, thus infringing upon the exercise of the core right of self-defense embodied in the Second Amendment. *See Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*") and *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*"); *see also Drummond v. Robinson Twp*, 9 F4th 217, 228 (3rd Cir. 2021); *see also Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

Pre-*Bruen*, the Third, Seventh, and Ninth Circuits' holdings were based upon concerns that, but for certain ancillary rights being protected, the right to "keep and bear Arms" would have little meaning. *Ezell I*, 651 F.3d, at 684; *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms"); *Jackson*, 746 F.3d at 967 ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." (internal quotations omitted)); *Drummond*, 9 F4th at 227 ("A right to bear those weapons, after all, 'wouldn't mean much without the training and practice that make [them] effective.'" (quoting *Ezell I*, 651 F.3d at 704). These decisions, however, were predicated upon identifying a necessary prerequisite to a plain text right that was

subject to a ban, thereby infringing upon the core right.

In the Third Circuit, the township similarly *eliminated* the use of center-fire cartridges, causing concern for the ability to practice with an entire category of "arms." *Drummond*, 9 F4th at 230. The Ninth Circuit held the Second Amendment covered ammunition because, unlike a restriction on making suppressors, "[a] regulation *eliminating* a person's ability to obtain or use ammunition *could thereby make it impossible to use firearms* for their core purpose." *See Jackson*, 746 F.3d at 967 (emphasis added).

In the Seventh Circuit, *Ezell I* and *Ezell II* were concerned with the Chicago's mandatory requirement that range training be required for a permit to purchase a handgun and yet *effectively* imposed a *complete ban* on available shooting ranges one could otherwise train to satisfy licensure requirements, thus directly impacting the ability to keep and bear arms. *Ezell I*, 651 F.3d at 698; *Ezell II*, 846 F.3d at 898. Each of these cases involved effective or complete bans on the alleged conduct, and these complete bans placed such a burden on the alleged conduct that those circuits found the Second Amendment's rights to "keep and bear arms" were infringed upon. *Ezell I* and *Ezell II* did not even find that the Township is required to accommodate Oakland's favored type of range (indoor vs. outdoor) or that a specific length is necessary (50 yards vs. 1,000 yards). *See Ezell I*, 651 F.3d at 704 ("the core right

wouldn't mean much *without* the *training and practice* that make it effective")
(emphasis added).

The Third, Seventh, and Ninth Circuits' recognition of regulations that place
such heavy burdens on necessary prerequisites for exercising a plain text right, to the
point that such burdens infringe upon the Second Amendment's plain text, is not at
issue here because the Township's Zoning Ordinance places little to no burden on
such ancillary conduct or rights. The Township Zoning Ordinance does not ban
training with firearms (and therefore otherwise infringe such a right if one exists).
Such claimed ancillary rights can be exercised in various forms within the Township
and nearby, including outdoors on private property, at nearby indoor ranges and
outdoor ranges with distances less than 1,000 yards, or at any range constructed and
operated in any of the four land use districts that allow for such ranges. Oakland could
alternatively use simulators and other calibers of long guns to simulate the same long
distances they seek here. *Ezell I*, 651 F.3d at 712 (Rovner, J., concurring).

Oakland fails to allege how the Township's Zoning Ordinance places any
significant burden upon their ability to exercise ancillary rights to train with firearms.
(*See* Am. Compl., R. 37, Page ID ## 862-863; Answer to Am. Compl., R. 46, Page
ID # 1127; Def.'s Mot. to Dismiss, R. 60, Page ID ## 1133, 1137, 1244-1253.) While
Oakland makes claims relating to the location of a commercial venue, they fail to
address how the Zoning Ordinance has any impact on the other activities that

individual Appellants desire to conduct, such as hunting or target practice. Oakland does not even address the Amendments to the Zoning Ordinance,[20] which clarified commercial shooting ranges within the Township. The only time Oakland addresses training on private property is in their Opening Brief when they concede that they have the ability for unrestricted private shooting on their very same land.

Oakland has further recognized that other shooting ranges are permitted in the Township, just not at the specific property surrounded by residences that Oakland desires (*See* Am. Compl., R. 44, Page ID ## 1086-1087, 1089, 1094, ¶¶ 8-10, 13, 30, 32.) Oakland even recognizes that ranges are allowed in some of the Township's land use districts, and that other indoor and outdoor ranges are in the vicinity of Oakland's desired location (*Id.* at Page ID ## 1087-1088, 1093-1094, 1101, ¶¶ 9, 10, 27, 60.)

Unlike the effective or complete bans outlined by the other Circuits, the Township's Zoning Ordinance places little to no burden on an ancillary right to train with firearms. Therefore, Oakland has not and will not be able to overcome the presumption of constitutionality of the Township's regulation, and to the extent this Court reaches such conclusion, this Court should hold that the Zoning Ordinance has not infringed upon Oakland's Second Amendment rights.

---

[20] Oakland states that "[w]e focus here on the unamended Ordinance because the amendments at a minimum cannot extinguish Plaintiffs' damages claims." (*See* Oakland's Opening Brief, R. 14, Page ID ## 18-19.)

Although the Court need go no further beyond the plain text analysis, and certainly not beyond finding that no ancillary right exists, if this Court were to find that Oakland did meet its burden to overcome the presumption of the Township's regulation's constitutionality, this Court should look to *Bruen* as a guide for the next step, and remand this case to allow a review of historical regulations that regulate corollary rights with similar impacts on plain text rights. If there is a historical practice of such regulations, then the Township's regulation would still survive.

### D.     Oakland lacks standing if this Court broadly construes the proposed course of conduct as a general right to train.

The Township raised several issues related to standing in its initial motion to dismiss (Def.'s Mot. to Dismiss, R. 60, Page ID ## 1195-1202) and subsequent reply. (Def.'s Reply, R. 75, Page ID ## 1933-1937.)[21] The District Court did not address these arguments in its initial opinion (Op. and Order, R. 84) or in its opinion currently on appeal. (Op. and Order, R. 117.) These issues of standing therefore are generally not reviewable by this Court but are preserved in the event this case is remanded to the District Court for any reason. *See United States v. Neal*, 577 Fed. App'x. 434, 439

---

[21] The Township noted that "[c]onsistent with the supplemental briefing ordered by the Court, the Township does not restate all of its arguments set forth in its Motion to Dismiss (ECF No. 60) and its Reply (ECF No. 75) as to why Oakland's [Second Amended Complaint] should be dismissed." (Def.'s Supplemental Brief, R. 97, Page ID # 2212). However, all of those arguments, including those related to standing, were properly in front of the District Court below.

(6th Cir. 2014) ("As the district court did not determine that Neal did not have standing . . . the issue of standing is not reviewable at this point.").

The District Court, however, did consider the issue of standing in determining the proposed course of conduct could not be as broad as the right to train with firearms: "The proposed conduct could not be simply 'training with firearms' because the zoning ordinance does not prohibit 'training with firearms.'" (Op. and Order, R. 117, Page ID # 2632.) In other words, the District Court recognized that Oakland could claim no injury if analyzed as a broad right to train. To the extent this Court characterizes the conduct in this case broadly, the Township believes that the District Court's opinion should be affirmed.

Standing must be maintained through the entire duration of a lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). Standing requires a plaintiff to demonstrate three things: (1) injury in fact, which means "an invasion of a legally protected interests that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "a causal relationship between the injury and the challenged conduct;" and (3) "a likelihood that the injury will be redressed by a favorable decision." *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993).

Oakland can claim no injury if the proposed course of conduct is construed as broadly as they allege: "Here, that proposed course of conduct is training with firearms that are in common use." (Oakland's Opening Brief, R. 14, Page ID ## 28-29.) This is because, as the Township has thoroughly explained below (Township's Reply, R. 75, Page ID # 1932) and the District Court concluded (Op. and Order, R. 117, Page ID # 2632), the Township does not generally prohibit training with firearms that are in common use. Furthermore, the Township attached to its response to Oakland's Second Amended Complaint a map of all the public shooting ranges in the State of Michigan where individuals can train, including those near Appellants' locations. (Answer to Am. Compl., R. 46-3, Page ID ## 1137-1138.) Oakland has also acknowledged that training is permitted in other areas of the Township by conceding that the Township has "allowed unrestricted shooting on private property as an accessory use throughout the Township." (Oakland's Opening Brief, R. 14, Page ID # 18.) And despite this concession, they fail to explain, let alone allege in their Second Amended Complaint, how individual Appellants are unable to engage in such generalized training and the discharge of firearms for other lawful purposes within the Township. Instead, all the individuals allege is a general inconvenience from being able to use Oakland's proposed facility.

In addition, even if Oakland could allege an injury (i.e., the inability to train with firearms), there would not be a causal connection between that injury and the

challenged provisions of the Zoning Ordinance. *See Brandywine, Inc. v. City of Richmond*, 359 F.3d 830 (6th Cir. 2004). The Zoning Ordinance deals with land use, not firearm regulation. In other words, if training were prohibited by the Township (which it is not), the Zoning Ordinance would not be the cause of that ban and Oakland's relief would not come through a Second Amendment challenge to the Zoning Ordinance.

Simply put, the District Court was correct in concluding that Oakland lacks standing if the alleged right is broadly construed as the right to train with firearms.

## II. If this Court were to recognize a Second Amendment right, remand to the District Court is the only appropriate action because the District Court never reached or addressed the second prong of *Bruen*.

The District Court did not reach the second prong under *Bruen* because it determined Oakland's proposed course of conduct was not covered by the plain text of the Second Amendment:

> The Court agrees with the Township that because this first question is answered in the negative, the Court need not reach the second (*i.e.*, whether historical evidence demonstrates that the regulations are consistent with the nation's historical tradition of firearms regulation)

(ECF117 PageID.2634.) The District Court's decision to not consider the second prong is consistent with how other courts have applied *Bruen* and the language of

*Bruen* itself.[22]

Oakland, however, asks this Court to address the second prong in *Bruen* and "decide this case in Plaintiffs' favor" if it resolves the first prong in favor of Oakland. (Oakland's Opening Brief, R. 14, Page ID # 44.) This Court should reject Oakland's invitation to become a trial court.[23] Furthermore, this Court should disregard the historical evidence offered by Oakland in relation to their arguments directed towards the second prong of *Bruen*.

      **A.**     **This Court should not address the second prong of *Bruen* because cases under *Bruen* are routinely decided on the first prong alone and the burden to provide historical analogues only arises when the plaint text of the Second Amendment covers the proposed course of conduct.**

---

[22] The majority in *Bruen* stated "when the Second Amendment's plain text covers an individual's conduct . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." The word "when" is being used as a condition, the reach of *Bruen's* historical-analogical test appears limited only to cases already covered by the "plain text" of the Amendment. Joseph Blocher, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 YALE L.J. (forthcoming 2023).

[23] It is astounding what Oakland seems to be asking this Court to do by inviting it to address the second prong in *Bruen* in the event it reverses the District Court on the first prong. ***This is an appeal of the District Court's granting of Defendant's motion to dismiss***. Yet, Oakland is asking for this Court to reverse the District Court's denial and seemingly reverse another decision of the District Court (which is not in front of this Court) and grant ***Plaintiffs' motion for summary judgment*** (Pls.' Mot. for Summ. J., R. 61, Page ID # 1277) by requesting this Court "decide this case in Plaintiffs' favor" (Oakland's Opening Brief, R. 14, Page ID # 44.)

