No. 23-1179

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

OAKLAND TACTICAL SUPPLY, L.L.C., JASON RAINES,
MATTHEW REMENAR, SCOTT FRESH, RONALD PENROD,
AND EDWARD DIMITROFF

Plaintiffs-Appellants

v.

HOWELL TOWNSHIP

Defendant-Appellee

Appeal from the United States District Court
For the Eastern District of Michigan
Case No. 18-cv-13443

***AMICUS CURIAE* BRIEF OF
MICHIGAN MUNICIPAL LEAGUE (MML) LEGAL DEFENSE FUND
AND MICHIGAN TOWNSHIPS ASSOCIATION (MTA)
IN SUPPORT OF HOWELL TOWNSHIP**

ROSATI SCHULTZ JOPPICH
& AMTSBUECHLER PC
THOMAS R. SCHULTZ (P42111)
Attorney for Amici Curiae
27555 Executive Drive, Suite 250
Farmington Hills, MI  48331-3550
(248) 489-4100

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES..........................................................................ii

STATEMENT OF QUESTION PRESENTED......................................................iii

STATEMENT OF *AMICUS CURIAE* INTEREST.................................................iv

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ........................................................................................5

I.      Under the first prong of *Bruen's* new two-part Second Amendment test, the Court must determine if the Appellants' course of conduct is covered by the plain text of the right to "keep and bear arms." The district court correctly concluded first that proposed course of conduct is to construct and operate a commercial long-range (1,000-yard) outdoor shooting range, and then, as a result, that such conduct is not covered by the plain text of the Amendment....................................................5

        1.      Appellants' Complaint makes clear that the "course of conduct" is the construction of a commercial 1,000-yard shooting range—because that's what Oakland Tactical asked the Township to allow. ....................................................................6

        2.      The Second Amendment's right to keep and bear arms does not include the right to build and operate a commercial 1,000-yard shooting range. ...................................................10

        3.      Significant practical issues arise for every local government if the Court holds that the Second Amendment's plain text includes the right to build and operate a commercial 1,000-yard shooting range—or even a general right to train. ...........................................15

        4.      The district court's decision is not impractical. Claims like Appellants' relating to limitations on training facilities can be addressed in the usual way—as zoning land use claims.....................20

CONCLUSION ....................................................................................23

## INDEX OF AUTHORITIES

### Cases

*District of Columbia v Heller*, 554 US 570 (2008) ..................................... 10,11,14

*Drummond v Robinson Township*, 9 F4 217 (3rd Cir 2021) ............................. 13,14

*Duncan v Bercerra*, 17-cv-1017-BEN-JLB .................................................... 17

*Ezell v City of Chicago*, 651 F3d 684, 704 (7th Cir 2011) ...................... 13,14,20,21

*Luis v United States,* 578 US 5 (2016) ................................................... 13

*New York State Rifle & Pistol Ass'n, Inc. v Bruen*, 142 S. Ct. 2111 (2022) ... passim

*U.S. v Sineneng-Smith*, 140 S Ct 1575 (2020) .......................................... 7

*Village of Belle Terre v Boraas***,** 416 US 1; 94 S Ct 1536;
   39 L Ed 2d 797 (1974) .......................................................... 19

*Village of Euclid v Amber Realty Co.,* 272 US 365; 47 S Ct 114;
   54 ALR 1016; 71 L Ed 303 (1926) ................................................ 19

### Statutes

MCL 125.3833 ......................................................................... 18

## <u>STATEMENT OF QUESTION PRESENTED</u>

Under the first prong of *Bruen's* new two-part Second Amendment test, the Court must determine if the Appellants' course of conduct is covered by the plain text of the right to "keep and bear arms."  Did the district court correctly conclude first that proposed course of conduct is to construct and operate a commercial long-range (1,000-yard) outdoor shooting range, and then, as a result, that such conduct is not covered by the plain text of the Amendment?

The district court answered:  Yes
Plaintiffs-Appellants answer:  No
Howell Township answers:  Yes
*Amici* answer: Yes
This Court should answer:  Yes

## STATEMENT OF *AMICUS CURIAE* INTEREST

Appellants seek complete immunity from the provisions Howell Township's zoning ordinance, by virtue of a constitutional right to train with firearms at an outdoor shooting range of 1,000 (linear) yards—a distance that presumably could be longer, should Appellants feel that need or desire as well.  As framed by Appellants, *every* local government has the obligation to accommodate this broad and specific and essentially *unqualified* right in its land use regulations.