Under *Bruen*'s approach, only when the plain text of the Second Amendment is found to cover the conduct at issue is a court required to address *Bruen'*s second prong. *See e.g., United States v. Sitladeen*, 64 F.4th 978, 989 n.3 (8th Cir. 2023) ("But whatever the answer to this difficult historical debate, we need not resolve it. Because *Flores* already answers *Bruen*'s threshold textual inquiry in the negative, the Government bears no burden of showing that [the regulation] is 'consistent with this Nation's historical tradition of firearm regulation.'"). In fact, a review of cases decided under the *Bruen* framework demonstrate that courts frequently only reach the first prong of *Bruen*, like the District Court did in this case.[24] *See United States v. Price*, No. 21 CR 164, 2023 U.S. Dist. LEXIS 23794, at *1 (N.D. Ill. Feb. 13, 2023); *United States v. Valentine*, No. 2:20-CR-117 JD, 2023 U.S. Dist. LEXIS 46246, at *22 (N.D. Ind. Mar. 20, 2023) ("Having found that §922(a)(6) does not implicate conduct protected by the Second Amendment, the Court will deny the motion and has no occasion to advance to the second prong of the *Bruen* analysis."); *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839, at *7 (C.D. Cal. Oct. 21, 2022).

---

[24] The Township understands that the cases presented in this section of the argument are not binding on this Court. However, the Township provides these cases to demonstrate the difficulty in accepting Oakland's argument that if it prevails on the first prong, the lack of the Township preemptively providing historical analogues (before the proposed course of conduct has even been determined) defaults the second prong of *Bruen*.

Simply put, despite Oakland's approximately 25 pages of unnecessary history[25] that inappropriately invite argument on the second prong of *Bruen*, there are no circumstances in which this Court should reach the second prong of *Bruen*. Doing so would run afoul of *Bruen*.

**B.    The District Court did not reach or address the second prong of *Bruen* and it would be inappropriate for this Court to decide the issue in the first instance.**

Sixth Circuit precedent demonstrates that this Court will not reach issues that the District Court did not reach or address. *See Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch. Dist.*, 600 F.App'x 448, 453 (6th Cir. 2015) ("We generally do not consider issues left unaddressed by the district court."); *United States v. Neal*, 577 F.App'x. 434, 439 (6th Cir. 2014) (explaining that when a district court does not make a determination on an issue, the issue is not reviewable by the appellate court). The reason for allowing district courts to make decisions in the first instance is because "awaiting a decision below and hearing from the parties [helps] ensure that [this Court] decide[s] correctly" after having the benefit of all the additional arguments and decision of the district court. *Elonis v. United States*, 575 U.S. 723, 742 (2015). As this Court has explained, it is a "court of review, not first view." *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015).

---

[25] The irrelevance of the history provided by Oakland is explained in Section II.C.

The second prong of *Bruen* presents several issues that this Court would be better positioned to review, not decide on in the first instance. The Court in *Bruen*, for example, noted that there is a debate on what history was relevant in the historical analogue inquiry. 142 S. Ct. at 2136-38. In *Bruen*, however, there was no dispute that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry" and so the Court stated the record before it was sufficient. *Id.* Oakland notes this debate (Oakland's Opening Brief, R. 14, Page ID # 58) but invites this Court to overlook it without full briefing below and a decision by the District Court. This would run counter to established Sixth Circuit precedent. *See Neal*, 577 F.App'x. 434, 439. But there is another reason this Court should not review the issue.

Oakland's invitation to this Court to reach the second prong of *Bruen* completely overlooks some questions related to what history is relevant because of how Oakland has shifted its proposed course of conduct throughout this litigation. This Court noted Oakland's attempt to shift its proposed course of conduct the last time Oakland appealed:

> We note that, although Oakland has alleged that the Second Amendment protects the right to train on 'outdoor ranges appropriate for . . . common firearms,' 'shotgun and handgun ranges,' and, more generally, 'a shooting range,' R. 86 PID 2113; R. 44 PID 1085-86, it most recently framed its proposed course of conduct as the right to train on 'outdoor, long-distance shooting ranges,' *see, e.g.*, Oakland Br. at 10.

(Unpublished Opinion and Judgment, R. 94, Page ID # 2200.) As discussed above,

Oakland alleges on this appeal a broader right. Without a resolution on the first prong of *Bruen* and what proposed course of conduct is alleged, the Township would be left to guess what historical analogues to provide. *See Bruen*, 142 S. Ct. at 2132-33 (explaining that to determine if regulations are relevantly similar, a court must consider the protected activity).[26]  Oakland's invitation to this Court to continue to the second prong of *Bruen* in the event it resolves the first prong in its favor is simply inappropriate because the issue was not reached or addressed by the District Court.[27]

### C.    This Court should disregard the "other authorities" cited by Oakland that attempt to distract from the issue in front of this Court.

In advancing its arguments on appeal, Oakland cites a total of 78 "Other Authorities." Notably, only 17 of the "Other Authorities" cited by Oakland are relied on related to their arguments focused on plain text analysis under *Bruen*. The rest of

---

[26] Oakland's assertion that "*Bruen* did not give New York repeated opportunities to supplement the record" (Oakland's Opening Brief, R. 14, Page ID # 43) completely overlooks that the proposed course of conduct in that case was "undisputed" and a plethora of history was presented by the respondents. 142 S.Ct at 2134-55 ("At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement.").

[27] Oaklands request this Court reach the second step of *Bruen* is additionally curious insofar as Oakland's only request of this Court in its conclusion is that "the district court's judgment granting the Township's motion to dismiss [ ] be reversed" (Oakland's Opening Brief, R. 14, Page ID # 68) and Oakland concedes a favorable determination related to the first step of *Bruen* "suffices to reverse the district court's decision." (Oakland's Opening Brief, R. 14, Page ID # 42.)

the 61 "Other Authorities" cited by Oakland are solely relied on for its argument related to the second prong of *Bruen* (i.e., where the Township would have the burden to produce historical evidence demonstrating that the regulations are consistent with the nation's historical tradition) in what can only be characterized as an end run around *Heller*'s historical analysis. Oakland conflates *Bruen*'s methodological approach. [28] This Court should reject such approach and the "Other Authorities" cited should be disregarded.

## CONCLUSION

For the reasons set forth above, the Township respectfully requests that this Court affirm the District Court's judgment dismissing Oakland's claimed violation of the Second Amendment, and grant the Township any other just and proper relief.

Respectfully submitted,

Dated: June 7, 2023

/s/Christopher S. Patterson
Christopher S. Patterson (P74350)
Jacob N. Witte (P82558)
David J. Szymanski (P86525)
*Fahey Schultz Burzych Rhodes, PLC*
Attorney for Defendant-Appellee
4151 Okemos Road
Okemos, Michigan 48864
(517) 381-0100

---

[28] There is simply no reason Oakland would have provided these "Other Authorities" for any reason other than to inappropriately supplement the record because even if the second prong of *Bruen* was reached, the burden would be on the Township to provide historical analogues. *See Bruen*, at 142 S. Ct. at 2134.

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements.

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words. This brief contains 12,702 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman.

Respectfully submitted,


Dated: June 7, 2023                    /s/Christopher S. Patterson
                                       Christopher S. Patterson (P74350)
                                       Jacob N. Witte (P82558)
                                       David J. Szymanski (P86525)
                                       *Fahey Schultz Burzych Rhodes, PLC*
                                       Attorney for Defendant-Appellee
                                       4151 Okemos Road
                                       Okemos, Michigan 48864
                                       (517) 381-0100

## CERTIFICATE OF SERVICE

I certify that on the date set forth below, the foregoing document was served on all parties of record or their counsel of record through the CM/ECF system if they are registered users, or if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below, if applicable).

Respectfully submitted,

Dated: June 7, 2023

/s/Christopher S. Patterson
Christopher S. Patterson (P74350)
Jacob N. Witte (P82558)
David J. Szymanski (P86525)
*Fahey Schultz Burzych Rhodes, PLC*
Attorney for Defendant-Appellee
4151 Okemos Road
Okemos, Michigan 48864
(517) 381-0100

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendant-Appellee, pursuant to Sixth Circuit Rules 28(a) and 30(g), designates the following portions of the record on appeal:

| Description of Entry | Date | Record No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 11/2/18 | 1 | 17 |
| First Amended Complaint | 6/6/19 | 37 | 862-863 |
| Second Amended Complaint | 7/11/19 | 44 | 1085-1089, 1093-1094, 1101 |
| Answer to 2nd Amended Complaint | 7/25/19 | 46 | 1127 |
| Exhibit 2 to Answer to 2nd Amended Complaint | 7/25/19 | 46-2 | 1134-1136 |
| Exhibit 3 to Answer to 2nd Amended Complaint | 7/25/19 | 46-3 | 1137-1138 |
| Exhibit 5 to Answer to 2nd Amended Complaint | 7/25/19 | 46-5 | 1147 |
| Defendant's Motion to Dismiss | 6/19/20 | 60 | 1133, 1137, 1179, 1195-1202, 1244-1253 |
| Plaintiffs' Motion for Summary Judgment | 6/19/20 | 61 | 1277 |
| Defendant's Reply | 8/11/20 | 75 | 1932-1937 |
| Opinion and Order Granting Defendant's Motion to Dismiss | 9/10/20 | 84 | 2086, 2091 |
| District Court Judgment | 9/10/20 | 85 | 2092 |
| Plaintiffs' Motion to Reconsider | 9/24/20 | 86 | 2094 |
| Opinion and Order Denying Plaintiffs' Motion for Reconsideration and for Leave to File a Third Amended Complaint | 2/9/21 | 91 | 2185-86 |
| Unpublished Opinion and Judgment | 8/5/22 | 94 | 2200 |

| Order Vacating ECF Nos. 84, 85, and 91 | 8/31/22 | 96 | 2206 |
|---|---|---|---|
| Supplemental Brief Supporting Entry of Judgment for the Township | 9/30/22 | 97 | 2208, 2212-2214, 2235 |
| Exhibit 2 (Ordinance Amendment No. 285) to Supplemental Brief | 9/30/22 | 97-2 | 2235 |
| Plaintiffs' Opposition to Defendant's Rule 12(c) Motion | 10/14/22 | 104 | 2466 |
| District Court Opinion Granting Summary Judgment | 2/17/23 | 117 | 2632-2634, 2629-2630 |

### INDEX OF UNPUBLISHED OPINIONS

| | Case Name | Page No. |
|---|---|---|
| A | *United States v. Price* | 52 |
| B | *United States v. Valentine* | 52 |
| C | *Def. Distributed v. Bonta* | 52 |



# United States v. Price

United States District Court for the Northern District of Illinois, Eastern Division

February 13, 2023, Decided; February 13, 2023, Filed

Case No. 21 CR 164

## Reporter
2023 U.S. Dist. LEXIS 23794 *; 2023 WL 1970251

UNITED STATES OF AMERICA, vs. EDWARD PRICE

**Counsel:** **[\*1]** For Edward Price, Defendant: Imani Chiphe, LEAD ATTORNEY, Federal Defender Program, Chicago, IL.

For USA, Plaintiff: Michael Joseph Kelly, LEAD ATTORNEY, SEC, Office of General Counsel, Washington, DC; Chicago, United States Attorney's Office (NDIL - Chicago), Chicago, IL; Pretrial Services; Charles William Mulaney, III, United States Attorney's Office, Chicago, IL.