On behalf of the nearly 1900 members (combined) of the MML and MTA, *Amici* support the position of Defendant Howell Township that Appellants do not have the categorical right under the Second Amendment to locate their shooting range wherever they want in whatever municipality they want, as they allege.[1]

---

[1] This Brief was written in its entirety by amicus counsel listed below, and no monetary contribution intended to fund the preparation or submission of this brief was made by a party or any other person aside from the amicus parties for whom this brief was written, as identified in the text accompanying this footnote.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

This case is about whether zoning—or maybe any land use regulation at all—is still allowed with respect to firearms after *New York State Rifle & Pistol Ass'n, Inc. v Bruen*, 142 S. Ct. 2111 (2022).  Appellee Howell Township and the Distrct Court believe that it is.  Plaintiffs-Appellants argue that it is not.

That is not an overstatement of Appellants' case.  At the time Appellants filed their currently operative complaint in 2019, the desired land use was pretty clearly just the right to build and operate a long-range (1,000-yard) commercial outdoor shooting range in the Township on land that Oakland Tactical owns that is not zoned for that use.  For various reasons, their position has now morphed to be more generally that the Court should declare a general "right to train" throughout not just Howell Township, but essentially any municipality within the state.  They are asking the Court to find that both are covered activities under the plain text of the right to keep and bear arms in the Second Amendment, satisfying the first prong of *Bruen*.

Moving to the second prong of *Bruen*, Appellants want the Court to say that there were no regulations either specific to its conduct or analagous to zoning recognized at the time of the ratification of the Second Amendment in 1791.  Therefore, they say, as applied to this shooting range use, the Township's zoning ordinance—and potentially the zoning ordinance of every other municipality in the state—is invalid or inapplicable.

The district court resolved the case in the Township's favor at the first prong of *Bruen.* It found that the text "keep and bear arms" did not include the right to build and operate a commercial 1,000-yard outdoor shooting range anywhere somebody wants. On appeal, Appellants rely heavily on language from the line of Second Amendment cases that preceded *Bruen* (and, significantly, that *Bruen* expressly overturned). Those cases had established a *different* two-prong test, a "means-end" analysis that also had a two-part inquiry—but one that was very different from *Bruen's* new test.

The old test asked first whether the regulated person, firearm, or conduct came within the scope of the Second Amendment, and if so the court would evaluate "how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right." *Bruen,* 142 S.Ct. 2111 at 2126. If a law burdened a "core" right, it would be examined under strict scrutiny. *Id*. All other regulations were examined under intermediate scrutiny. *Id*. at 2126-27.

A few cases under that old test cited by Appellants did evaluate whether some things, like the right to train, were incidental to or necessarily implied within the right to keep and bear arms. (Appellants' Brief, Doc. 14, pp. 32-35). The logical and legal problem with Appellants citing those cases now is that rights that are incidental to the keep and bear/possess and carry language, or that have to be implied, are by definition *not* part of the plain text of that language. That's what the

Township argued below, that's what the District Court held, and *Amici* obviously agree with that conclusion.

But A*mici* also suggest that the Court should, as it evaluates Appellants' arguments, be aware that there is also a whole host of practical problems that would necessarily result from finding the first prong of the *Bruen* test to be met in this situation and moving on to the second prong. There were no actual "zoning" regulations in 1791; though a good century old now, zoning is a newer development that attended the growth of the country's population over time. There were of course other laws and regulations that governed the safe use and discharge of firearms in the Founding era. Zoning is just the modern version of those, fashioned to address the increase in the sheer density of people in the country now compared to then— and the correspondingly different manner in which people participate in their local communities.

There were only about 2.5 million people in the entire United States in or around 1791.[2] Some of the states at the time of ratification had far fewer people in the entire land mass of the state than the 600,000 hunters and 327,000 gun owners that live within just the 100-mile radius of the property at issue that Appellants hope to have visit the proposed shooting range. (Compl., R1, Page ID #8, ¶28).

---

[2]    https://www2.census.gov/programs-surveys/sis/resources/fourth-of-july-ff.pdf

That said, however, the real problem for municipalities faced with a finding of either a general right to train or a specific right to an outdoor (or indoor) shooting range is simply not knowing what is specifically allowed and how to regulate it. A 1,000-yard shooting range is over a half-mile long, and some communities in Michigan are literally too small to accommodate that. Other communities are already densely and fully built out. Still other communities could possibly handle smaller ranges—but how small qualifies as acceptable under Appellants' reading of *Bruen's second* prong?