**Judges:** MATTHEW F. KENNELLY, United States District Judge.

**Opinion by:** MATTHEW F. KENNELLY

## Opinion

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A federal statute, 18 U.S.C. § 922(g)(1), criminalizes the possession of a firearm by a convicted felon. Defendant Edward Price has filed a motion to dismiss the indictment in this case, which charges him with violating section 922(g)(1). He argues that this statute, on its face and as applied to him, violates the Second Amendment's guarantee of his right to bear arms as articulated by the United States Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022). The Court denies the motion to dismiss for the reasons set forth below.

## Background

Price has a criminal record that includes six prior felony convictions. Three of those convictions involved narcotics offenses, and the other three involved Price's violation of sex offender registration requirements. Price's sex offender registration **[\*2]** requirement was triggered by a juvenile court proceeding brought against him at age 13 in which he was adjudicated delinquent for criminal sexual assault.

On January 3, 2021, Price was pulled over by Chicago police officers for allegedly running a red light. During the stop, the officers recovered a loaded firearm from Price's sweatshirt pocket. On March 3, 2021, a federal grand jury returned an indictment against Price charging him with possession of a firearm by a convicted felon in violation of section 922(g)(1).

On December 22, 2022, Price filed a motion to dismiss the indictment. He contends that section 922(g)(1) is unconstitutional on its face and as applied to him as a nonviolent felon because the government cannot make the affirmative showing required by *Bruen* that the statute is part of the nation's historical tradition of limiting non-violent felony offenders' right to bear arms. His challenge follows in the wake of dozens of similar challenges around the country, including some in this district.[1]

---

[1] *See United States v. Garrett*, No. 18 CR 880, Dkt. no. 144, 2023 U.S. Dist. LEXIS 4923 (N.D. Ill. Jan. 11, 2023); *United States v. John Seiwert*, No. 20 CR 443, Dkt. no. 89 (N.D. Ill. Sept. 28, 2022);

Virtually every district court to decide this issue has rejected the constitutional challenge.

## Discussion

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people **[\*3]** to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the Supreme Court rejected the means-end standard long used by courts of appeal to evaluate firearm restrictions under the Second Amendment. The Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. When the Second Amendment's plain text protects certain conduct, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. If the government cannot demonstrate the existence of a historical tradition that would support applying the regulation to the conduct at issue, a court must conclude that the conduct is protected because it falls within the Second Amendment's "unqualified command." *Id.*

Prior to *Bruen*, the Supreme Court determined, in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008), that "the right secured by the Second Amendment is not unlimited," *id.* at 626, and extends only to "law-abiding, responsible" citizens who keep or bear arms for "lawful purposes." *Id.* at 635. *Heller* contemplated that certain citizens were "disqualified" from keeping or bearing arms under the Second Amendment. *Id.* at 635 ("*Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue **[\*4]** him a license to carry it in the home.") (emphasis

added). The Court made it clear that "nothing in [its] opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons," *id.* at 626-27, which the Court said are "presumptively lawful." *Id.* at 627 n.26. The Court reiterated this admonishment in *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons[.]" (internal quotation marks omitted)).

Applying *Heller*, in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), the Seventh Circuit rejected the precise argument advanced here by Price. In *Kanter*, the Seventh Circuit found section 922(g)(1) constitutional, finding the prohibition on the possession of firearms by felons—even those convicted of nonviolent felonies—to be presumptively lawful and substantially related to the important governmental objective of reducing gun violence. *Kanter*, 919 F.3d at 448. The court also rejected the suggestion, also made by Price, that dangerousness assessments of felons appropriately should be made on an individualized basis. The court stated that this "highly-individualized approach" was "'a function best performed by the Executive, which, unlike courts, is institutionally equipped for **[\*5]** conducting a neutral, wide-ranging investigation.'" *Id.* at 450 (quoting U.S. v. Bean, 537 U.S. 71, 77 (2002)).

These principles set by the Supreme Court in *Heller* and *McDonald*, and which the Seventh Circuit applied in *Kanter*, were left intact by *Bruen*. Price's argument seeks to separate *Bruen* from its factual context, which involved whether New York state could constitutionally "disarm *law-abiding* citizens" who carry firearms for self-defense. *Bruen*, 142 S. Ct. at 2133 (emphasis added). In answering this question, *Bruen* did not depart from *Heller's* framework that the right to bear arms belongs only to "law-abiding, responsible citizens." 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Indeed, the majority used the phrase "law-

---

*United States v. Heriberto Carbajal-Flores*, No. 20 CR 613, Dkt. no. 74 (N.D. Ill. May 6, 2022). The Seventh Circuit heard oral arguments on this issue in *Atkinson v. Garland*, No. 22-1557 (7th Cir.), on November 8, 2022 but has not yet issued a decision.

abiding" to describe "the people" whose rights the Second Amendment guarantees no fewer than fourteen times, including in its concluding paragraph:

> New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents *law-abiding citizens with ordinary self-defense needs* from exercising their right to keep and bear arms. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*Id.* at 2156 (emphasis added). Moreover, Justice Kavanaugh's concurrence repeats the Supreme Court's reassurances from *Heller* and *McDonald* regarding the presumptive constitutionality of felon dispossession [*6] laws. *Id.* at 2162. And Justice Alito's concurrence characterizes the Supreme Court's narrow holding as deciding only that "a State may not enforce a law . . . that effectively prevents its *law-abiding* residents from carrying a gun" for the purpose of self-defense, and "nothing about who may lawfully possess a firearm." *Id.* at 2157 (emphasis added). Finally, the Court stated that "nothing in [the Court's] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" which necessarily require applicants to show that they are "law-abiding, responsible citizens." *Id.* at 2138 n.9 (internal citations omitted).

The government argues that those charged under section 922(g)(1), by definition, are not law-abiding citizens but rather are among the classes of individuals whose rights to bear arms historically have been restricted for public safety. The Court agrees with the government. Section 922(g)(1) is a constitutional restriction on firearms possession because convicted felons—whether their underlying felony was violent or not[2]—are, by definition, not law-abiding and therefore do not fall within the textual purview of the Second Amendment.

Prior to *Bruen*, the Seventh Circuit noted in *Kanter* that "relying on the 'presumptively lawful' [*7] language in *Heller* and *McDonald*, every federal court of appeals to address the issue has held that § 922(g)(1) does not violate the Second Amendment on its face." *Kanter*, 919 F.3d at 442.[3] The court further noted that "[t]he Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits have suggested that § 922(g)(1) is always constitutional as applied to felons as a class, regardless of their individual circumstances or the nature of their offenses," and that although the Fourth, Eighth, and D.C. Circuits—along with the Seventh Circuit itself at that point—had "left room for as-applied challenges to the statute," none had ever actually upheld such a challenge. *Id.*

Price stakes much of his claim on discussion in the dissenting opinions in *Kanter* and *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), expressing doubt that history supports the categorical disqualification of felons convicted of nonviolent offenses from possessing firearms. But not only are those dissenting opinions not binding, they are contrary to the controlling law of this circuit upholding the categorical convicted felon firearms ban in section 922(g). *See Skoien*, 614 F.3d at 640 (law disqualifying domestic violence misdemeanants from firearms possession did not run afoul of *Heller* because "statutory prohibitions on the possession of weapons by some persons are proper"); *see also, United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (upholding [*8] section 922(g)(1)'s categorical ban on firearm possession by convicted felons); *Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019) (section

---

precaution").

---

[2] The Court notes, however, that Price's narcotics-related convictions are indicative of dangerous activity. *United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("[d]rug crimes are associated with dangerous and violent behavior and warrant a higher degree of

[3] In *Range v. AG United States*, 53 F.4th 262 (3d Cir. 2022), the Third Circuit also relied on this language to uphold the constitutionality of section 922(g)(1) post-*Bruen*. On January 6, 2023, the Third Circuit granted a petition for rehearing *en banc* and vacated the panel opinion.

922(g)(1) does not violate the Second Amendment as applied to felon convicted of non-violent crime).

Though the Seventh Circuit has not definitively decided whether felons were historically outside the scope of the Second Amendment's protection, it has suggested "that felons were not historically understood to have Second Amendment rights." *Kanter*, 919 F.3d at 445. And in *Skoien*, the Seventh Circuit stated that some "categorical limits" on firearm possession were "part of the original meaning" of the Second Amendment. *Skoien*, 614 F.3d at 640. In *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), the court similarly stated that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens," including felons. *Id.* at 684-85 (internal quotation marks omitted).

Courts in this district—and all those identified by the government in footnote 4 of its response—have also held, post-*Bruen*, that the plain text of the Second Amendment does not cover the possession of firearms by individuals who are not law-abiding. *See Seiwert*, 2022 U.S. Dist. LEXIS 175417, 2022 WL 4534605 at *2 (unlawful users of controlled substances fall outside the Second Amendment's protection as they are not law-abiding); *Garrett*, 2023 U.S. Dist. LEXIS 4923, 2023 WL 157961 at *3-4 (the Seventh Circuit's pre-*Bruen* caselaw holds that § 922(g) is constitutional in light of *Heller* and *McDonald's* prohibition against **[*9]** the use or possession of firearms by non-law-abiding citizens, and "*Bruen* does not disturb that conclusion" because it did not abrogate or otherwise suggest that this longstanding prohibition is no longer lawful).

To the Court's knowledge, only one federal court of appeals has reached an arguably contrary conclusion post-*Bruen*. In *United States v. Rahimi*, No. 21-11001, 2023 U.S. App. LEXIS 2693, 2023 WL 1459240 (5th Cir. Feb. 2, 2023), the Fifth Circuit held that the possession of a pistol and a

rifle by a defendant, while he was subject to domestic violence restraining order, fell within purview of Second Amendment, and thus, the Second Amendment presumptively protected his right to possess those weapons.[4] In reaching this conclusion, the Fifth Circuit referred to the "law-abiding, responsible citizen" or "ordinary, law-abiding citizen" constraint on the Second Amendment that many courts have relied on as an "implied gloss" that does not actually limit the Amendment's reach. *Rahimi*, 2023 U.S. App. LEXIS 2693, 2023 WL 1459240 at *4. But the court in *Rahimi*, in the same paragraph, seemingly acknowledged that the "law-abiding citizen" language used in *Heller* and then *Bruen* did mean to exclude "groups that have historically been stripped of their Second Amendment rights" by "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such **[*10]** as schools and government buildings . . . ." *Id.* (quoting *Heller*, 544 U.S. at 626-27). The court also acknowledged that "[t]here is some debate on this issue." *Rahimi*, 2023 U.S. App. LEXIS 2693, 2023 WL 1459240 at *3. In sum, both *Bruen* and *Rahimi* recognize that the right to keep and bear arms is subject to some reasonable restrictions. *Bruen*, 142 S. Ct. at 2131, 2156-57, 2162.