If every community is different, how is any community to know what commercial gun operations it must allow and what it can regulate? Hiring a historian to track down old statutes—aside from being expensive and time-consuming— might not even help local officials know if a 50-yard or 100-yard range must be allowed to locate in a residenatial neighborhood in their town.

Appellants think the answer is simple: *no* regulations are allowed under *Bruen* that relate to or affect the right to train—up to and including and presumably beyond the 1,000-yard shooting range. They argue that there were no such restrictions in 1791 other than (maybe) a general "safety" concept, and thus there can be none now. Of course, the absence of specific historical regulation in the context of commercial shooting ranges should not count for much at all. There are an infinite number of regulations or laws relating to the discharge of firearms (or just firearms generally)

that weren't adopted as of 1791 because, well, there was no *need* to adopt them, given the training opportunities that existed then that did not require paying others to build and provide a facility for someone else's use.

## ARGUMENT

I.   **Under the first prong of *Bruen's* new two-part Second Amendment test, the Court must determine if the Appellants' course of conduct is covered by the plain text of the right to "keep and bear arms." The district court correctly concluded first that proposed course of conduct is to construct and operate a commercial long-range (1,000-yard) outdoor shooting range, and then, as a result, that such conduct is not covered by the plain text of the Amendment.**

*Bruen* held that the plain text of the Second Amendment allowed open carry of firearms in public, and that there were no relevant Founding-era restrictions on that personal and individual right that resembled New York's. When it struck down New York's law, that applied everywhere else, too—whether in the City of Detroit or in the tiny Village of Calumet in the Upper Peninsula.

What Appellants want here is to open a commercial operation and invite the those 600,000 hunters to come and use it, for a fee. Unlike *Bruen's* right of general application to the public, the gun range proposed here cannot be generally replicated everywhere else, physically or practically. Appellants' specific proposed commercial activity is not of similar character to the individual right examined in *Bruen*; it does not make it to the second prong.

5

1. ***Appellants' Complaint makes clear that the "course of conduct" is the construction of a commercial 1,000-yard shooting range—because that's what Oakland Tactical asked the Township to allow.***

Under *Bruen,* to determine whether the Second Amendment's plain text covers an individual's conduct, a court must first identify and delineate the specific "proposed course of conduct" at issue. 142 S. Ct. at 2134.  This Court noted in its August 5, 2022, Opinion (R94, Page ID #2200) that the Appellants have been a little loose in the description of exactly what conduct it is they want to engage in:

> We note that, although Oakland Tactical has alleged the Second Amendment protects the right to train on "outdoor ranges for . . . common firearms" "shotgun and handgun ranges," and, more generally, a shooting range," * * * it most recently framed its proposed course of conduct as the right to train on "outdoor, long distance shooting ranges," . . .

(R94, Page ID #2200.)  On remand, the district court started its Opinion with a determination that ". . . the Court believes the proposed conduct is best summarized as construction and use of 'an outdoor, open air, thousand-[yard] shooting range.'" (R94, Page ID #2200.)

Appellants' Second Amended Complaint (R44, Page ID #1085) could not be clearer:

> ¶ 55 – "Oakland reasonably believes that the Township will enforce the zoning laws against it *if it operates a shooting range on the property. . . .*"
> ¶ 56 – "If allowed to do so under Howell Township Zoning Ordinance, *Oakland would forthwith construct, open, and operate a shooting range* within Howell Township. . . ."

¶ 69 – "In order to make possible the exercise of rights thereunder, the Second Amendment protects *the right of the people*, including Appellant, *to own, construct, and operate a range* for these purposes."

¶ 71 – "But for the shooting range ban and the aforesaid actions of Defendant, Appellant Oakland *would forthwith build, construct, open, offer the use of, and operate the proposed range*, thereby allowing members of the public the use thereof for the purposes described therein."

¶ 73 – "Defendant's actions described herein, by denying approval to build, open, and operate a range have proximately caused Appellant Oakland to suffer *lost profit* and other *monetary damages* and the individual Appellants to suffer damages."

(Emphasis added.)   Under the "Prayer for Relief" section of the Complaint, Appellants ask for a permanent injunction "from enforcing any law against the ordinary *operation and use of shooting ranges open to the public*." (Emphasis added.)