Price suggests that there is no basis to apply a different rule to convicted felons in the context of the Second Amendment than courts do in the context of the First or Fourth Amendments, citing *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015), in support. *Id.* at 669 (expressing reluctance to "place more weight on [] passing references [to law-abiding citizens] *than the Court itself did.*") (emphasis added). But as *Meza-Rodriguez* itself notes in this passage, the Supreme Court did, in *Heller*, place weight on this language

---

[4] The Court notes that *Rahimi* is distinguishable from this case because unlike the felony convictions underlying a section 922(g)(1) violation, the underlying offense in *Rahimi* was subject merely to civil process.

in reaching its decision. Second, this argument ignores differences between the rights protected by the First and Second Amendments, as the exercise of rights under the First Amendment do not put at risk the physical safety of others. That, in the Court's view, is an appropriate basis to "apply a different rule" to the Second Amendment than to the First or Fourteenth. Def.'s Mot. to Dismiss at 12. Section 922(g)(1) "comports with legislatures' longstanding authority and discretion to disarm citizens unwilling to obey the government and its laws." *Range*, 53 F.4th at 273.

Because the Second Amendment's plain text does not cover the possession of a **[*11]** firearm by a felon, the Court need not determine whether the government has demonstrated that section 922(g)(1) is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.[5] Section 922(g)(1) is constitutional on its face and as applied to Price, and nothing in *Bruen* disturbs that conclusion.

**Conclusion**

For the reasons stated above, the Court denies Price's motion to dismiss the indictment [dkt. no. 111]. The time between today's date and the March 9, 2023 status hearing is excluded under 18 U.S.C. § 3161(h)(7)(A) in the interests of justice due to the need for further preparation due to the Court's denial of the motion to dismiss.

/s/ Matthew F. Kennelly

MATTHEW F. KENNELLY

United States District Judge

Date: February 13, 2023

_____

[5] The Supreme Court in *Bruen* also expressly contemplated that step two would be applied only to law-abiding citizens. *Bruen*, 142 S. Ct. at 2133 (instructing that courts must identify historical analogues to modern firearm regulations by assessing "how and why the regulations burden a *law-abiding* citizen's right to armed self-defense.") (emphasis added).

**End of Document**

**B**

# United States v. Valentine

United States District Court for the Northern District of Indiana, Hammond Division

March 20, 2023, Decided; March 20, 2023, Filed

Case No. 2:20-CR-117 JD

**Reporter**

2023 U.S. Dist. LEXIS 46246 *; 2023 WL 2571720

UNITED STATES OF AMERICA v. DAVID REGINALD VALENTINE

**Counsel:** **[*1]** For David Reginald Valentine, Defendant: Roxanne Mendez Johnson - FCD, LEAD ATTORNEY, Federal Community Defenders Inc - Ham/IN, Northern District of Indiana, Hammond, IN.

For United States of America, Plaintiff: Nicholas J Padilla, LEAD ATTORNEY, US Attorney's Office - Ham/IN, Hammond, IN.

**Judges:** JON E. DEGUILIO, Chief United States District Judge.

**Opinion by:** JON E. DEGUILIO

# Opinion

## OPINION AND ORDER

The Defendant, David Valentine, has moved for the Court to allow him to withdraw his guilty plea and for the Court to dismiss his indictment. (DE 72.) Mr. Valentine argues he should be allowed to withdraw as the charge he pled guilty to is unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 213 L. Ed. 2d 387 (2022). He also argues that his indictment fails to state an offense for several reasons unrelated to the *Bruen* decision. For the following reasons, this motion will be denied.

## A. Factual Background

A federal grand jury returned a five-count indictment against Mr. Valentine in August 2020, charging him with five violations of knowingly making a materially false statement in the course of purchasing a firearm as prohibited by 18 U.S.C. § 922(a)(6). (DE 1.) All five counts allege Mr. Valentine lied about his state of residence and address. In addition, **[*2]** Counts Two and Three allege that Mr. Valentine also lied about being the actual purchaser of the firearm when, in fact, he was purchasing the firearm for another person (a practice known as "straw buying"). These false statements were made when Mr. Valentine completed Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473 and provided false answers to questions on the form. Mr. Valentine subsequently entered a plea agreement with the Government, pled guilty to Count Two of the indictment before a federal Magistrate Judge, and his plea was accepted by this Court on February 2, 2022. (DE 46.)

Therefore, there is no factual dispute in this case about whether Mr. Valentine has committed acts sufficient to be convicted under Count Two and the Court only needs to consider the legal questions raised by his motion.

## B. Legal Standards

A defendant does not have an absolute right to withdraw a guilty plea, but may withdraw a guilty plea after the court accepts the plea and before sentencing "if the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B); *United States v. Wallace*, 276

F.3d 360, 366 (7th Cir. 2002). Legal innocence may be a fair and just reason for withdrawing a guilty plea. *United States v. Harper*, 934 F.3d 524, 528 (7th Cir. 2019). Mr. Valentine argues that because the **[\*3]** statute of his conviction is unconstitutional, he is legally innocent and should be allowed to withdraw his plea.

A defendant can move before trial to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B). A defendant can make such a motion on the basis that the charged offense is based on an unconstitutional statute. *United States v. Holden*, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, \*2 Ind. Oct. 31, 2022) (internal citations omitted).[1] A constitutional challenge to a statue can be brought either as a facial challenge, or an as-applied challenge. Mr. Valentine brings both types of challenges in his motion. To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications. *City of L.A. v. Patel*, 576 U.S. 409, 415, 418, 135 S. Ct. 2443, 192 L. Ed. 2d 435 (2015). To succeed on an as-applied challenge, the moving party must show it is unconstitutional because of the way it was applied to the particular facts of their case. *See United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011).

**C. Discussion**

Prior to discussing Mr. Valentine's Second Amendment arguments, the Court will address the

_____

[1] The Court will note that despite Mr. Valentine's characterization, *Holden* did not review the constitutionality of § 922(a)(6). (*See* DE 72 at 1.) *Holden* found that 18 U.S.C. § 922(n) (barring those under indictment from receiving firearms) was unconstitutional, and accordingly the Defendant's prosecution under § 922(a)(6) could not proceed because his lie about his indictment status was no longer material. At least one other sister court has reached the opposite conclusion about this type of prosecution. *United States v. Combs*, 2023 U.S. Dist. LEXIS 28267, 2023 WL 2144150, \*2 (E.D. Ky. Feb. 21, 2023) (denying a motion to dismiss a § 922(a)(6) indictment even though the underlying statute for the lie, 18 U.S.C. § 922(g)(8), was struck down by the same court).

other arguments Mr. Valentine raises in his motion. The Court will then turn to the *Bruen* related challenge.

**(1) *Mr. Valentine's nondelegation and statutory interpretation arguments are inappropriate to raise in this motion and without merit***

Mr. Valentine **[\*4]** raises three arguments challenging the sufficiency of his indictment which are entirely unrelated to *Bruen* or the Second Amendment. These arguments allege that his indictment fails to state an offense under Rule 12(b)(3) of the Federal Rules of Criminal Procedure. The three specific arguments are: (1) that § 922(a)(6) and Form 4473 violate the nondelegation doctrine, (2) that his residential address is not material information under § 922(a)(6), and (3) that straw buyers cannot be prosecuted under § 922(a)(6).

The Court will begin by noting it is unclear how these arguments can be properly raised in this motion. As will be thoroughly explained later in this order, these arguments are entirely unrelated to *Bruen* and could have been proffered well before the plea agreement was concluded. As the Government correctly notes, an argument that an indictment fails to state a valid offense generally needs to be filed pretrial. Fed. R. Crim. P. 12(b)(3)(B)(v). There are exceptions to this general rule, including for circumstances involving an intervening change in law. However, *Bruen* did not adjudicate § 922(a)(6), nor any federal statute at all. Moreover, these three arguments by Mr. Valentine do not involve the Second Amendment, but rather two issues of statutory interpretation and an unrelated constitutional law challenge.

This Court has previously noted that there **[\*5]** is nothing in *Bruen* which suggests the Supreme Court sought to "overturn the entire statutory construction apple cart," and in fact the text of the decision clearly indicates an intent to be read in accord with the pre-existing statutory interpretation framework. *United States v. Posey*, 2023 U.S. Dist.

LEXIS 22005, 2023 WL 1869095, *7 (N.D. Ind. Feb. 9, 2023). Mr. Valentine has offered no other rationale as to why these arguments would be appropriately raised now. In other words, he has not explained why the basis for this motion was not reasonably available prior to *Bruen* being decided or the entry of his plea agreement. Fed. R. Crim. P. 12(b)(3)(B)(v). As such, the Court would reject these arguments as improperly raised. In the alternative, each would fail on its merits.

(a) *The non-delegation doctrine challenge is waived as underdeveloped and is without merit*

In a footnote to his motion, Mr. Valentine argues that this Court has a basis for granting his motion based upon the non-delegation doctrine. According to Mr. Valentine, Form 4473 is created by the United States Attorney General pursuant to statutory authority contained in 18 U.S.C. § 923(g)(1). However, this statute allegedly grants "substantial and nearly unfettered discretion to create unguided and unintelligible regulations" to the Attorney General and thus runs afoul of the non-delegation **[*6]** doctrine, which imposes limits on the amount of authority that Congress may devolve to executive branch officers. (DE 72 at 16 n.1.) Besides this conclusory assertion of how much authority § 923(g)(1) confers on the Attorney General, Mr. Valentine's argument consists of a single citation to legal authority. This footnote is without meaningful explanation of the non-delegation doctrine, or application of the doctrine to the facts at issue in this case.

This is simply not the appropriate way to present arguments before a court. As such, the Court finds this argument to be waived as underdeveloped as it does not actually describe the legal standard which the Court should be applying or make any effort to apply that standard to the facts at issue in this case. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062-63 (7th Cir. 2020) (arguments that are underdeveloped, cursory, and lack supporting authority are waived); *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) (party can waive an argument by presenting it in an undeveloped footnote).

In the alternative, the Court would reject this argument on the merits. The Supreme Court has repeatedly held that a Congressional allocation of power does not run afoul of the non-delegation doctrine if Congress lays down an "intelligible principle" to which the person or body receiving **[*7]** the delegated authority is directed to conform. *Gundy v. United States*, 139 S.Ct. 2116, 2123, 204 L. Ed. 2d 522 (2019) (internal quotations omitted). The Supreme Court has further characterized Form 4473 and § 922(a)(6) as part of a "*detailed scheme*" created by Congress to regulate the sale of firearms and prevent them from falling into the wrong hands. *Abramski v. United States*, 573 U.S. 169, 172-73, 134 S. Ct. 2259, 189 L. Ed. 2d 262 (2014) (emphasis added). The Court would find that Congress has provided an intelligible principle, namely implementing the statutory requirements for firearm sales, to guide the Department of Justice in exercising its authority to create Form 4473.

(b) *Binding Seventh Circuit precedent holds that Mr. Valentine's address is material information*

Mr. Valentine argues that the indictment fails to state an offense because the false address he provided cannot be considered a material misrepresentation as required by § 922(a)(6). This argument is foreclosed by binding Seventh Circuit precedent. In *United States v. Queen*, the Seventh Circuit clearly held that "Lying about a street address on an ATF Form 4473 is a material misrepresentation that violates § 922(a)(6)." 408 F.3d 337, 339 (7th Cir. 2005).

Mr. Valentine offers no reason why the holding of *Queen* would be disturbed by *Bruen*, and the Court discerns none. The reasoning of *Queen* does not involve the Second Amendment, rather it only involves issues of statutory **[*8]** interpretation. *Id.* at 338-39. Therefore, the Court finds it is part of the statutory construction apple cart which *Bruen* did not disturb.