"In our adversarial system of adjudication, we follow the principle of party presentation." *U.S. v Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (finding abuse of discretion on the part of the appellate court interjecting the theory of the case not presented by the parties.) The system "is designed around the premises that [parties represented by competent counsel] know what is best for them, and they're responsible for advancing the facts and argument entitling them to relief." *Id.* (Brackets in original.)  This Court, like the district court, should take Appellants at their word as far as what they intend to do or want the courts to allow and/or enjoin.

The Court should also take the statements in Appellant's Complaint as the description of their proposed course of conduct because, in the end, this is a zoning

case, and the Court ought to be reviewing the arguments that the Appellant made *to the Township* in requesting it to act legislatively by amending its ordinance to accommodate Appellants' precise use.  That's a critical fact to acknowledge: the *only* request actually acted on by the Township was to consider a proposed text amendment to its zoning ordinance. There was no rezoning request, no site plan submitted, no appeal to ar variance from the Zoning Board of Appeals. Just a demand that the Township Board act as a legislative body to pass a law. (See generally, Second Amended Complaint,  R44, Page ID # 1097-1100, ¶46-55).

In asking the Court to use the broader concept of a right to train instead of a right to build and operate and train at a 1,000-yard commercial shooting range, Appellants say that it is improper to focus only on the furthest reach of its proposed shooting range.  That, they argue, ignores the "full spectrum" of the activities proposed to occur at the range, which includes not only long-range training, but also training at shorter distances with handguns, shotguns, etc. (R86, ID #2113; R44, ID #1085-86; Appellants' Br. at 10). According to Appellant, because more traditional close range training will also occur at its range, the Court should apparently concentrate on those portions of the overall activity and review the Township's ordinances for the effect on them.  *Id.*

But that's like saying in a zoning dispute where a denial of a request to build a multiple-family apartment building is being challenged that the court should treat

the proposed development as a single-family development because single families can and will live within the individual units. Or that a sprawling office complex should be reviewed as a small restaurant use, because it includes a cafeteria on the bottom floor of one of its buildings. Appellant Oakland Tactical asked the Township to allow the building and commercial operation of a 1,000-yard shooting range and was denied. *That's* the action the Court is reviewing against Appellants' Second Amendment challenge.

By now arguing for a general right to train, Appellants are distancing themselves a bit from the claims they asserted in 2019—i.e., before *Bruen* was decided and therefore before the focus on the specific "course of conduct" became particularly important to know. So it is supremely ironic that, in that pre-*Bruen* Complaint, one of the reasons that individual Appellant Penrod gave for wanting to come train in Oakland Tactical's proposed commercial 1,000-yard shooting range was his:

> …fears for his family's safety and the safety of their animals due to the sound of uncontrolled shooting occurring on other residents' properties around his property. Mr. Penrod is aware of two horses being hit accidentally by stray bullets in the area and of a man who was hit and killed by a stray bullet from a .22 that traveled across a lake in a state where he lived previously."

(Complaint, ¶ 11, R1, Page ID #1.) Maybe much to Mr. Penrod's chagrin, Appellants are now asserting exactly that kind of "everything, everywhere, all at once" right to train it seems that he was hoping to get away from. The district court

was correct, however, to take the Appellants' claims as actually presented to it, as did the Township before that.

**2.    The Second Amendment's right to "keep and bear" arms does not include the right to build and operate a commercial 1,000-yard shooting range.**

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., Amend. II.  In *District of Columbia v Heller*, 554 U.S. 570, 636 (2008), the Court interpreted the phrase "keep arms" as protecting the possession of a handgun "for self-defense in the home[,]" subject to "long-standing prohibitions on the possession of firearms by felons and the mentally ill . . . ."  To keep and bear arms is, therefore, understood as protecting the right to "carry[] [a weapon] for a particular purpose—confrontation." *Heller*, 554 U.S. at 584. Framed that way, it is clear that the mere fact that an activity involves a firearm does not automatically bring it under the plain text of the Amendment.

*Bruen* was the culmination of efforts by the lower appellate courts to put *Heller's* pronouncements to work in resolving the challenges to all sorts of gun laws that resulted from it. Ultimately, *Bruen* set up a new burden-shifting test, which the Court summed up thusly:

> *When* the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must *then* justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation. (Emphasis added.)

Because it actually creates a presumption if met, the first prong under *Bruen* should be treated as a "real" requirement, to be *affirmatively* met by a plaintiff—not just a given, as Appellants hope to treat it.