Mr. Valentine's reply, in a footnote, attempts to argue that *Queen* is distinct from this case. (DE 82 at 8 n.1.) He claims

> "[*Queen*] is distinguishable in that the Court there analyzed only Form 4473 and not the broader transferee materiality requirement under § 922(a)(4). As stated in Mr. Valentine's opening brief, '[t]hough Form 4473 may require current place of residence from the transferee, because Chapter 44 does not list that as a transferee requirement or as a necessary condition precedent for firearm possession, counts 1-5 here also fail to state an offense and must be dismissed ... .'"

> *Id.* (citing DE 72 at 17.)

The Court finds this is not actually an argument that *Queen* is distinguishable.[2] Rather, this seems to be a segue redirecting the Court to a legal argument in the original motion without addressing adverse precedent. This original argument is that no federal statute indicates the address of residence would be material information that a prospective gun buyer must provide. The motion argues that the requirements for a place of residence are located within 18 U.S.C. § 922(b)(5), dealing **[*9]** primarily with records a gun dealer is obligated to maintain, while the Court should actually look to § 922(t) to determine the obligations on the buyer. (DE 72 at 17.) In *Queen* the Seventh Circuit plainly indicates that § 922(b)(5) is relevant to determining what information a gun buyer must provide and whether it is material. Specifically, the Seventh Circuit stated:

> "922(a)(6) requires a buyer to provide truthful information to a dealer about any fact material to the lawfulness of a firearm sale. Section

922(b)(5) of Title 18 in turn requires the dealer to record the buyer's place of residence, thus making a firearm sale by a gun dealer illegal unless the dealer notes the buyer's "place of residence" in records the dealer is required to maintain. Lastly, the Gun Control Act's implementing regulations require that a dealer record the buyer's "residence address (including county or similar political subdivision)" on Form 4473, which specifically asks for "No., Street, City, County, State, [and] ZIP Code." A false street address is therefore material to the lawfulness of the sale because, when the seller falsely represents his address on the form, the dealer fails to record the buyer's address, in violation of § 922(b)(5)."

408 F.3d at 338-39 (internal citations omitted). **[*10]**

The Court finds that *Queen* squarely governs the outcome of Mr. Valentine's materiality argument and therefore it will be rejected.

(c) *Binding Supreme Court precedent establishes that straw purchasers may be prosecuted under § 922(a)(6)*

Mr. Valentine also argues that § 922(a)(6) cannot be utilized to prosecute him for straw purchasing a firearm.

This issue is squarely precluded by the Supreme Court's decision in *Abramski* which upheld the prosecution of a straw purchaser using § 922(a)(6). 573 U.S. at 193. The Court sees no basis for concluding the holding of *Abramski* was disturbed by *Bruen*. *Abramski* is a case of statutory interpretation. As the Court has previously discussed, the general statutory interpretation framework utilized by the federal courts was not disturbed by *Bruen*.

Mr. Valentine raises two arguments as to why *Abramski* should be revisited, but neither is persuasive. First, Mr. Valentine argues that *Abramski* was reliant on the interest balancing step of the pre-*Bruen* Second Amendment test. (DE 72

---

[2] To put a finer point on it, *Queen* and Mr. Valentine's case are almost identical. Queen was charged with § 922(a)(6) violations for listing a false address on Form 4473, 408 F.3d at 338, which is almost exactly what Mr. Valentine is charged with. (*See* DE 1.) The only distinction, which is not relevant to this argument, is that Mr. Valentine is also charged with lying about being the purchaser of the firearm.

at 16.) This is not a faithful description of *Abramski*. The text of the decision does not mention the Second Amendment or the interest balancing test of the circuit court test. Mr. Valentine's entire argument is predicated on a footnote where the majority noted that adopting Abramski's reading of the **[*11]** statute "would also" have serious negative implications for efforts to control gun crime. (DE 72 at 16 (citing 573 U.S. at 180 n.7)). The mere fact that the Supreme Court recognized that there were negative practical implications of a proposed interpretation of a statute, does not magically transform a statutory interpretation case into a Second Amendment case. Moreover, consideration of the "structure, history, and purpose" of the statute is a routine part of statutory interpretation which is unrelated to the interest balancing inquiry of the old circuit court test for Second Amendment challenges. *Id.* at 179.

Mr. Valentine's reply also raises a new argument that Congress' recent passage of a dedicated prohibition on straw purchasing means *Abramski* would have a different outcome if decided today. (DE 82 at 7); *see* 18 U.S.C. § 932. The Court rejects this argument for three reasons. First, it is inappropriate to raise new arguments in a reply brief. Accordingly, this argument is denied as waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." (internal citations omitted)). Second, this argument is based on speculation about how the Supreme Court would approach *Abramski* if the case were pending today. Mr. Valentine **[*12]** does not provide specific analysis of how the existence of § 932 would impact the reasoning of the Court's decision in *Abramski*.

Third, the Court would also reject this argument on the merits. Mr. Valentine argues § 932 should be read as narrowing the scope of straw purchase prosecutions under § 922(a)(6). He argues that *Abramski* indicates § 922(a)(6) can be used to punish a straw purchaser for buying a firearm on behalf of *anyone else*, while § 932 only prohibits buying a firearm for a person who cannot legally own a firearm or if the firearm will be used in a crime. Consequently, his reasoning goes, this signifies Congressional intent to only criminalize straw purchasing when the ultimate beneficiary of the firearm transaction is a person who cannot legally own a gun, or the gun would be used in a crime.

Mr. Valentine cites no legal authority for the proposition that the enactment of a new, largely unrelated law, should change the outcome of a previously decided statutory interpretation question. Further, if Congress had sought to change the outcome of *Abramski*, then they could have modified § 922(a)(6) instead of enacting a new, freestanding, prohibition on straw purchasing. The Court assumes Congress is aware of the jurisprudence of relevant Supreme Court **[*13]** precedent when enacting a new statute. *Guerrero-Lasprilla v. Barr*, 140 S.Ct. 1062, 1072, 206 L. Ed. 2d 271 (2020). Therefore, Congress would have known it could abrogate *Abramski* by directly modifying § 922(a)(6) instead of engaging in the roundabout effort Mr. Valentine describes.

The Court would also note that the maximum penalty under § 932 is 15 years of imprisonment, 18 U.S.C. § 932(c)(1), while the penalty for § 922(a)(6) is only 10 years, 18 U.S.C § 924(a)(2). If Congress was aware of the *Abramski* decision, then the decision to enact § 932 without disturbing § 922(a)(6) could reflect Congress' intent to prohibit all straw purchases, but more harshly punish straw purchases which are for the benefit of a criminal or criminal enterprise. Consequently, the Court finds that *Abramski* directly forecloses Mr. Valentine's argument that his false statement was not a material one.

Having disposed of Mr. Valentine's non-constitutional arguments to dismiss his indictment, the Court will now turn to his Second Amendment challenge. As an initial matter, if a statute as applied to a defendant is constitutional, then a

facial challenge to that statue should also fail as the statute will not be unconstitutional in all applications. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). Therefore, the Court will first address Mr. Valentine's as-applied challenge and only advance to his facial challenge if necessary.

### (2) *The Bruen standard [*14] for applying the Second Amendment*

Mr. Valentine argues that this case must be dismissed because 18 U.S.C. § 922(a)(6) is unconstitutional under the Second Amendment to the United States Constitution. Therefore, the Court must analyze and apply the Second Amendment jurisprudence articulated by the Supreme Court.

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court concluded that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). In reaching this conclusion, the Court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. In *Bruen*, the Supreme Court built upon its prior holdings to further define the scope of the Second Amendment right. The Court described its earlier Second Amendment decisions as "recogniz[ing] ... the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." 142 S.Ct. at 2122. (citing *Heller*, 554 U.S. 570; *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)). The *Bruen* Court went on to lay out the methodology lower courts should utilize in reviewing Second Amendment challenges.

Prior to *Bruen*, the various circuit courts had largely converged on a two-step framework for analyzing Second Amendment challenges. *Id.* at 2126. At the first step, the government could justify its regulation by establishing that [*15] the challenged law regulates activity falling outside the scope of the Second Amendment right as originally understood. *Id.* At the second step, the courts analyzed how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right. *Id.* In *Bruen* the Court stated that this test was "one step too many." *Id.* at 2127. The Court held that the first step of this framework was broadly consistent with *Heller*, but the "means-end scrutiny" of step two was inconsistent with the Second Amendment and the appropriate methodology centers on the "constitutional text and history." *Id.* at 2127-29.

In *Bruen*, the Court articulated that the proper standard is as follows:

> "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, 81 S. Ct. 997, 6 L. Ed. 2d 105 n.10 (1961)).

Phrased another way, this test is composed of two prongs. The first prong is determining whether the plaint text of the Second Amendment covers the conduct at issue. *Id.* at 2129, 2134-35. The second prong [*16] is determining whether the Government has established the regulation is consistent with the historical tradition of firearms regulation in the United States. *Id.* at 2129-30.

The Supreme Court stated that the second prong would require the use of "historical analogies" and reasoning by analogy as is commonly done by lawyers and judges. *Id.* at 2132. Consequently, in comparing a historical firearm regulation and a modern one, the key determination to be made is

whether the two are "relevantly similar." *Id.* The *Bruen* Court did not provide an exhaustive survey of the features that could render regulations relevantly similar but found that *Heller* and *McDonald* outlined at least two: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Phrased differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*'" considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 at 767 (itself quoting *Heller*, 554 U.S. at 599)).

The Court further noted that this analogical reasoning is "neither a regulatory straitjacket nor a regulatory blank check." *Id.* While warning courts to not "uphold every modern law that **[*17]** remotely resembles a historical analogue," the Court also clarified that the Government is only obligated to identify a "historical *analogue*, not a historical *twin*." *Id.* (internal citation omitted). Therefore, even if a modern regulation is not a "dead ringer" for a historical precursor, it may be sufficiently analogous to pass constitutional muster.[3] *Id.*

(a) *§ 922(a)(6) does not regulate conduct protected by the Second Amendment*

_____

[3] *Bruen* also stated that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Some courts have read this language as creating a more stringent standard of review for gun regulations aimed at societal ills dating to the Founding era, and Mr. Valentine suggests this Court to do the same. *See e.g. United States v. Holden*, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509, *3 (N.D. Ind. Oct. 31, 2022); *United States v. Lewis*, 2023 U.S. Dist. LEXIS 6541, 2023 WL 187582, *4-5 (W.D. Okla. Jan. 13, 2023); (DE 38 at 11.) While the Court does not need to decide this issue, it will note its skepticism of this conclusion for the reasons noted by other sister courts. *See United States v. Jackson*, 2023 U.S. Dist. LEXIS 33579, 2023 WL 2242873, *12-13 (D. Md. Feb. 27, 2023). Ultimately, the issue is moot in this case as the Court resolves the motion on the first prong of the *Bruen* test.

The first step in the *Bruen* analysis is determining whether the regulated conduct is protected by the Second Amendment. The Court finds that § 922(a)(6) does not regulate any activity protected by the Second Amendment. As such, it is a constitutionally permissible regulation under *Bruen*.

Section 922(a)(6) states "It shall be unlawful ... for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a ... licensed dealer ... , knowingly to make any false or fictitious oral or written statement ... intended or likely to deceive such ... dealer ... with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter." 18 U.S.C. § 922(a)(6).