In fact, *Bruen* notes at the outset of its discussion that *Heller's* textual approach set up a "test rooted in the Second Amendment's text *as informed by history.*" *Id.* at 2127. That would suggest that someone challenging a regulation actually has to show more than just that their conduct falls into some sort of dictionary meaning of the "keep and bear" text; they should show that the conduct also falls within some historical practice that was widely understood to be a matter of right. Only at that point should the burden then shift to the government to establish the required tradition of regulation of that right.

Engaging in its step one/first prong analysis, the Court in *Bruen* had "little difficulty" concluding that the "plain text" of the Second Amendment protected the course of conduct that the *Bruen* plaintiffs wanted to engage in: carrying handguns for self-defense *in public*. *Id.* at 2134. The Court reasoned that "the term 'bear' naturally encompasses public carry." *Id.* Because "self-defense is 'the *central component* of the [Second Amendment] right itself," and because "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135 (citation omitted). And because

11

the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the Court said that the burden then shifted to the government (step two/second prong) to show that the prohibition was consistent with a nationally accepted tradition of firearm regulation. *Id.* at 2135.

Here, by contrast, the conduct that Appellants want to engage in is not to possess and carry a firearm. The Township's zoning ordinance does not regulate those things. The conduct that Oakland Tactical, in particular, wants to engage in is to build a commercial gun range of epic—or at least highly unusual—proportions in the Township, because, notably, that kind of use is unusual and is not offered anywhere else in the area. That conduct is the use of land; it has nothing to do with the keeping and bearing of arms.

All of the many references in Appellants' Brief to the need to train, the proficiency of early Americans with firearms, and the degree to which they liked to shoot at stuff are no doubt accurate. (Appellants' Brief, Doc.14, pp. 19-20, 24-290). But they present no evidence whatsoever of a broad historical tradition of doing so at a commercial shooting range. It is highly unlikely that in, say, Founding-era Delaware (population roughly 60,000) there would have been a need to have a commercial shooting range of any kind, let alone this kind.[3] And that is why the

---

[3] Plaintiffs' Complaint takes care to note that "there are approximately 327,000 rifle target shooters and 638,000 hunters within a 100 mile radius of the

*exact* course of conduct needs to be determined before the *Bruen* two-prong test can actually work.

Appellants cite Justice Thomas' concurrence in *Luis v United States,* 578 U.S. 5, 26 (2016), for the proposition that "constitutional rights . . . implicitly protect those closely related acts necessary to their exercise," which Justice Thomas specifically said would include the concept of the ability "to acquire and maintain proficiency" in the use of firearms in the context of the Second Amendment. *Id.* They also cite *Ezell v City of Chicago*, 651 F.3d 684, 704 (7th Cir 2011) (the right to arm self-defense "wouldn't mean much without the training and practice that make it effective") and *Drummond v Robinson Township*, 9 F.4th 217, 227 (3rd Cir 2021) (same proposition).

But all these cases predate the *Bruen* test. They all, by definition, acknowledge that the right to train is *not* in the language of keeping and bearing arms, but is an ancillary or incidental right. While that language incorporation by implication might have worked under the old, now discarded "means-end" analysis

_____

property." Second Amended Complaint, ¶ 28, R44, Page ID #1084. 600,000 people is more than the population of all but one of the thirteen ratifying states. (See census link at fn#1, above]. 327,000 people is more than all but six of those states. In fact, Livingston County, where Howell Township is located, contains more people (193,000) now than five of the states that ratified the constitution.
https://www.livgov.com/plan/Documents/Population%20Estimates.pdf

reflected in cases like *Ezell* or *Drummond*, the *Bruen* test *is an entirely new interpretive method*. A complete "reset" of the regulatory concept. There are no "core" versus "ancillary" rights under the Second Amendment analysis anymore. Just a plain-text-then-history test.

*Bruen* acknowledged that *Heller* used a textual analysis that focused on the Second Amendment language's "normal and ordinary meaning" as a guarantee of an individual right to "possess and carry weapons." *Bruen*, 142 S. Ct. at 2127. And *Bruen* itself hammers that home by saying that it is shifting the burden to the government "because the Second Amendment's ***bare text*** covers petitioner's public carry…." *Id*. at 2141. (Emphasis added.) No part of the Second Amendment's "bare text"—the unadorned words of it—covers Appellant's commercial facility.

Appellants' focus on ancillary or incidental things as being within the plain text of the Second Amendment hopes to lead the Court down a rabbit hole. Using their logic, the right to bear arms might also not mean much without the ability to manufacture them. That is not in the "plain text," either, though presumably Appellants would similarly argue the right to build a manufacturing facility on their site as well. And, since most people are not able to build their own firearms, presumably the argument would work for a retail facility as well, as most people are going to have to buy them.