Mr. Valentine laboriously argues that this straightforward text, prohibiting false **[*18]** statements in connection with the acquisition of a firearm, is actually an elaborate Trojan Horse regulation which incorporates by reference the substantive restrictions contained elsewhere in § 922. (DE 72 at 8-15.) This includes the prohibition of those under felony indictment from possessing firearms. *See* 18 U.S.C. § 922(n). In turn, the alleged constitutional invalidity of those provisions render § 922(a)(6) likewise invalid. *See Holden*, 2022 U.S. Dist. LEXIS 212835, 2022 WL 17103509 (striking down § 922(n) under *Bruen*).[4]

Mr. Valentine lacks legal authority supporting this extraordinary proposition. In fact, it seems every court to consider § 922(a)(6) has concluded the statute only prohibits the conduct it expressly says that it does. In *Queen*, the Seventh Circuit characterized § 922(a)(6) as requiring "a buyer to provide truthful information to a dealer about any fact material to the lawfulness of a firearm sale." 408 F.3d at 338. The Supreme Court in *Abramski* likewise characterized it as imposing "criminal

_____

[4] The Court has no occasion to review the validity of § 922(n) and determine whether it agrees with the decision in *Holden*.

penalties on any person who, in connection with a firearm's acquisition, makes false statements about "any fact material to the lawfulness of the sale." 573 U.S. at 171.

Four sister courts, in rejecting *Bruen* challenges to this statute, have found § 922(a)(6) only prohibits making false statements, and this prohibition does not implicate conduct **[*19]** protected by the Second Amendment. *United States v. Soto*, 2023 U.S. Dist. LEXIS 14023, 2023 WL 1087886, *5 (W.D. Tex. Jan. 27, 2023); *United States v. Combs*, 2023 U.S. Dist. LEXIS 28267, 2023 WL 2144150, *2 (E.D. Ky. Feb. 21, 2023); *United States v. Gonzalez*, 2022 U.S. Dist. LEXIS 224710, 2022 WL 17583769, *1 (D. Ut. Dec. 12, 2022); *United States v. Tilotta*, 2022 U.S. Dist. LEXIS 156715, 2022 WL 3924282, *5 (S.D. Cal. Aug. 30, 2022).⁵ Furthermore, while this motion was pending, another Judge within this District rejected a *Bruen* challenge to § 922(a)(6) substantively similar to this one and concluded that § 922(a)(6) does not burden Second Amendment protected conduct. *United States v. Campbell*, No. 2:22-CR-23-PPS-JPK, DE 31 (N.D. Ind. Mar. 15, 2023) (Simon, J.).

The Court agrees with its sister courts and will not belabor this point. Section 922(a)(6) does not create a substantive restriction on who may possess a firearm. Rather, the conduct which this section regulates is lying to the federal government about material facts during the course of firearms transactions. The fact this includes lies about whether the purchaser would be barred based on a substantive restriction contained elsewhere in § 922 does not change that. This is merely a category of lies prohibited by § 922(a)(6), the ultimate prohibited conduct is the lying. Further, the crime prohibited by § 922(a)(6) is complete once the lie has been delivered and it is immaterial if the liar ever takes possession of the firearm. *Soto*, 2023 U.S. Dist. LEXIS 14023, 2023 WL 1087886 at *5. Therefore, § 922(a)(6) is not a substantive

restriction on who may possess a firearm.

The conclusion that the Second Amendment does not protect the conduct of lying during the course of a firearm transaction is widely embraced by the federal courts. In rejecting challenges to 18 U.S.C. § 924(a)(1)(A), two sister courts unequivocally **[*20]** held lying on firearm purchase forms is unprotected by the Second Amendment.⁶ *United States v. Flores*, 2023 U.S. Dist. LEXIS 10769, 2023 WL 361868, *6 (S.D. Tex. Jan 23, 2023); *United States v. Porter*, 2023 U.S. Dist. LEXIS 1818, 2023 WL 113739, *3 (S.D. W.Va. Jan. 5, 2023) (holding the Second Amendment does not allow an individual to be untruthful as to the manner and purpose for purchasing a firearm).

In addition, the Court also agrees with its sister courts that straw purchasing firearms is not protected conduct under the Second Amendment. In *Bruen*, the Supreme Court described the Second Amendment right as a "law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. The Court, in discussing what it means to "bear arms" noted that the Second Amendment guarantees an individual right to "possess and carry weapons in case of confrontation." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 592).

Nothing about serving as a straw purchaser implicates the purchaser's Second Amendment rights as they are not the ultimate possessor of the firearm. *Tilotta*, 2022 U.S. Dist. LEXIS 156715, 2022 WL 3924282 at *5; *see also Soto*, 2023 U.S. Dist. LEXIS 14023, 2023 WL 1087886 at *5-6; *Campbell*, No.2:22-CR-23, DE 31 at 11 (finding individuals who serve as straw purchasers are not law-abiding citizens protected by the Second Amendment). To the extent a straw buyer possesses

---

⁵ According to the Court's research, no other court has found § 922(a)(6) to be unconstitutional in light of *Bruen*.

⁶ This law is similar to § 922(a)(6) and prohibits "knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter." 18 U.S.C. § 924(a)(1)(A).

a firearm, he does not possess it for the purposes of self-defense as protected by the Second Amendment, he possesses it for the purpose of transfer to another. Mr. Valentine has provided no legal authority supporting the idea that the Second Amendment protects an unrestricted right to buy, sell, or otherwise transfer firearms and **[*21]** the Court discerns none. *See Flores*, 2023 U.S. Dist. LEXIS 10769, 2023 WL 361868 at *5 (commercial sale of arms is not protected activity under the Second Amendment); *Gonzalez*, 2022 U.S. Dist. LEXIS 224710, 2022 WL 17583769 at *2 (§ 922(a)(6) does not implicate an individual's ability to defensively arm themselves. Thus, transfer of firearms without a license, and proceeds derived from that activity are likewise unprotected). Moreover, Mr. Valentine's briefing does not provide any explanation on how modestly restricting his ability to transfer firearms to another person implicates his right to self-defense.

Mr. Valentine also argues that § 922(a)(6) interferes with an individual's ability to possess firearms by imposing information requirements they must satisfy before being allowed to obtain a firearm. This is also incorrect. Section 922(a)(6) prohibits individuals from *providing materially false information* in the course of firearms transactions and other statutory provisions delineate what information is required. Mr. Valentine himself acknowledges this in his non-delegation challenge by noting Form 4473 is authorized by 18 U.S.C. § 923(g)(1). In turn, Mr. Valentine has not brought a proper challenge to the statutory provisions which actually require the production of information.

The Court doubts Mr. Valentine could prevail on such a challenge even if properly brought. No **[*22]** federal jurisprudence reviewed by this Court suggests the Second Amendment confers an unfettered right to acquire and possess firearms, or that requiring the production of information to establish the buyer is eligible to possess a firearm offends the Second Amendment. *See Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J. concurring) (stating that objective gun licensing regimes which require

background checks among other requirements are constitutionally valid); *Heller*, 554 U.S. at 627 (noting nothing in the decision should be interpreted as casting doubt on long standing regulations on the commercial sales of arms); *McDonald*, 561 U.S. at 786 (reaffirming *Heller*'s statement about the propriety of regulations on the commercial sales of arms). As a matter of basic reasoning this latter point makes sense. If certain individuals or groups can be prohibited from acquiring and possessing firearms, as is recognized under the Second Amendment, then there must be a constitutionally permissible method of screening those individuals from all prospective gun buyers. *See United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc) (the original meaning of the Second Amendment includes some categorical limits on firearm possession).

Having found that § 922(a)(6) does not implicate conduct protected by the Second Amendment, the Court will deny the motion and has no occasion to advance to the second prong of the *Bruen* analysis. **[*23]** [7]

### D. Conclusion

Accordingly, for the reasons previously stated, the Court finds that Mr. Valentine has not established he is legally innocent of the crime which he pled guilty to. Therefore, the Court finds Mr. Valentine has not shown a fair and just reason to allow him to withdraw his guilty plea and his motion to withdraw his guilty plea is DENIED (DE 72). Likewise, his motion to dismiss the indictment is DENIED. (*Id.*)

SO ORDERED.

ENTERED: March 20, 2023

/s/ JON E. DEGUILIO

---

[7] As such, the Court also has no occasion to reach the question of whether § 922(a)(6) is a presumptively lawful regulation on the commercial sale of arms as contemplated by *Heller* and its progeny.

2023 U.S. Dist. LEXIS 46246, *23

Chief Judge

United States District Court

---

**End of Document**

C

# Def. Distributed v. Bonta

United States District Court for the Central District of California

October 21, 2022, Decided; October 21, 2022, Filed

CV 22-6200-GW-AGRx

**Reporter**

2022 U . S . Dist. LEXIS 195839 *; 2022 WL 15524977

Defense Distributed v. Robert Bonta, et al.

**Subsequent History:** Adopted by, Injunction denied by Def. Distributed v. Bonta, 2022 U.S. Dist. LEXIS 198110 (C.D. Cal., Oct. 24, 2022)

**Counsel:** For Defense Distributed, a Texas corporation |, Second Amendment [*1] Foundation, Plaintiffs: Brett William Johnson, LEAD ATTORNEY, Snell and Wilmer LLP, Phoenix, AZ USA; Derek C Flint, PRO HAC VICE, Cameron James Schlagel, Michael B Reynolds, Snell and Wilmer LLP, Costa Mesa, CA USA.

For Robert Bonta, in his official capacity as California Attorney General |, Luis Lopez, in his official capacity as Director of the California Bureau of Firearms |, Defendants: Sean Clinton Woods, LEAD ATTORNEY, CAAG - Office of Attorney General of California, San Francisco, CA USA.

For Robert Bonta, in his official capacity as California Attorney General |, Defendant: Sean Clinton Woods, LEAD ATTORNEY, CAAG - Office of Attorney General of California.

**Judges:** GEORGE H. WU, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE H. WU

# Opinion

**CIVIL MINUTES - GENERAL**

**PROCEEDINGS: IN CHAMBERS - TENTATIVE RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [14]**

Attached hereto is the Court's Tentative Ruling on Plaintiff's Motion [14] set for hearing on October 24, 2022 at 8:30 a.m.

## I. Introduction/Background

On August 31, 2022, Defense Distributed ("DD") and the Second Amendment Foundation filed this lawsuit against Robert Bonta, in his official capacity as California Attorney General, [*2] and Luis Lopez, in his official capacity as Director of the California Bureau of Firearms (collectively, "Defendants"). The operative complaint in the action is now the First Amended Complaint for Declaratory and Injunctive Relief ("FAC"), with DD listed as the sole plaintiff in the action. *See* Docket No. 13. The FAC contains the following four claims for relief: 1) "42 U.S.C. § 1983 Action for Deprivation of Plaintiff's Rights under U.S. Const. amends. II and XIV;" 2) "42 U.S.C. § 1983 Action for Deprivation of Plaintiff's Rights under U.S. Const. amends. I and XIV;" 3) "42 U.S.C. § 1983 Action for Deprivation of Plaintiff's Right to Equal Protection under U.S. Const. amend. XIV;" and 4) "Supremacy Clause, U.S. Const. art. VI."

Generally speaking, this action concerns the California Legislature's passage of two provisions. The first is Assembly Bill 1621, 2021-2022 Reg.