The *Bruen* Court seemed to go out of its way to allay concerns that the effect of its decision would be sweeping. Justice Thomas called laws like New York's "outliers," *Id.*at 2156. Justice Alito pointed out that the historical analysis only went to permitting laws like New York's. *Id.* at 2157. Justice Kavanaugh, joined by Justice Roberts, talked about limits to the Court's opinion and to the Second Amendment itself, and noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions…." *Id.* at 2162.

Appellants are having none of that. Their version of the Second Amendment is as a battering ram that makes an outdoor gun range, where people come from a 100 miles away to pay money to fire bullets at targets more than a half-mile distant, a *prima facie* covered activity that shifts the burden to the Township. Which then must prove a longstanding tradition of protecting residents from flying bullets and noise and commercial gatherings that affect the peace and quiet of a town or neighborhood.

>    3.    *Significant practical issues arise for every local government if the Court holds that the Second Amendment's plain text includes the right to build and operate a commercial 1,000-yard shooting range—or even a general right to train.*

Appellants' position is that a gun range is some sort of super land use that supplants all others. Unregulated and unregulatable. That is not an exaggeration; that is Appellants' second prong analysis: the regulation is "wholly without support in this Nation's history…" (Appellants' Brief, Doc. 14, p. 29.)

15

The district court noted the practical difficulty of Appellants' argument from a *land use* standpoint:

> Moreover, Appellants' position that the "proposed conduct" is "training with firearms" would lead to an absurd result. In any future case, any proposed conduct touching on any type of firearms training would be presumptively protected by the plain text of the Second Amendment. In order to regulate, e.g., the location or restriction of such training if challenged in court, a municipality would be required to reach the second step of the *Bruen* analysis and demonstrate that the regulation is consistent with the nation's historical tradition of firearms regulation. *Bruen* changed the landscape of Second Amendment jurisprudence, but it did not change it that far.

(District Court Opinion, R117, Page ID #2632.)

One problem with Appellants' position is the literal impossibility of locating its use within every municipality in the state—which is, again, essentially what the argument amounts to.  (R44, Page ID #1085, ¶6).  Oakland Tactical has secured a property of 352 acres for its range. That's more than half (0.55) of a square mile.  A distance of 1,000 yards is 3,000 lineal feet, which is a little over half a mile (0.57). Attached as Exhibit 1 to the Amicus Brief filed in the district court below was a list of Michigan's 533 cities and villages maintained by and secured from the MML. (R99-1, Page ID #2316.)  There are communities on that list that are literally too

small to fit Appellants' use from end of gun to target; others possibly could but only if everyone else left town.[4]

If it is in fact a Second Amendment *right* to have an outdoor, 1,000-yard long (or more) shooting range, then it would seem to follow that every community will be subject to it.  If, for example, *Bruen* says that a discretionary "may issue" regulation limiting possession and carrying of handguns in public is invalid in New York City, then it's invalid in the smallest village in Michigan as well.

But how are we to know, if a municipality cannot physically accommodate a 1,000-yard range, whether it needs to allow one of 50 yards, or 100 yards, or 500 yards?  Will hiring a historian even help? Aside from the absurdity of that proposition as relates to this modern-day, invented land use, just think of the cost of having to do that in both time and money.[5]  The Court cannot lightly pass over the

---

[4] The Village of Bear Lake in Manistee County is 0.3 square miles.  The Village of Calumet in Houghton county is 0.2 square miles.  The Village of Beulah in Benzie County is 0.4 square miles.  Many, many other communities in the state are hardly much bigger than that.

[5] The Court may find helpful in this regard the information and declarations filed by the various experts/historians on behalf of the governmental defendant in *Duncan v Bercerra*, 17-cv-1017-BEN-JLB, currently pending on the United States District Court for the Southern Division of California. The amount of time devoted by those experts to the history problem is mind-boggling. The cost is astronomical. (The Court can find those materials assembled at the following link: https://michellawyers.com/duncan-v-becerra/

Appellant's obligation to *first* establish that their conduct is in fact covered by the "bare text" of the Amendment before putting every municipality in that trick box.

Appellants' position essentially requires municipalities to plan their entire community around gun training uses.