Sess. ("AB 1621"), which amended or added multiple provisions of the Penal Code, and which took effect immediately upon the Governor's signature on June 30, 2022. AB 1621, *inter alia*, prohibits any persons in the State of California — other than federally-licensed firearms manufacturers or importers — from using, possessing, selling, or transferring a computerized numerical code ("CNC") milling machine that has a sole or primary purpose of manufacturing firearms.[1] AB 1621 § 25; Cal. Pen. Code § 29185. The **[*3]** second item of legislation is Section 2 of Senate Bill 1327, 2021-2022 Reg. Sess. ("SB 1327") — enacted on July 22, 2022, and set to go into effect on January 1, 2023. SB 1327, *inter alia*, makes anyone who seeks declaratory or injunctive relief to prevent enforcement of any statute, ordinance, rule, regulation or any other law that "regulates or restricts firearms" potentially "jointly and severally liable to pay the attorney's fees and costs of the prevailing party," with anyone seeking such declaratory or injunctive relief themselves not eligible for such prevailing-party status, and the government given up to three years after the conclusion of the litigation in which to seek to recoup its fees if it is deemed the "prevailing party." *See* FAC ¶¶ 40, 59, 61-62, 64;[2] Cal. Civ. Proc. Code § 1021.11.

DD's theory on its Second Amendment claim is that "the text of the Second Amendment, which guarantees 'the right of the people to keep and bear Arms,' implicitly includes the right to acquire and manufacture firearms." FAC ¶ 76 (quoting U.S. Const. amend. II). DD alleges that "laws that restrict the tools and parts used for the self-manufacture of firearms are inconsistent with the Nation's historical tradition of firearms regulation,"

*id.* ¶ 36, and that the provisions **[*4]** of AB 1621 are just such laws. According to the FAC, "CNC milling machines are the modern-day manifestation of firearm milling technology, technology that has never before been regulated in American history." *Id.* ¶ 6. "Modern-day CNC milling is a standard machining process that employs computerized controls and rotating cutting tools to precisely remove material from a workpiece to produce a custom-designed part or product." *Id.* ¶ 10. DD sells, among other things, the "Ghost Gunner," a "general-purpose [CNC] milling machine . . . that gives purchasers the ability to complete unfinished frames and receivers for various types of firearms, including the AR-15, AR-308, M1911, and AK-47." *Id.* ¶ 1. "Because the materials provided by [DD] often do not have serial numbers and are not licensed with the federal government, they may be used to make what are popularly known by the moniker 'ghost guns.'" *Id.* ¶ 17.

On September 23, 2022, DD moved for a preliminary injunction, asking that the Court enjoin Defendants (and any others in active concern or participation with them) from enforcing California Penal Code sections 29180(f), 29185, 30400, 27530(a), and 18010(d), as enacted by AB 1621, and from enforcing Section 2 of SB 1327.

## II. Discussion

Under *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008), to obtain injunctive relief, **[*5]** DD must show that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20; *see also Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014). In the wake of *Winter*, the Ninth Circuit also still employs a lesser, "sliding-scale" approach. Under that latter construct, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance

---

[1] FAC ¶ 1 states that: "Defense Distributed sells a product called the Ghost Gunner [which] is a general-purpose Computerized Numerical Code milling machine." *See* Docket No. 13.

[2] The FAC's third and fourth causes of action are both tied to DD's challenge to SB 1327, not to the challenge to AB 1621 and the Penal Code provisions it added. *See* FAC ¶¶ 101-105, 107-108; *see also* Docket No. 14, at 2:11-18.

of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (omitting internal quotation marks) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).[3] "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S 531, 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.*

The Court will deny DD's motion. In brief, the Court would find that, given the purpose of California's regulation, the "balance of equities" and "public interest" are not so one-sided in DD's favor as DD appears **[*6]** to believe — even if DD *was* able to demonstrate a likely violation of Second Amendment rights. As to AB 1621 and the Penal Code provisions it introduced, the Court does not believe DD has demonstrated *at this time* a

---

[3] It is not dispositive here, but this Court continues to believe that the Ninth Circuit's resurrection of its "sliding-scale" approach was problematic in the wake of *Winter*. In *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), the Ninth Circuit made clear that the Supreme Court's *Winter* decision had announced the applicable standard governing injunctive relief: "To the extent that our cases have suggested a lesser standard [than that announced in *Winter*], they are no longer controlling, or even viable." *Id.* at 1052. In making that announcement, the *American Trucking* panel cited directly, as an example of "a lesser standard," to a pin-cited page of its earlier decision in *Lands Council v. Martin*, 479 F.3d 636 (9th Cir. 2007), in which it had earlier set forth both the "possibility of irreparable injury" standard that *Winter* specifically addressed *and* the Ninth Circuit's sliding scale approach. *See id.* at 639. It is a commonplace observation that one three-judge panel of the Ninth Circuit — such as the panel in *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011), that seemingly first-revived the "sliding scale" approach — may not overrule an earlier three-judge panel in the absence of intervening controlling Supreme Court precedent. *See United States v. Mayer*, 560 F.3d 948, 964 (9th Cir. 2009). Although, on this point, the water is not just under-the-bridge but by now, likely far, far, out to sea, so far as this Court is aware the Ninth Circuit has never attempted to address this issue head-on.

likelihood that it will prevail on the merits of its Second Amendment claim (or even that there are "serious questions going to the merits" on that issue) and, necessarily, it therefore has not demonstrated a likelihood of irreparable injury. As to SB 1327, Defendants have made it clear that they have no intention of enforcing its provisions against DD — *i.e.*, seeking attorneys' fees and costs pursuant to that authority — in connection with this litigation. Whatever that might or might not mean with regard to mootness and/or standing, that is not the issue here — for purposes of a preliminary injunction motion, it means that DD faces no likely irreparable harm/injury.

## A. AB 1621

DD's case for why AB 1621 and the Penal Code provisions it introduced in California violate the Second Amendment is based upon its belief that Defendants must demonstrate historical analogues that justify the type of regulation at-issue. Specifically, it believes that the Supreme Court's decision this year in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), requires that showing as part of **[*7]** the applicable analysis. Unfortunately for DD, the Court does not share that reading of *Bruen*.

In *Bruen*, the Supreme Court "h[e]ld that *when the Second Amendment's plain text covers an individual's conduct*, the Constitution presumptively protects that conduct." 142 S. Ct. 2111, 2126, 213 L. Ed. 2d 387 (2022) (emphasis added). In *that* situation, if a government seeks to justify its regulation, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*[4]

---

[4] No reasonable person would dispute that the type of regulation at issue in *Bruen* — a limitation on an individual's "right to carry

The Supreme Court, perhaps concerned that it had not already been clear enough (and/or that its interim discussion of analysis in *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) had potentially distracted the reader), later "sum[med]" up its analysis, and "reiterate[d] that the standard for applying the Second Amendment is as follows: *When the Second Amendment's plain text covers an individual's conduct*, the Constitution presumptively protects that conduct. The government must *then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30 (emphases added). Then, when actually applying **[\*8]** the analysis it had deemed proper, the first thing *Bruen* undertook was to "turn to whether *the plain text of the Second Amendment* protects [the two individual plaintiffs'] proposed course of conduct — carrying handguns publicly for self-defense." *Id.* at 2134 (emphasis added). The Court had "little difficulty concluding that it does," in part because "[n]othing in *the Second Amendment's text* draws a home/public distinction with respect to the right to keep and bear arms." *Id.* (emphasis added); *see also id.* at 2135 (concluding that "[t]he Second Amendment's plain text thus presumptively guarantees [the individual plaintiff's] a right to 'bear' arms in public for self-defense" before proceeding on to determine whether New York could show that its "proper-cause requirement" was "consistent with this Nation's historical tradition of firearm regulation"); *id.* at 2141 n.11 ("[A]gain, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.")

---

handguns publicly for their self-defense" via issuance of "public-carry licenses only when an applicant demonstrates a special need for self-defense," 142 S. Ct. at 2122 — is completely different than what is at issue here. *See also District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) (considering District of Columbia's handgun ban); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (considering laws similar to District of Columbia's).

(emphases added). Whatever else may be said of *Bruen*, these parts of the opinion are crystal-clear (as the Court's review of post-*Bruen* case law applying *Bruen* largely supports).[5] *See also, e.g.*, *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 138385, 2022 WL 3083715, \*8 (N.D. Cal. Aug. 3, 2022) ("If the conduct **[\*9]** at issue is covered by the text of the Second Amendment, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical traditional of firearm regulation . . . ."); *Young v. Hawaii*, 45 F.4th 1087, 1092 (9th Cir. Aug. 19, 2022) (*en banc* Order) (O'Scannlain, J., dissenting); *Firearms Policy Coalition, Inc. v. McCraw*, __ F.Supp.3d __,

---

[5] Notwithstanding the clarity this Court perceives, even Defendants appear to be somewhat confused about *Bruen*'s import, at least in one instance. They at least initially describe *Bruen* as having "held that courts must apply a standard 'rooted in the Second Amendment's text, as informed by history.'" Docket No. 15, at 11:21-22 (quoting *Bruen*, 142 S. Ct. at 2127). But the passage of *Bruen* they quote concerns *Bruen*'s description of what *Heller* "demands," not what *Bruen* itself "held" (which, as noted above, is plain-text analysis *first, then* history *if necessary*). DD picks up on Defendants' mis-step, arguing in its Reply that "the Supreme Court in *Bruen* unambiguously held that the Second Amendment analysis consists of a single step where the Court interprets the scope of the Second Amendment's textual guarantee, informed by history and tradition." Docket No. 16, at 3:14-17. Again, unless the Court misunderstands the "plain text" meaning of "unambiguously," it cannot fathom how DD could reach this conclusion. Certainly, DD's decision to omit the phrase "plain text" aids its ends, but the means are fatally-flawed.

Yes, the Supreme Court did say — again, after *repeatedly* making clear that the "plain text" inquiry was a threshold inquiry — that "[t]he test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." DD mysteriously locates that quotation on page 2126 of *Bruen* (to pick just one, the word "understanding" appears nowhere on page 2126), *see* Docket No. 16, at 6:25-27, when it actually appears on page 2131, much later in the decision (a placement that actually means something, given the course/progress of *Bruen*'s analysis). *Bruen* saying — on page 2131 — that it had to consider text and historical understanding reveals two things — 1) it actually *did* need to consider both "text" and "historical understanding" in that case given the nature of the regulation in question, and 2) the quoted sentence cannot possibly be understood as meaning that the "text" of the Second Amendment is informed by a "historical understanding," at least not without rendering the Supreme Court's repeated reference to "plain text" entirely meaningless.

2022 U.S. Dist. LEXIS 152834, 2022 WL 3656996, *8 (N.D. Tex. Aug. 25, 2022); *Rigby v. Jennings*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 172375, 2022 WL 4448220, *5 (D. Del. Sept. 23, 2022); *United States v. Price*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457, *2, 6 (S.D. W. Va. Oct. 12, 2022).[6] DD's reading of the decision to the contrary, *see* Docket No. 16, at 6:22-25 ("Though the Supreme Court did explain that '[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct,' it did not subordinate the historical analysis as a contingent second step.") (quoting *Bruen*, 142 S. Ct. at 2131), is not possible to square with these passages.