MCL 125.3833 requires a master plan to include, among other things:

(a) …a classification and allocation of land for agriculture, residences, commerce, industry, recreation, ways and grounds….
***
(d) . . . a zoning plan for various zoning districts controlling the height, area, bulk, location, and use of buildings and premises. The zoning plan shall include an explanation of how the land use categories on the future land use map relate to the districts on the zoning map.

If locational requirements do not apply to gun range uses, a municipality cannot by definition plan their location. But nor can it confidently plan the location of *any other kind of use* that might be affected by, say, an open air gun range: childcare centers, schools, churches, residential subdivisions, and the like.

The same is true—perhaps to a greater extent—when it comes to actually drafting zoning regulations. How does a municipality craft a zoning ordinance if there is a use—potentially dangerous, potentially noisy, potentially not a good neighbor—that is simply unregulatable as Appellants claim, and can go anywhere?

Local legislative action establishing and amending zoning use districts and related rules is at the very heart of nearly every municipality's efforts to protect the safety and quality of life of its residents. As Justice Marshall observed in his dissent

in *Village of Belle Terre v Boraas*, 416 U.S. 1, 13 (1974), with regard to the zoning power:

> It may indeed be the most essential function performed by local government, for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life.

The landmark zoning case decided by the Supreme Court of the United States in 1926, *Village of Euclid v Amber Realty Co.,* 272 U.S. 365 (1926), very decisively concluded that zoning is a valid exercise of power, not only to protect the community from nuisance conditions, but also to make the community a better place to live. In other words, zoning is a valid and needed exercise of power to both protect the community from harm and promote quality of life.

Under Appellants' formulation, even if each municipality hires a historian to help it navigate Founding-era land use (or analogous) regulations, it really would never know what it can and can't do in a zoning ordinance with respect to these significant land uses—unless and until it gets sued and secures a court's pronouncement under the second part of *Bruen*.

The Township has challenged Appellants' standing to bring their claims, particularly under a theory of a general right to train (since the zoning ordinance does not ban or limit that right at all). *Amici* certainly support that argument, but also note that, if such a broad right is declared and the Court determines that Oakland Tactical in particular can proceed with its claim, there is a significant exposure to

communities all over the state to lawsuits from landowners who might feel that they, too, do not have a convenient enough location to train. Those landowners could point to a specific regulation in the community that might—or might not—actually be the cause of the impairment of that right, and the municipality would then have the burden to defend its specific regulations in relation as to that property.

Countless local regulations could be challenged—in some instances, like this one, by people who do not even live in the affected community. While Appellants might be happy to see municipalities walk away from regulating this conduct, given the costs in time and money to defend those regulations, most residents and businesses affected surely would not.

> **4.      The trial court's decision is not impractical. Claims like Appellants' relating to limitations on training facilities can be addressed in the usual way—as zoning land use claims.**

The regulations in the Township's zoning ordinance are not aimed at the Second Amendment. In fact, the Township's zoning regulations actually *accommodate* and maybe even *encourage* training with firearms, as there are places expressly provided for within the Township for both indoor and outdoor shooting ranges. As the Township's Brief notes, some 30% of Township land is available for this kind of use. (Appellees' Brief, Doc. 19, p. 12).

That makes this case substantially different from the *Ezell* case above, in which the plaintiff alleged that the areas authorized for training were so negligible

as to not truly be available. *Ezell, supra,* 651 F.3d at 704. Here, what prompted Appellants' challenge was a one-time decision not to amend a zoning ordinance—that is, not to engage in a *legislative* act—to add a new commercial land use.

In fact, Appellants have not demonstrated or even tried to explain that their preferred range could not be constructed somewhere else in the Township. There is, then, realistically no burden on either the "core" rights in the Township's ordinance or any ancillary/incidental/implied right to train. But unfortunately, that does not help Appellants make money—hence the framing of their Complaint in 2019 as a right to build and operate the proposed commercial facility.

Appellants note several times that the act of training with a firearm would be permitted on a *non*-commercial basis on this very property. But that does not actually help Appellants' case. That argument concedes, specifically, that the *training itself* is not regulated—just the commercial aspect of it. The argument also asks the Court to ignore the reality of how a large-scale commercial endeavor might be expected to have some different rules apply to it, even if it involves activity that is not regulated when engaged in by an individual. There is a difference between an individual property owner occasionally using their property for training and an every-day, for-profit use by dozens or maybe hundreds of people. Distinguishing between such kinds of uses in other contexts has been recognized in scores of federal land use cases.