Though it leads with a recognition of the primacy of *Bruen*'s "plain text" point, *see* Docket No. 14, at 19:20-21, DD seeks in its opening brief to jump ahead in the analysis to a historical/tradition assessment (and to jump ahead in *Bruen* to that decision's discussion of how to conduct such an assessment). *See id.* at 19:23-24:27. But it has effectively attempted to avoid the necessary threshold consideration — does the "Second Amendment's plain text" cover the issue here? No, it plainly does not. AB 1621 has nothing to do with "keep[ing]" **[*10]** or "bear[ing]" arms. *See Bruen*, 142 S. Ct. at 2127 (noting that *Heller* employed a "textual analysis" to focus on the Second Amendment language's "normal and ordinary meaning" as a guarantee of an individual right "to possess and carry weapons") (quoting *Heller*, 554 U.S. at 576-77, 592); *id.* at 2134 ("*Heller* further

confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket . . . .").

"To determine whether the Second Amendment's plain text covers an individual's conduct, courts must first identify and delineate the specific course of conduct at issue, which in *Bruen* was 'carrying handguns publicly for self-defense.'" *Nat'l Ass'n for Gun Rights*, 2022 U.S. Dist. LEXIS 138385, 2022 WL 3083715, at *8 (quoting *Bruen*, 142 S. Ct. at 2134). Under DD's own characterization of the Penal Code provisions introduced via AB 1621, what is at issue here is a ban on "self-manufacture of firearms" and a prohibition on "the sale of the tools and parts necessary to complete the self-manufacturing process." Docket No. 14, at 1:26-2:1; *see also id.* at 9:8-9 (referring to a "Second Amendment right [of law-abiding citizens] to craft and build their own personal firearms"). Try as you might, you will not find a discussion of those concerns (or any such "right(s)") in the "plain text" of the Second Amendment. *See* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a **[*11]** free State, the right of the people to keep and bear Arms, shall not be infringed.").[7]

DD "implicitly" recognizes this, because it argues that the Second Amendment's recognition of a right "to keep and bear arms" "implicitly includes the right to acquire and manufacture firearms" and "necessarily involves the right to purchase" arms. Docket No. 14, at 19:4-6 (internal quotation marks omitted) (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)). DD seemingly perceives a penumbra. *See* Docket No. 16, at 9:9-11 (criticizing Defendants' "painfully literal approach [because it] ignores the fundamental principal [*sic*] that when analyzing the text of an amendment, 'certain unarticulated rights are implicit in enumerated

---

[6] The Third Circuit Court of Appeal's recent statement that "the Supreme Court [in *Bruen*] recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded justification," *Frein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (emphasis in original), is, quite simply, wrong. That is, unless *Bruen* means something other than what it quite-plainly says (although, considering that what we deal with here is the Second Amendment, perhaps this is no longer accepted as a persuasive criticism). As a "pin-cite" (to three pages of text) for its attempt to reflect the law, the *Frein* decision cites only to that portion of *Bruen* that begins *after Bruen* has — *repeatedly* — made it clear that a "plain text" assessment comes *before* any historical analysis is necessary. *See id.* (citing *Bruen*, 142 S. Ct. at 2131-33).

[7] Query how — if DD was correct about how the Second Amendment's plain text should be read and *Bruen* should be applied in the history of self-manufacture — *any* serialization requirement of firearms could be Constitutional.

guarantees'") (quoting *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)). But whether or not it does so, its analysis is quite-clearly not a "plain text" analysis, required under *Bruen*.[8] Even beyond that point, DD has not pointed to any clear regulation in AB 1621 of any perceived rights concerning the acquisition or purchase of "arms."

Much as DD would like to move history and tradition forward in the course of relevant analysis under *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of that decision. In the end, as Defendants argue, "under *Bruen*, the burden **[*12]** does not shift to the government to support the regulations with a historical analysis, and [DD's] Second Amendment challenge" — at least for purposes of this motion — "fails at the threshold stage of the inquiry." Docket No. 15, at 17:28-18:2.[9]

---

[8] The Court does not find the recent conclusion to the contrary by a District of Delaware court, relying entirely (at least so far as citations go) only on a pre-*Bruen* Seventh Circuit decision dealing with implied rights to acquire- and maintain-proficiency in the use of firearms, to be persuasive. *See Rigby v. Jennings*, __ F.Supp.3d __, 2022 U.S. Dist. LEXIS 172375, 2022 WL 4448220, *8 (D. Del. Sept. 23, 2022) ("Similarly, here, the right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm. Thus, if possessing untraceable firearms is protected by the Second Amendment, then so too is manufacturing them.") (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). Defendants' observation about DD's motion is a point that could equally be made about *Rigby* — "[DD] produces no authority that the right to own a machine used to manufacture one's own arms is encompassed by the plain text of the Second Amendment, which says nothing about 'self-manufacture or assembly' of one's own firearms." Docket No. 15, at 14:23-25.

[9] Even if DD were somehow able to clear the threshold consideration made clear in *Bruen*, it filed this case on August 31, 2022, the FAC on September 21, 2022, and this motion on September 23, 2022. In order to even be able to assess whether or not DD could demonstrate a "likelihood" of prevailing on the merits — again, under a hypothetical manner of analysis that most-definitely does *not* apply under *Bruen* — there is no possibility this Court would expect Defendants to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice). DD obtaining a preliminary injunction — at least as to AB 1621 — on October 24, 2022, was wishful-thinking, at-best, for at least that reason.

DD — and apparently certain other courts — would like to treat the Supreme Court's *Bruen* opinion as a "word salad," choosing an ingredient from one side of the "plate" and an entirely-separate ingredient from the other, until there is nothing left whatsoever other than an entirely-bulletproof and unrestrained Second Amendment.[10] That is not how precedent works; it is not even how language works (let alone salad, in most instances). Under the analytical framework established in *Bruen*, DD has not demonstrated at this time either a "likelihood" of prevailing on the merits or even a "reasonable probability of success" in connection with its case against AB 1621. *See* Docket No. 14, at 18:15-21. If there is some other non-*Bruen* framework that could give life to its challenge to AB 1621, DD has not yet identified/defined it. With no demonstration of a likely Second Amendment violation at this point, no irreparable harm is likely. DD therefore cannot satisfy either of the two (arguably-) appropriate tests for preliminary **[*13]** injunctive relief, and its motion insofar as AB 1621 is concerned is denied.

## B. SB 1327

DD challenges SB 1327 on right-to-petition, substantive due process, equal protection, and Supremacy Clause grounds. As to this aspect of DD's case and its request for a preliminary injunction, the Court has no need or cause to consider whether or not Section 2 of SB 1327 is constitutionally-infirm/whether DD has a likelihood of prevailing upon that point.[11] This is because DD has to be able to demonstrate "immediate threatened harm/injury" in order to warrant a

---

[10] Such approach would contrary to the actual language of the Second Amendment which provides that "A *well-regulated* militia, being necessary to the security of a free State . . . . [emphasis added]."

[11] The Court would note that, but for Defendants' commitment not to pursue attorneys' fees or costs from DD or its attorneys pursuant to Section 2 of SB 1327 in connection with this action, it would entertain reservations as to SB 1327's impact on DD's First Amendment rights.

preliminary injunction. *See Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (noting that, in demonstrating irreparable injury, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief"); *see also Midgett v. Tri-County Metro. Transp. Dist. of Or.*, 254 F.3d 846, 850-51 (9th Cir. 2001) ("This court already has rejected the argument that a determination that a plaintiff has suffered sufficient injury to support standing logically requires the court to conclude that the plaintiff necessarily has demonstrated a sufficient fear of immediate and substantial injury to warrant an injunction.").

Defendants have made clear that they "have informed [DD] that they will **[\*14]** not seek attorneys' fees or costs from [DD] or its attorneys pursuant to [Section 2 of SB 1327] in connection with this action." Docket No. 15, at 1:9-11; *see also id.* at 9:19-23; Declaration of S. Clinton Woods in Support of Defendants' Opposition to Motion for Preliminary Injunction, Docket No. 15-1, ¶¶ 3-5 & Exh. A. Given Defendants' statements in documents filed with the Court, it is almost certain that any later court considering a contrary plan would hold Defendants to their word under principles of judicial estoppel. *See, e.g., Bock v. Washington*, 33 F.4th 1139, 1145 (9th Cir. 2022) (observing that "[w]hen 'a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position'" and noting that one factor to consider in deciding whether to apply the doctrine is whether "'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped'") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)); *United States v. Kim*, 806 F.3d 1161, 1167 (9th Cir. 2015) ("[T]he judicial estoppel doctrine . . . prevents the offending party from gaining an unfair advantage by his litigation tactics."); *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1047 n.10 (9th Cir. 2004) (approving of application of judicial estoppel **[\*15]** in connection with litigant's "strategic decision"). As a result, the Court does not believe that DD has demonstrated the threat of immediate injury that is necessary to issue the extraordinary remedy of a preliminary injunction. *See, e.g., Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) ("This Court has ruled that '[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief.'") (quoting *Caribbean Marine*, 844 F.2d at 674).

Potentially-realizing that Defendants' firm offer does not aid its present motion, in its Reply DD immediately attempts — indeed, in the first line of text in the Reply — to cast the maneuver solely in "mootness" terms and, just a few lines later, via standing principles. *See* Docket No. 16, at 3:4 ("Defendants attempt to moot Plaintiff's SB 1327 challenge . . . ."); *id.* at 3:8-10 ("Plaintiff has Article III standing to challenge SB 1327 because Defendants' representations in this case do not preclude the State from seeking attorneys' fees in a subsequent action."). Whatever Defendants' position **[\*16]** might mean with respect to any mootness/standing considerations is not an issue this Court needs to decide on this DD-initiated motion for a preliminary injunction, notwithstanding Defendants' attempt to also argue that point in opposition to the motion.

Because DD cannot show it will likely suffer irreparable harm or injury because of Section 2 of SB 1327, it cannot meet the applicable preliminary injunction test(s). The motion is therefore denied in this respect.

### III. Conclusion

Whatever the above discussion might mean for the future of DD's case, a preliminary injunction is an "extraordinary remedy." For the reasons set forth above, DD simply has not made a case for its issuance here. The Court therefore denies the motion.

## PROCEEDINGS: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [14]

Plaintiff Defense Distributed's Motion for Preliminary Injunction ("Motion") came on for hearing before this Court. After considering the moving and opposition papers plus concomitant evidentiary submissions, the pleadings, and the oral argument of counsel, the Court adopts its Tentative Ruling (*see* ECF No. 19) as its final decision on the Motion and DENIES Plaintiff's request for a preliminary injunction.

In further response **[*17]** to an argument made by Plaintiff's counsel at the hearing, the Court already explained in-detail in both its Tentative Ruling and at oral argument why it reads *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022), as asking the "plain text" question before there is a determination that any history need be consulted, using multiple examples from the discussion in *Bruen* itself to justify that understanding. In part, Plaintiff responded that *Bruen* clearly ended the "two-step approach" that had been employed post-*Heller* and post-*McDonald* and, in that process, stated that it was "one step too many." That is no doubt true. But as the Court reads *Bruen*, that move to a "single-step" process only applies in situations where the plain text of the Second Amendment covers an individual's conduct that a government has attempted to regulate. That is — as also explained in the Tentative Ruling and at oral argument — not the situation here. The regulation at issue in *Bruen* (and *Heller* and *McDonald*, for that matter) has nothing to do with California's legislative efforts (*i.e.*, AB 1621) here. As a result, while the "single-step" discussion is an almost-certainly accurate

assessment of *Bruen*, it is merely an interesting, academic debate so far as this case is concerned. It has no controlling effect here.

---