The most basic formulation of Appellants' case is that the training they want to do is with arms protected by the Second Amendment, and that Amendment also protects "conduct that makes the effective exercise of those rights possible." (Appellants' Brief, Doc. 14, p. 19) Essentially, that the rifles and handguns and shotguns are all legal to possess and carry, and that because that is true, it *necessarily follows* that training with them is protected as well. (*Id.*)

In their second prong analysis, however, Appellants do nod to the idea that a general right to train might be subject to some basic safety requirements. That also does not help their case. If, as Appellant argues, there are no second prong analogous regulations from 1791 to help guide a decision in this case, how would a community ever know when something is "safe"? It sounds that from Appellants' perspective as though everyone would have to just know it when they see it.

But what about all the other things besides location that are necessary to undertake training at a facility like a shooting range?  Does the property owner get to undertake other improvements to make the land use safe? Can they build walls around a property to contain bullets? Is that construction subject to *any* sort of municipal review? Are setback requirements permitted?  Noise limits? Lighting for nighttime exercises? Can the municipality require bathroom facilities for public health and safety?  A minimum number of parking spaces?  Appellants thinks those

concerns are relevant only in the context of the *second* prong of *Bruen*. But the district court recognized, as does the Township, that they really go to the *first* prong.

Once Appellants concede that there is indeed a concept of safety built into the general right to train, that takes the concept out of the plain text portion of the *Bruen* test.  Because presumably every community—given their different sizes and population densities and existing land use patterns—would need to address safety differently, too.  If each community then has the ability to treat training differently on the basis of "safety," how does the review of those determination realistically differ from the typical zoning case?

And once it is conceded that the Second Amendment right might apply differently in different communities or even on different properties, then that involves discussion of what is reasonable in a *particular* community.  Which sounds an awful lot like a typical dispute about whether a particular zoning ordinance or zoning ordinance provision is reasonable as applied to a particular property in a particular community.  These are the kinds of things Appellants would be expected to argue in some sort of takings or due process claim in a land use case.

## <u>CONCLUSION</u>

Municipalities in Michigan are used to dealing with and honoring significant constitutional rights as they go about providing for the safety, health and welfare of their communities.  In the First Amendment context, for example, they understand

the extra scrutiny that a zoning or land use decision with respect to, say, a request to approve a mega-church will get from a court in light of the constitutional right to the free exercise of religion. And that a decision to review locating a newspaper printing and distribution center might get under the right to a free press. At the same time, though, few would argue that those reviews cannot be made at all because of the mere existence of those constitutional concepts.

*Bruen* did away with heightened scrutiny for reviewing decisions or regulations relating to the right to keep and bear arms, in favor of the plain-text-then-history formulation. Among the consequences of that is the need for courts to pay particular attention now to the first part of *Bruen's* inquirty: is the specific course of conduct in fact covered by the text? In practice, that general inquiry might not have been quite as searching under the old test; but it is crucial now, given the difficulties and costs that litigating the second prong of *Bruen* places on local governments, and the potential consequences of improperly doing so.

The plain text of the Second Amendment talks about keeping and bearing arms—possessing and carrying them. It says nothing about the rules for discharging those arms at all, let alone the construction, operation, or location of any shooting range (indoor or outdoor) in a particular location or jurisdiction. It says nothing about establishing a whole new commercial land use for training with long guns outdoors

at targets more than a half a mile away, let alone requiring every municipality to set aside land for that use on the off chance Oakland Tactical decides to move there.

This Court should find that neither the right to train generally or the right to build and operate a commercial shooting range are covered by the plain text of the Second Amendment.  This is not a Second Amendment case.  This is a commercial land use case.

ROSATI SCHULTZ JOPPICH
& AMTSBUECHLER PC

/s/ THOMAS R. SCHULTZ
THOMAS R. SCHULTZ (P42111)
Attorneys for Amici Curiae
27555 Executive Drive, Suite 250
Farmington Hills, MI  48331-3550
(248) 489-4100

## STATEMENT REGARDING WORD COMPLIANCE

I hereby certify that the foregoing Brief complies with the requirements of Federal Rule of Appellate Procedure 32(a), in that it is prepared in 14-point Times New Roman font, a proportionately spaced typeface and contains 6,377 words (exclusive of items listed in rule 32(f)) as measured by Microsoft Word.

/s/ THOMAS R. SCHULTZ (P42111)
Attorney for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2023, I electronically filed the foregoing paper with the Clerk of the Court using the Court's e-filing system which will send notification of such filing to all counsel of record.

s/ Paula M. Rosenthal